## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

ANTONIO GALLEGOS, KRISTIAN PETTINE,
ANDRE GALLEGOS, and K. L. P. L., a minor child,

        Plaintiffs,

vs.                         Case No. 1:12-CV-224-LH/KBM

CITY OF ESPAÑOLA, et al.,

        Defendants.

## PLAINTIFFS', ANTONIO GALLEGOS, KRISTIAN PETTINE AND ANDRE GALLEGOS, MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT

COME NOW, the Plaintiffs, Antonio Gallegos, Kristian Pettine and Andre Gallegos, by and through their attorney, New Mexico Firm, L.L.C. [Nathaniel V. Thompkins], and pursuant to Fed.R.Civ.P., Rule 56 and D.N.M.LR-CIV. 56, state the following for their Partial Motion for Summary Judgment on 42 U.S.C.A. § 1983, against the individual Defendants, Jeremy Apodaca and Robert Vigil, involving False Arrest, False Imprisonment and Excessive Force and Memorandum in Support:[1]

## INTRODUCTION

On the morning of July 31, 2010, Plaintiffs were at their home/business[2] getting ready for their Saturday. The business is located at 1201 North Paseo De Onate.  Defendants Jeremy Apodaca (hereinafter "Apodaca") and Defendant Robert Vigil (hereinafter "Vigil"), were

---

[1]As allowed by D.N.M.LR-Civ. 7.7, Plaintiffs have combined this Motion with a Memorandum in support thereof. As required by D.N.M.LR-Civ. 7.1(a), Plaintiffs conferred telephonically with Defendants' counsel on August 12, 2013 to determine whether Defendants' concurred with or opposed this motion. Defendants' counsel opposes the instant motion.

[2] Mr. Gallegos' business, American Spirit Homes, Inc., sells Mobile Homes.  The business office is inside a Mobile Home which they use both as a residence and business.

dispatched to the business location as a result of a 911 "Assault" call placed by Alfonso Gurule. Defendant Apodaca, on his way to the incident location, was advised by dispatch that the suspect, "Estevan", had left the business location and was walking south towards New Mexico Community College and he had a black in color handgun. [Exhibit A, Incident Report, pg.1; and Exhibit J, Jeremy Apodaca Deposition[3], pg.56, lns.4-7; and lns.21-25].

Antonio Gallegos (hereinafter "Mr. Gallegos") was at home when he saw the Defendant Officer Robert Vigil (hereinafter "Vigil"), outside of his business office. [Exhibit B, Antonio Gallegos, Depo., pg.17, lns.18-23 and pgs.20-1, lns.16-4].   Mr. Gallegos thought Defendant Vigil might be a customer [*Id.,* pg.20, lns. 14-5] so he went outside and asked Defendant Vigil if he could help him. [*Id.*, pg.21, ln.17].  Defendant Vigil advised Mr. Gallegos that "there was a 911 call" and "… somebody had pulled a gun on somebody else." [*Id.,* pg.21-2, lns.24-1].   Mr. Gallegos advised Defendant Vigil that he didn't know anything about the 911 call. [*Id.*, pg.22, lns.3-4]. Further, after a considerable period of time, Mr. Gallegos advised both Defendant Vigil and Defendant Apodaca that "I didn't know of any phone call or any gun or anything that he (Alfonso Gurule) was talking about."  [*Id.,* pg.23-4, lns. 13-9; and lns.9-11].

Mr. Gallegos questioned Mr. Gurule and asked whether he saw Estevan with gun. [*Id.,* pg.24, lns.10-11].  Mr. Gurule responded, "no, I don't know". [*Id.* pg.26, lns.8-13]. Mr. Gallegos then said to Defendant Vigil, "… obviously there is not anything going on here. Somebody made a call saying there was a gun and now he (Alfonso Gurule) is saying no, and he doesn't know." [*Id.*, pg.26, lns.15-18].  Mr. Gallegos, not being suspected of having committed any crime stated, "[s]o there's nothing here, there is no reason for you to stay here. … I have to go to work, I have to take care of my business, and I appreciate if you guys just left."  [*Id.,* pg.34, lns.3-8].  After

---

[3] Depositions after the initial references shall be cited by the Exhibit number followed by the initials,  for example, "JA" for Jeremy Apodaca followed by the page reference "pg." and lines "lns.".  Antonio Gallegos and Andre Gallegos shall be cited by their first name then page and lines.

this statement was made by Antonio, Defendant Vigil became "got combative … raised his voice … got in my face … told me no, we are not – we are not going anywhere." [*Id.*, pg.34, lns.10-12].

As Mr. Gallegos "started up the stairs" to his home, "Officer Vigil ran up, he ran up behind me, said stop, stop, you can't – you can't – he told me to stop ... *So I stopped at the top of the stairs* …". [*Id.*, pg.36, lns.4-7]. Defendant Vigil then "grabbed my arm and he cuffed my arm. And then he was going to get this other arm he grabbed my head and started to force my head into the wall… then Officer Apodaca ran up at the same time and used a Taser on my neck". [*Id.*, pg.36, lns.8-13].

As Mr. Gallegos was being accosted by the Defendants, his wife, Mrs. Kristian Pettine (hereinafter "Mrs. Pettine") and his son Andre Gallegos (hereinafter "Andre") were both inside their home. [See Exhibit C, Kristian Pettine Depo., pg.33, lns.22-5; and Antonio Depo., pg.23-4, lns.11-5 and pg.34, lns.21-22]. Kristina was getting ready to take a shower with her two year old daughter. [Exhibit C, KP, pg.35, lns.3-6]. Mrs. Pettine then suddenly heard screaming, coming from the direction of the living-room. [*Id.*, pgs.35-6, lns.8-3]. When she walked into the living-room she saw her husband (Antonio) "on the ground getting tased". [*Id.*, pg.36, lns.10-16].

Andre Gallegos is Antonio Gallegos' natural son and Kristian Pettine's step-son. On July 31, 2010, the date of the incident, Andre was seventeen (17) years old and was only four (4) days away from his eighteenth (18th) birthday. [See Exhibit D, Andre, pgs.50-1, lns.24-6]. While inside the home, Andre went to the lobby and he witnessed Defendants Vigil and Apodaca following his dad towards the house. Andre witnessed the two Defendants attack his father and push him against a concrete wall. [*Id.*, pg.16, lns.1-4]. As the Defendant Vigil pushed Atonio's face against the concrete wall, Defendant Apodaca reached over and applied his Taser to

Antonio's neck. [*Id.*, pg.16, lns.8-11].  As his father and Defendant Vigil went towards the steps and a cement slab in front of the home, Defendant Apodaca Tased his father again on the left side. [*Id.*, pg.17, lns.5-10].   After Defendant Vigil handcuffed his father other arm and Antonio was lying face down on the ground and not resisting, Defendant Apodaca applied his Taser a third time and to the middle of Antonio's back. [*Id.*, pg.17, lns.10-18].

Immediately following the third (3rd) application of the Taser, Andre exited the house and shouted "stop tasing my dad". [*Id.*, pg.18, lns.3-5].  Defendant Apodaca responded by running "up the stairs, and he put the Taser to my face and told me – he cursed at me.  'You shut the Fuck up, and you get against the wall,' put my hands up.  And I asked, 'Why am I being arrested" What did I do? Defendant Apodaca stated "shut up" and he put "… my hand against the wall, hands up. … then he patted me down and arrested me." [*Id.*,pgs.17-8, lns.18-11].

Following Andre's arrest, Defendant Apodaca approached Mrs. Pettine and began screaming at her, "where is Estevan?" [Exhibit C, KP, pg.42, lns.16-20].  Defendant Apodaca did not ask Mrs. Pettine about any other family members. [*Id.,* pg.48, lns.11-15].  When the Defendant Apodaca asked about the minor child's father, Steven Marquez, a witness responded, "please don't call him because he is very abusive."  This prompted the victim (Alfonso Gurule) to state, leave her (Kristian) out of this, she had nothing to do with any of this. [*Id.*, pgs.48-9, lns.16-3].

Shortly thereafter the Defendant Vigil, without a warrant, entered the home of the Plaintiffs and grabbed the minor child.  Mrs. Pettine then immediately went and took the child from Defendant Vigil.  Later, Defendant Vigil then came up to Mrs. Pettine and insisted that she give him her daughter or he would mace her face. [*Id.*, pgs.49-50, lns.19-9].  When Mrs. Pettine stated that she did not want to give her child to the Defendant Vigil, he then "clawed" the minor

child off of Mrs. Pettine, who at this time was crying and felt like she couldn't breathe." [*Id.* pg.50, lns.4-20].  When Mrs. Pettine ran after the minor child, Defendant Vigil arrested her and while placing her in the police car, he kicked her in the legs. [*Id.* pgs.50-51, lns.19-18]. Defendant Vigil then laughed and exclaimed, "there goes your baby." [*Id.*, pg.52, lns.2-3].

## LEGAL STANDARD

Summary judgment is appropriate if "the record contains no evidence of a genuine issue of material fact and demonstrates that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 247 (1986). Although the Court must view the evidence and draws all inferences in the light most favorable to the party opposing summary judgment, that party still "must identify sufficient evidence which would require submission of the case to a jury." *Mares v. ConAgra Poultry Co.*, 971 F.2d 492, 494 (10th Cir. 1992).

Qualified immunity shields federal and state officials from money damages <u>unless</u> a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080, 179 L. Ed. 2d 1149 (2011).

A Government official's conduct violates clearly established law when, at the time of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear" that every "reasonable official would have understood that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate. *Ashcroft,* 131 S. Ct. at 2083.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." An arrest, of course,

qualifies as a "seizure" of a "person" under this provision, *Dunaway v. New York*, 442 U.S. 200, 207–208, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), and so must be reasonable under the circumstances. *Ashcroft,* 131 S. Ct. at 2080.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.     On July 31, 2010, Defendant Jeremy Apodaca ("Apodaca") was dispatched to Plaintiffs' home located at 1201 A North Paseo De Onate in reference to a 911 call regarding aggravated assault. [Exhibit A, pg.1, ¶ 1; and Exhibit J, Jeremy Apodaca Deposition, pg.55, lns.16-20].

2.     Defendant Apodaca was informed by dispatch that the suspect "at that point in time had walked towards the Northern New Mexico Community College" or, in other words, had left the scene of the alleged incident. [Exhibit J, JA, pgs.55-6, lns.21-3].

3.     Defendant Apodaca was also advised by dispatch that the suspect had left the scene with a "black in color handgun" or "pistol". [Exhibit J, JA, pg.56, lns.4-7; and lns.21-25].

4.     Defendant Apodaca and Defendant Robert Vigil ("Vigil") conducted an investigation of the 911 call and questioned Antonio Gallegos, Kristian Pettine and the victim, Alfonso Gurule, for close to one hour. [Exhibit J, JA, pg.55, lns.9-15; and Exhibit K, Robert Vigil Deposition, pg.109, lns.3-25].

5.     Defendant Apodaca, after questioning the alleged victim, Alfonso Gurule, had the following information: (1) name of the suspect, "Estevan"; (2) a description of the suspect; (3) the direction that the suspect left the scene in; and (4) the fact that the suspect was carrying a black in color hand gun.  After receiving this information, the Defendant Apodaca and Defendant Vigil did nothing further to attempt to locate the suspect, Estevan. [Exhibit J, JA, pgs.59-60, lns.24-16; lns.17-21 and pg.61-2, lns.24-3].

6.      The suspect, identified as "Estevan", was not Mr. Gallegos, Mrs. Pettine or Andre Gallegos. [Exhibit A, pg.1, ¶ 1].

7.      Defendant Vigil and Defendant Apodaca had no information that indicated that either Mr. Gallegos or Mrs. Pettine was suspected of pointing a gun at the victim Alfonso Gurule.  [Exhibit K, RV, pg.104, lns.6-21; and Exhibit J, JA, pgs.58-9, lns.20-14].

8.      Defendant Apodaca had a concern that Estevan had left the scene and was walking around with a hand gun. [Exhibit J, JA, pg.59, lns.7-14].

9.      Defendant Apodaca, despite "standard operating procedures", did not "document the description of the alleged suspect" Estevan.  [Exhibit J, JA, pgs.60-61, lns.22-4].

10.     Defendant Apodaca did not: (1) immediately give dispatch a description of the suspect as is the standard operating procedure; (2) communicate with dispatch immediately after he got a description of the suspect, because the suspect could still be in the area; and (3) did not complete a "separate gun incident report" about the incident that he was investigating and involving a black in color hand gun. [Exhibit J, JA, pg.62, lns.2-20].

11.     The description of the suspect given by the victim Alfonso Gurule did not match either Mr. Gallegos or Mrs. Pettine. [Exhibit J, JA, pg.74, lns.4-7].

12.     Defendant Apodaca after speaking with the victim, Alfonso Gurule, stopped investigating the aggravated assault 911 call and began focusing on Mr. Gallegos and Mrs. Pettine. [Exhibit J, JA, pg.61, lns.9-13].

13.     During the course of Defendant Apodaca's investigation, he ordered Mr. Gallegos to "stand there by my police car." [Exhibit J, JA, pg.70-1, lns.24-2].

14.     Defendant Apodaca after arriving at the scene only observed the minor child for less than a "couple of minutes".  [Exhibit J, JA, pg.66, lns.9-20].

15.     Defendant Apodaca, during his investigation, observed Ms. Pettine walking around holding the minor child and placing her (the minor child) down.  [Exhibit J, JA, pg.68, lns.2-11].

16.     During Defendant Apodaca's investigation the minor child "wasn't exposed to any danger …". [Exhibit J, JA, pg.68, lns.17, 24].

17.     After an approximate hour of investigation and when Mr. Gallegos decided to walk into his home, Defendant Apodaca and Defendant Vigil both ran after Mr. Gallegos and yelled at him to stop, thereby placing him under arrest. [Exhibit J, JA, pg.69, lns.4-19; and Exhibit K, RV, pg.116, lns.14-23].

18.     Defendant Vigil physically placed himself in front of Mr. Gallegos and prevented him from entering his home. [Exhibit K, RV, pg.115, lns.2-12; and pg.116, lns.14-16]. Defendant Vigil testified that, "I got in front of Mr. Gallegos and I stopped him. I told him you can't go back in." [Exhibit K, RV, pg.115, lns.2-7].

19.     Defendant Vigil "went after him (Mr. Gallegos) … physically detained …" Mr. Gallegos and "took him to the ground." [Exhibit E, pg.1, ¶ 4].

20.     Mr. Gallegos understood, at the moment when Defendant Apodaca and Defendant Vigil, yelled, ran after him, yelled at him to stop and physically prevented him from going into his home, he was under arrest and not free to leave.   [Exhibit E, pg.1, ¶4 and Exhibit J, JA, pg.70, lns.1-2].

21.     Defendant Apodaca used his Taser on Mr. Gallegos three (3) times.  The first Taser application was to the neck. [Exhibit D, Andre, pg.16, lns.8-13; and Exhibit B, Antonio, pg.36, lns.4-16 and pg.37, lns.21-23]. The second Taser application  was to Mr. Gallegos' side. [Exhibit B, Antonio, pg.37, lns.17-20 and lns.21-23; and Exhibit D, Andre, pg.17, lns.5-8].

Finally, the third Taser application was in the middle of Mr. Gallegos' back, after he had been handcuffed and was lying face down on the ground. [Exhibit D, Andre, pg.17, lns.10-16; and Exhibit B, Antonio, pg.38, lns.12-20].

22.    At the time that the Defendant Vigil and Defendant Apodaca arrested Mr. Gallegos, they had no information that Mr. Gallegos was engaged in any criminal activity or had committed a crime or was about to commit a crime. [Exhibit K, RV, pg.115-6, lns.13-10; and Exhibit J, JA, pg.70, lns.317].

23.    Defendant Vigil had no information that Mr. Gallegos was a suspect in the alleged aggravated assault incident which he was investigating. [Exhibit K, RV, pg. 108, lns.3-23].

24.    Defendant Apodaca had no information that Mr. Gallegos was a suspect involved in the aggravated assault call which he was investigating. [Exhibit J, JA, pg.58-9, lns.24-10 and pg.61-2, lns.24-3].

25.    Defendant Apodaca had no information that an unidentified weapon in the home was involved in the aggravated assault call to which he was investigating or that the weapon posed any danger to anyone. [Exhibit J, JA, pg.71, lns.11-21; pg.72, lns.3-13].

26.    The information that Defendants, Apodaca and Vigil, had was that "… a weapon was believed to be somewhere on *the premises of the vehicle*." [Exhibit E, pg.1, ¶ 5 and Exhibit J, JA, pgs.72-3, lns.14-17].

27.    Defendant Apodaca arrested Mr. Gallegos and charged him with (1) Battery upon a Peace Officer and (2) Resisting, Evading, or Obstructing an Officer. [Exhibit J, JA, pg.70, lns.19-22].

28.    Defendant Apodaca made the decision to arrest Mrs. Pettine for Resisting, Evading or Obstructing an Officer. [Exhibit J, JA, pg.74, lns.10-15].

29.     Defendant Apodaca testified at the Custody Hearing that Mrs. Pettine was arrested because, "[s]he was arrested due to the fact, for one, that she was intoxicated, and also for the intoxication part, we didn't want to leave her at the scene or on her own just in case she got hurt, we didn't want her to get hurt …".  [Exhibit G, Hearing Transcript pg.35, lns.1-9; and pg.36, lns.6-13; and Exhibit J, JA, pgs.97-8, lns.7-12]. Defendant Apodaca never criminally charged Mrs. Pettine for being intoxicated. [Exhibit M, pg.1].

30.     Defendant Apodaca allegedly arrested Ms. Pettine because "… she wouldn't give me any information as far as anybody that would possibly be able to take the child." [Exhibit J, JA, pg.75, lns.4-11].  Second, Ms. Pettine was arrested because she "… *was almost* provoking him (Antonio Gallegos) in a sense, to – which causing him to react in a negative way and be more combative." [*Id.,* pg.75, lns.12-15].

31.     Defendant Apodaca did not document what Mrs. Pettine was alleged to have said that allegedly provoked Mr. Gallegos.  Defendant Apodaca's testimony was that he could not recall "specifically" what Mrs. Pettine said. [Exhibit J, JA,, pg.75, lns.12-23].

32.     Defendant Apodaca in his "*Statement of Probable Cause*" for the Criminal Complaint against Mrs. Pettine wrote: "I asked Mrs. Pettine who was the child's parents? And she told me the child was her daughter." [Exhibit F, pg.1, ¶ 2].  "I asked Mrs. Pettine where her daughter's father was and she told me he was somewhere in Albuquerque, and very abusive." I asked Mrs. Pettine if there was anyone else in the home in an attempt to find someone suitable to take care of the baby as [name omitted] and two years of age, at which point two other males walked out of the home."  [Exhibit F, pg.1-2, ¶ 2].  The Criminal Complaint does not state that Mrs. Pettine resisted arrest or used "fighting words".

33.     While Defendant Apodaca was conducting his investigation, the minor child (name omitted) was not "… exposed to any danger …". [Exhibit G, Custody Trial Transcript, pg.33, lns.11-16].

34.     Defendant Apodaca arrested seventeen (17) year old, Plaintiff Andre Gallegos, placed him in handcuffs, placed him in a police car and Booked him at the Espanola Adult Detention Facility with instructions to "Hold". [Exhibit J, JA, pg.44, lns.18-23; pg.45-6, lns.8-5].

35.     Defendant Apodaca was advised that Andre Gallegos "… did not score high enough on the JPO points system for obstruction charges …". Despite this information, he arrested Andre Gallegos without probable cause. [Exhibit H, pg.1, ¶ 1].

36.     Andre Gallegos was taken to the Espanola Adult Detention facility and "Booked". [Exhibit J, JA, pg.42, lns.3-25].  Defendant Apodaca completed the booking form and instructed the Espanola Detention Center to "Hold" Andre. [Exhibit I, pg.1, "Bond"].

37.     Defendant Apodaca, in his Supplemental Report, falsely stated that "It should be noted that Andre was never placed under arrest …".  [Exhibit H, last sentence].

## **LEGAL ARGUMENT**

### **A.  DEFENDANTS, HAD NO BASIS TO DETAIN ANTONIO GALLEGOS AND NO PROBABLE CAUSE TO ARREST HIM AND FALSELY ARRESTED HIM.**

A Fourth Amendment seizure occurs where there is a governmental termination of freedom of movement through means intentionally applied. *Scott v. Harris,* 550 U.S. 372, 127 S. Ct. 1769, 1774, 1776 L. Ed. 2d 1769 (2007). "A seizure occurs when a reasonable person would not feel free to leave or disregard the contact." *United States v. Salas–Garcia*, 698 F.3d 1242, 1248 (10th Cir.2012).  In the *United States v. Davis*, 94 F.3d 1465, 1467-68 (10th Cir. 1996) the Court held:

"(2) *__investigative detentions__* which are Fourth Amendment seizures of limited scope and duration and *__must be supported by a reasonable suspicion of criminal activity__*, see, e.g., *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989); *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968); and (3) *__arrests__*, the most intrusive of Fourth Amendment seizures and *__reasonable only if supported by probable cause__*. See, e.g., *Hayes v. Florida*, 470 U.S. 811, 815–16, 105 S.Ct. 1643, 1646–47, 84 L.Ed.2d 705 (1985); *Dunaway v. New York*, 442 U.S. 200, 212–16, 99 S.Ct. 2248, 2256–59, 60 L.Ed.2d 824 (1979)." (Emphasis ours)

To succeed on a § 1983 claim alleging *false arrest*, the plaintiff must show that the police lacked probable cause to arrest him. *Mucha v. Village of Oak Brook*, 650 F.3d 1053, 1056 (7th Cir. 2011). A basic element for a *false imprisonment claim*, is the plaintiff must be confined or restrained in some way by the Defendant. *Mendoza v. K-Mart, Inc.*, 587 F.2d 1052, 1058 (10th Cir. 1978). Restraint constituting false imprisonment "may arise out of words, acts, gestures or similar means which induces reasonable apprehension that force will be used of the plaintiff does not submit and it is sufficient if they operate upon the will of the person threatened and result in a reasonable fear of personal difficulty or personal injury." *Mendoza*, 587 F.2d at 1058, citing Restatement Second, Torts § 37. To succeed on a false imprisonment claim the restraint need only be for a brief period of time. *Fuerschbach v. Sw. Airlines Co*., 439 F.3d 1197, 1207 (10th Cir. 2006). Plaintiffs each of them will demonstrate that they were all falsely arrested and falsely imprisoned in violation of their Fourth Amendment constitutional rights.

"A seizure by means of an investigative detention 'is constitutional only if supported by a reasonable and articulable suspicion that *the person seized is engaged in criminal activity*.' " *Lambert*, 46 F.3d at 1069 (quoting *United States v. Ward*, 961 F.2d 1526, 1529 (10th Cir.1992) (quoting *Reid v. Georgia*, 448 U.S. 438, 440, 100 S.Ct. 2752, 2753, 65 L.Ed.2d 890 (1980) (per curiam))). An officer who "stops" and briefly detains a person for questioning "*must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion*." *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20

L.Ed.2d 889 (1968). An investigative *does demand "something more than an inchoate and unparticularized suspicion or 'hunch*.' " *United States v. Melendez–Garcia*, 28 F.3d 1046, 1051 (10th Cir.1994) (internal quotation marks omitted). *United States v. Davis*, 94 F.3d 1465, 1468 (10th Cir. 1996).

The encounter between Defendant Apodaca, Defendant Vigil and Mr. Gallegos while might be initially an investigative detention, immediately turned into an arrest when Defendant Apodaca ordered Mr. Gallegos to "… stand there by my police car" without the freedom to leave or disregard the contact. [JA, pg.70-1, lns.24-2]. As held in *Iacobucci v. Boulter*, 193 F.3d 14, 25 (1st Cir. 1999), "[a] police officer is not a law unto himself; he cannot give an order that has no colorable legal basis and then arrest a person who defies it." *Id.* So it is in the instant case: Mr. Gallegos was not engaged in any criminal activity and the Defendants had no lawful basis or authority to detain him and to take away his ability to leave or disregard the contact.

In *Walker v. City of Orem*, 451 F.3d 1139, 1147 (10th Cir. 2006) the Court held that detention of a potential witness to a crime must satisfy the Fourth Amendment's reasonableness requirement. *Id.* at 1147. While there is nothing in the Constitution that prevents a police officer from addressing questions to anyone on the streets, absent special circumstances, *the person approached may not be detained* or frisked, but *may refuse to cooperate and go on his way. Id.* Police have less authority to detain those who have witnessed a crime for investigatory purposes than to detain criminal suspects. *Id.*

Defendant Apodaca and Defendant Vigil made it clear to Mr. Gallegos that he was not free to leave and disregard the contact that they made with him. In point of fact, when Mr. Gallegos said he was going back to work and started walking to his office, Defendant Vigil and Defendant Apodaca used verbal commands, as well as, force in the use of hand techniques,

handcuffs and a Taser before placing him in the back of a police car. [Exhibit K, RV, pg.115, lns.2-12; and pg.116, lns.14-16; and Exhibit B, Antonio, pg.35, lns.15-25; and pg.38, lns.12-20]. Quoting *Terry v. Ohio,* the 10th Circuit held in *Walker v. City of Orem*, 451 F.3d 1139, 1147 (10th Cir. 2006) "[i]t must be recognized that *whenever a police officer accosts an individual and restrains his freedom to walk away, he has "seized" that person*."

An arrest, being the most intrusive Fourth Amendment seizure, is reasonable only if supported by probable cause. *Davis*, 94 F.3d at 1467-68. It has long been recognized that probable cause requires more than a mere suspicion of criminal activity. *Sherouse v. Ratcher*, 573 F.3d 1055, 1062 (10th Cir. 2009). An arrest is distinguished by the involuntary, highly intrusive nature of the encounter. *Manzanares v. Higdon*, 575 F.3d 1135, 1148 (10th Cir. 2009). The use of firearms, *handcuffs, and other forcible techniques* generally exceed the scope of an investigative detention and enter the realm of an arrest. *Id.* The 10th Circuit noted in *Manzanares* that police have less authority to detain suspects who have witnessed a crime for investigative purposes than to detain criminal suspects. *Id.* at 1149. In *Manzanares* the Court held that a police officer's refusal to exit the home of a suspect's co-worker after the co-worker revoked his consent to enter constituted a violation of the co-worker's clearly established Fourth Amendment rights due to lack of probable cause. The Court held that the police officer investigating a rape *lacked probable cause* to believe that the suspect's co-worker had *resisted, evaded, obstructed, or refused to obey the officer*, under New Mexico law as was required for detention of the co-worker after revoked his consent for the officer to enter the home. *Id.* at 1146-47] (Italics ours). In the instant case, Defendant Apodaca and Defendant Vigil had no probable cause supporting their arrest of Mr. Gallegos. Therefore Mr. Gallego's arrest violated his clearly established Fourth Amendment rights.

     **i.**    **ANTONIO GALLEGOS IS ENTITLED TO**
                  **JUDGMENT AS A MATTER OF LAW.**

In *Keylon v. City of Albuquerque*, 535 F.3d 1210, 1217 (10th Cir. 2008) the police arrested Ms. Keylon and charged her with "resisting, evading or obstructing an officer". The basis for the arrest involved the police being called and dispatched to Ms. Keylon's home because of a tow-truck driver's complaint that his truck was damaged when someone drove a vehicle off of it. *Id.* 535 F.3d at 1213. The tow-truck driver directed the officers to Ms. Keylon, who was walking out of her home, and he identified her as the mother of the person that drove the vehicle off of his tow-truck. *Id.* Officer Barnard approached Ms. Keylon and advised her that her son was the subject of a felony investigation, and that he would need to get some information from her. When Officer Barnard asked for Ms. Keylon's son's birthday and address, she responded that she did not know. *Id.*

Believing that Ms. Keylon was being "untruthful and evasive", Officer Barnard asked for Ms. Keylon's identification. Ms. Keylon did not produce identification, and instead approached her van. Officer Barnard put his hand up, preventing Ms. Keylon from getting in her van. *Id.* Officer Barnard asked Ms. Keylon where her identification was, and she told him it was in her purse, which was in the house. *Id.* When Ms. Keylon started walking up the drive way towards her home, Officer Barnard stated, "Ma'am, I need to see your ID. Ms. Keylon responded, "Well, I'll get my ID when I'm ready." *Id.* Officer Barnard then placed her under arrest for concealing her identity, in violation of N.M.S.A. § 30-22-3. All of this occurred on the sidewalk and lawn in front of Ms. Keylon's home. *Id.*

Ms. Keylon, prior to trial filed a motion for summary judgment, claiming that as a matter of law, Officer Barnard had no basis to detain her and no probable cause to arrest her. The district court denied her motion for summary judgment, finding that there were disputed facts for

the jury to decide. *Id.*  With regard to Officer Barnard's arrest of Ms. Keylon, the lower court found that there were genuine issues of fact as to whether Officer Barnard reasonably believed he had probable cause to arrest Ms. Keylon. *Id.*, 535 F.3d at 1214. At the trial and the close of evidence, Ms. Keylon moved for judgment as a matter of law on the basis that the qualified immunity standard is a legal question for the Court to decide not the jury [namely, that there is no genuine issue of material fact]. Ms. Keylon's attorney argued, the Court "should decide that no reasonable police officer could believe that Mrs. Keylon violated any statute when she was arrested." *Id.*, 535 F.3d at 1215.  In denying the motion the district court stated, "I believe that the facts are so in dispute that, depending on which version the jury believes, it could reasonably reach a verdict in either direction." *Id.*

On appeal, the 10th Circuit held:

"Because there were no issues of genuine fact with respect either to 1) whether Ms. Keylon's Fourth Amendment rights were violated, or 2) whether Officer Barnard was entitled to qualified immunity as a defense, *we hold that the district court erred in denying Ms. Keylon's motion for judgment as a matter of law*."

*Id.*, 535 F.3d at 1215-16. (Italics ours).  The Fourth Amendment is violated if police officer arrests an individual without probable cause. *Fogarty v. Gallegos*, 523 F.3d 1147, 1156 (10th Cir. 2008). "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee *has committed or is committing an offense*." *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir.1995). *Id.*, 535 F.3d at 1216.

As noted by the Court, in order to arrest Ms. Keylon for concealing her identity, "there must be reasonable suspicion of some predicate, underlying crime." *Id.*  See *Brown v. Texas,* 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) (observing that whatever purposes may be

served by "demanding identification from an individual without any specific basis for believing

he is involved in criminal activity, the guarantees of the Fourth Amendment do not allow it").

The Court further held, "[u]nder New Mexico law, '[r]esisting, evading, or obstructing an

officer primarily consists of physical acts of resistance." *State v. Wade*, 100 N.M. 152, 667 P.2d

459, 460 (N.M.Ct.App.1983) (internal quotation marks omitted). Officer Barnard does not

contend that Ms. Keylon engaged in any physical act of resisting *prior to her arrest*.[4]   *Keylon,*

535 F.3d at 1216-17.

Such are the facts involved in the instant case. Defendant Apodaca admits that there was

no "resistance" prior to Mr. Gallegos being arrested and that the charges of resisting, evading or

obstructing were alleged to have occurred as they arrested him. [Exhibit J, JA, pg.69, lns.4-19

and pg.70, lns.1-22].  Also the charge of Battery upon a Peace Officer allegedly occurred when

Defendant Vigil and Defendant Apodaca arrested him not before. As presented, there was no

underlying predicate crime for which Mr. Gallegos was arrested.  As a matter of law, Defendant

Apodaca and Defendant Vigil did not have probable cause to arrest Mr. Gallegos and thereby

violated his Fourth Amendment rights.  Mr. Gallegos is entitled to judgment as a matter of law.

### B.  DEFENDANTS, AS A MATTER OF LAW, HAD NO BASIS TO DETAIN KRISTIAN PETTINE AND NO PROBABLE CAUSE TO ARREST HER.

Mrs. Pettine, was arrested and charged with "resisting, evading or obstructing an officer.

[Exhibit F, pg.2].  However, like Mr. Gallegos and the facts in the *Keylon* case supra, there was

no underlying crime which had been committed by Ms. Pettine which provided the Defendant

Apodaca with probable cause to arrest her.  As *Keylon v. City of Albuquerque*, 535 F.3d 1210,

---

[4] As noted by the 10th Circuit in footnote 1 in *Keylon v. City of Albuquerque*, 535 F.3d 1210, 1217 (10th Cir. 2008) "Although she does contend that she physically resisted once he handcuffed her, this resistance begs the question. ***The only resistance that can provide probable cause for her arrest must, necessarily, precede the arrest***. Therefore, the alleged physical resistance to the arrest is irrelevant, and we must only ask whether any facts and circumstances within Officer Barnard's knowledge could have led a reasonable officer to believe that Ms. Keylon was resisting." (Emphasis ours).

1217 (10th Cir. 2008) held, "[u]nder New Mexico law, '[r]esisting, evading, or obstructing an officer primarily consists of physical acts of resistance.*"*  As noted in footnote 1 of the *Keylon* opinion, "The only resistance that can provide probable cause for her arrest must, necessarily, *precede the arrest*." *Keylon,* 535 F.3d at 1216, fn. #1. (Italics ours).  There are absolutely no facts contained either in Defendant Apodaca's Incident Report [Exhibit A], the Criminal Complaint filed against Mrs. Pettine, by Defendant Apodaca [Exhibit F] or in Defendant Apodaca's deposition that demonstrates that Mrs. Pettine physical resisted any officer prior to her arrest.

A point in fact, the Defendant Apodaca in his deposition testified that he charged Mrs. Pettine with "resisting, evading and eluding me by -- … I was trying to obtain information for the sake of the child to place the child with either the child's father or family member." [Exhibit J, JA, pg.74-5, lns.22-23]. Defendant Apodaca also testified, although he admitted he did not put any of this in his Incident Report, that Mrs. Pettine " … *was almost provoking* him (Antonio) in a sense, to – which was causing him to react in a negative way and be more combative. <u>So she was therefore resisting, because we kept telling her stay back, just stay out, stay back for right now, and stuff to that effect. And she just kept on – I would say provoking him.</u>" [Exhibit J, JA, pg.75, lns.12-19].  Defendant Apodaca admitted that he did not state that Mrs. Pettine was provoking Mr. Gallegos in his Incident Report. [*Id.*, pg.75, lns.20-23]. As well, Defendant Apodaca did not list any "fighting words" in either his Incident Report or the Criminal Complaint that he filed against Mrs. Pettine. [Exhibits A and F].

The next question, which the 10th Circuit in *Keylon*, supra, considered was whether Ms. Keylon under the charge of "[r]esisting, evading or obstructing an officer" engaged in any speech likely "to incite an immediate breach of the peace." *Kelyon*, 535 F.3d at 1217.  New

Mexico courts have found § 30–22–1 to prohibit certain speech, when that speech is abusive, but not when it is merely evasive. See id. at 461 (" '[A]busing' speech in § 30–22–1(D) ... *covers only speech that can be called 'fighting' words*."). "'Fighting' words are those which tend to incite an immediate breach of the peace." *Id.*   As held in *Keylon,* "[u]nder either version of the facts, she did not recite any "fighting" words as defined by New Mexico law."

In the instant case, Defendant Apodaca cannot to prove that Mrs. Pettine used any "fighting words" to provoke Mr. Gallegos. In fact, Defendant Apodaca could not recall "specifically" what Mrs. Pettine said. [Exhibit J, JA, pg.75, lns.12-23].   The specific question asked of the Defendant Apodaca was, "what did she say that provoked him?" To which Defendant Apodaca answered, "I can't specifically recall."   N.M.S.A. 1978, § 30–22–1(D) ... *covers only speech that can be called 'fighting' words*." *Keylon,* 535 F.3d at 1217.   There is no evidence that Mrs. Pettine's arrest and charge for "[r]esisting, evading or obstructing an officer" involved her using any "fighting words".

As a matter of law, Defendant Apodaca did not have probable cause to arrest Mrs. Pettine and he violated her clearly established Fourth Amendment Rights.   Mrs. Pettine is entitled to judgment as a matter of law.

### i.   KRISTIAN PETTINE IS ENTITLED TO JUDGMENT AS A MATTER OF LAW.

The Court held in *Keylon v. City of Albuquerque*, 535 F.3d 1210, 1217 (10th Cir. 2008) that "[u]nder New Mexico law, '[r]esisting, evading, or obstructing an officer primarily consists of physical acts of resistance.*" *State v. Wade*, 100 N.M. 152, 667 P.2d 459, 460 (N.M.Ct.App.1983) (internal quotation marks omitted). Like Officer Barnard in *Keylon,* Defendant Apodaca did not contend that Mrs. Pettine engaged in the physical act of resisting

*prior to her arrest*.  Therefore, Defendant Apodaca's arrest would have to rely upon Mrs. Pettine having engaged in the use of "fighting words".

Defendants, including Apodaca, are unable to produce any evidence that Mrs. Pettine engaged in speech using "fighting words" that were likely "to incite an immediate breach of the peace." [Exhibit J, JA, pg.75, lns.12-23].  In order to survive constitutional scrutiny, the arresting officer must have probable cause to believe that the arrestee *committed the offense charged*. *Swiecicki v. Delgado,* 463 F.3d 489, 498 (6th Cir. 2006). Defendant Apodaca did not have probable cause to arrest Mrs. Pettine for violating N.M.S.A. 1978, § 30-22-1.  Without probable cause to arrest, Defendant Apodaca violated Mrs. Pettine's clearly established Fourth Amendment rights. Mrs. Pettine is entitled to judgment as a matter of law.

### C.  DEFENDANTS, AS A MATTER OF LAW, HAD PROBABLE CAUSE TO ARREST ANDRE GALLEGOS.

Plaintiff Andre Gallegos ("Andre") was 17 years old at the time of the incident and was four (4) days short of his 18th birthday. [Exhibit H, pg.1; and Exhibit N, Andre Gallegos Deposition, pgs.50-1, lns.24-6].  Defendant Apodaca arrested Andre. [Exhibit J, JA, pg.42, lns.3-6].  Defendant Apodaca alleged Andre was "resisting, evading or obstructing an officer". [*Id.*, JA, pg.43, lns.17-23].   However, the Juvenile Probation Office ("JPO") advised Defendant Apodaca that "… Andre did not score high enough on the JPO point system for obstruction charges …". [Exhibit H, middle of paragraph].

Despite the fact that Defendant Apodaca had no probable cause to arrest Andre he: (1) handcuffed Andre; (2) placed him in a police car; (3) transport him to the Espanola Adult Detention Center; [*Id.*, JA, pg.44, lns.18-23] (4) "Booked" Andre into the Espanola Adult Detention Center; and [*Id.*, JA, pgs.41-2, lns.19-25] (5) instructed the Detention Center to "Hold" Andre. [Exhibit I].  "A seizure occurs when a reasonable person would not feel free to

leave or disregard the contact." *United States v. Salas–Garcia*, 698 F.3d 1242, 1248 (10th Cir.2012).  Clearly a reasonable person in Andre's position would believe that he or she was not free to leave after being handcuffed; placed in the back of a police car; transported and booked at an Adult Detention facility and the Detention Center was instructed to "Hold" Andre.  Defendant Apodaca had no probable cause to arrest Andre as admitted in his Supplemental Narrative, Exhibit H, that falsely states: "… *Andre did not score high enough on the JPO point system for obstruction charges* …" and "[i]t should be noted that Andre was *never placed under arrest and no charges were ever filed on Andre*. [Exhibit H, highlighted].

An arrest is the most intrusive of Fourth Amendment seizures and is reasonable *only* if supported by probable cause. *United States v. Davis*, 94 F.3d 1465, 1467-68 (10th Cir. 1996). Defendant Apodaca alleged that Andre had resisted evaded or obstructed a police officer. However, the JPO informed Defendant Apodaca that Andre could not be charged with obstruction.  As held in *Panetta v. Crowley,* 460 F.3d 388, 395-96, (2nd Cir. 2006) a police officer may not disregard plainly exculpatory evidence.

### i.    ANDRE IS ENTITLED TO JUDGMENT AS A MATTER OF LAW.

The Court held in *Keylon v. City of Albuquerque*, 535 F.3d 1210, 1217 (10th Cir. 2008) that "[u]nder New Mexico law, '[r]esisting, evading, or obstructing an officer primarily consists of physical acts of resistance*."* Clearly Andre did not engage in any physical act of resisting *prior to his arrest*.  Further, there is absolutely no evidence that Andre engaged in the use of speech which constituted "fighting words".

Defendant Apodaca's contradictory statements that Andre was not placed under arrest, does not square with his act of violating Andre's Fourth Amendment rights and illegally arresting Andre without probable cause.  Without any reasonable basis to believe that Andre had

engaged in the crime of resisting or evading an officer, Defendant Apodaca could not arrest Andre. Thus, as a matter of law, Defendant Apodaca violated Andre's clearly established Fourth Amendment rights and Andre is entitled to judgment as a matter of law.

### D.  DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.

Defendants have not raised the defense of qualified immunity and Plaintiffs have chosen to address this issue in anticipation of it being raised in Defendants' Response to the instant motion for summary judgment. The general purpose of qualified immunity is to provide public officials with the ability to anticipate when their conduct may give rise to liability. *Anderson v. Creighton,* 438 U.S. 635, 646, 107 S.Ct. 3034, 97 L. Ed. 2d 523 (1987).  "An official is protected from personal liability unless his allegedly unlawful official action was objectively legally unreasonable when assessed in light of legal rules, that were clearly established when the actions was taken. *Trigalet v. Young*, 54 F.3d 645, 647 (10th Cir. 1995).

Qualified immunity issues are almost always questions of law, decided by a court prior to trial. *Keylon v. City of Albuquerque*, 535 F.3d 1210, 1217 (10th Cir. 2008).  The Tenth Circuit had held that, "[m]any of our sister circuits have held that qualified immunity is never a question for the jury. However, we have recognized that "in exceptional circumstances historical facts may be so intertwined with the law that a jury question is appropriate as to whether a reasonable person in the defendant's position would have known that his conduct violated that right." *Id.* 535 F.3d AT 1217-18.   The instant case presents no "exceptional circumstances" and as Defendants' admit, "*[t]his case does not merit the need for expert witnesses as lay fact finders can decide for themselves if the arrests were warranted*."  [Doc.37, pg.1, ¶ # 2].

In *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), "the Court reconsidered the standard it previously had established for the affirmative defense of

qualified or 'good faith' immunity." *Lutz v. Weld County Sch. Dist*., 784 F.2d 340, 342 (10th Cir.1986). After *Harlow*, qualified immunity *does not depend on the officer's subjective, good faith belief that he was not violating clearly established federal law, but instead the defense now hinges on whether that belief was reasonable*. *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1253 (10th Cir.2003). (Italics ours). What an officer "honestly believed" is irrelevant to the *objective reasonableness test that qualified immunity analysis requires*.   When there are no issues of material fact there are no "exceptional circumstances," which would allow the question of qualified immunity to be submitted to the jury. *Id.,* 535 F.3d at 1218.

"Determining whether a defendant is entitled to qualified immunity involves answering two questions: (1) whether a plaintiff has asserted that the defendant violated a constitutional or statutory right, and if she has, (2) "whether that right was clearly established such that a reasonable person in the defendant's position would have known that his conduct violated that right." … "In determining whether the right was 'clearly established,' *the court assesses the objective legal reasonableness* of the action at the time of the alleged violation and asks whether the right was sufficiently clear that a reasonable officer would understand that what he is doing violates that right." *Id.*, 535 F.3d at 1218 (Emphasis in original).

"The objective reasonableness of the [defendant]'s actions is a legal question."   Unless there are historical facts that are material, which in this case there are not, and in dispute then the issue is for the jury.   However, when no material historical facts are in dispute then it is a legal question which is resolved by the Court. *Id.* 535 F.3d at 1219.   The facts of this case, as established through the Incident Report, Criminal Complaints, Statements of Probable Cause supporting the Criminal Complaints and the depositions of the Defendants, do not present "exceptional circumstances" and thus qualified immunity is a question of law.

In the context of an unlawful arrest, the Court's analysis is simple, for the law was and is unambiguous; *a government official must have probable cause to arrest an individual*. *Id.* 535 F.3d at 1220. Defendants' own subjective reasons for the arrest are irrelevant. New Mexico law is clear – *no reasonable person in Defendant Apodaca and Defendant Vigil's position could have thought they had probable cause to arrest Mr. Gallegos, Mrs. Pettine and Andre Gallegos. Id.* Defendants are not entitled to qualified immunity in the arrests of the Plaintiffs in this case.

### E.  MR. GALLEGOS IS ENTITLE TO SUMMARY JUDGMENT ON HIS CLAIM OF EXCESSIVE USE OF FORCE.

In his arrest of Mr. Gallegos, the Defendant Apodaca used his Taser[5] on Mr. Gallegos three (3) times in a short period of time.  The third and last Taser was applied by the Defendant Apodaca when Mr. Gallegos was handcuffed and lying face down on the ground, not resisting and presenting no danger to anyone. [Exhibit D, Andre, pg.17, lns.10-16; and Exhibit B, Antonio, pg.38, lns.12-20].

At his deposition, Defendant Apodaca testified that he thought he used his Taser on Mr. Gallegos two (2) times. [Exhibit J, JA, pg.82, lns.9-13].  However, after looking at his Incident Report, Defendant Apodaca testified that he reported only using his Taser once on Mr. Gallegos. [*Id.*, pgs.82-3, lns.25-3].  The incident report contradicts all the physical evidence and photographs showing three (3) distinct Taser marks on Mr. Gallegos, which Defendant Apodaca in violation of the Espanola Police Department Directives failed to report to the Chief of Police and failed to photograph. [Exhibit N, pg.3, 73.1.20; pg.5, 73.1.30 through 73.1.30].

Defendant Apodaca failed to follow the clear directives of the Espanola Police Department regarding his use of a Taser and with the Defendant Chief Martinez' direct involvement in his investigation of the incident shows the existence of a department cover-up of

---

[5] The Defendant Apodaca "dry stunned" Mr. Gallegos which is a technique that does not involve the deployment of the "Taser cartridge".

the excessive force on Mr. Gallegos.  Defendant Apodaca pursuant to EPD - 73.1.19 was required to "document" **any** use of the Taser. [Exhibit N, pg.3] (emphasis in original). Documentation included, but was not limited to, (1) "Use of Force report"; (2) Taser User Report; (3) Photographs; and (4) update User Log. [*Id.*, pg.3, 73.1.19].  Pursuant to EPD – 73.1.20 Defendant Apodaca had a duty to report "all Taser uses to the ***Office of the Chief*** [Defendant Joe Martinez] and/or his designee for tracking and review. [Exhibit N, pg.3]. After Defendant Apodaca used his Taser he was required to "photograph" individuals subjected to the Taser's use. [Exhibit N, pgs.4-5, 73.1.28 (G)].   Defendant Apodaca was also required to "photograph the person's affected areas as soon as possible". [Exhibit N, pg.5, 73.1.30].  Further, Defendant Apodaca was required to complete and submit a separate use-of-force form to the ***Office of the Chief of Police*** any time a Taser is used; [Exhibit N, pg.5, 73.1.31].  Defendant Apodaca was required to submit Taser Use Report forms to the **Office of the Chief of Police.** [Exhibit N, pg.4, 73.1.32].  Finally, Defendant Apodaca was required to submit all photographs to the property section. [Exhibit N, pg.5, 73.1.33].

The question of whether Defendant Apodaca's use of a Taser on Mr. Gallegos was objectively reasonable, in light of the undisputed facts is a pure question of law. *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 664 (10th Cir. 2010).  Excessive force claims are governed by the Fourth Amendment's "objective reasonableness" standard.  *Id.*  "Under this standard courts must "careful[ly] balance ... the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.*  "More specifically, courts determine whether *the officer's use of force was reasonable given the severity of the suspected crime*, *the immediate threat to the officer or others*, and *whether the suspect was actively resisting arrest or evading arrest by flight*." *Id.* (Italics ours).

In finding the officer's use of a Taser unreasonable in *Cavanaugh* the Court held, the Officer's weapon of choice was a *Taser-a weapon that sends up to 50,000 volts of electricity through a person's body, causing temporary paralysis and excruciating pain*. *Cavanaugh,* 625 F.3d at 665. "Although Tasers may not constitute deadly force, their use unquestionably "seizes" the victim in an abrupt and violent manner. Accordingly, the "nature and quality" of *the intrusion into the interests of Ms. Cavanaugh protected by the Fourth Amendment was quite severe*. *Id.* (Italics ours).  Defendant Apodaca's intrusion upon Mr. Gallegos' Fourth Amendment rights was equally quite severe.

In *Cavanaugh* the Officer was responding to a non-emergency and to the extent she was suspected of any crime it was minor. *Cavanaugh*, 625 F.3d at 665.  In the instant case, Defendant Apodaca had sufficient information from the victim and other witnesses that the suspect had left the scene with the weapon and *Mr. Gallegos was not suspected of engaging in any criminal activity*.  It is an undisputed fact that Defendant Apodaca and Defendant Vigil knew that Mr. Gallegos did not pose a threat to anyone including themselves.  Mr. Gallegos' clearly visible hands contained no knife or weapon.  Defendant Apodaca applied the Taser after arresting Mr. Gallegos without probable cause and then a third time after Mr. Gallegos was already handcuffed and lay face down on the grown.  A reasonable officer could conclude that Mr. Gallegos was not a threat anyone. Further, Mr. Gallegos was not actively resisting arrest nor fleeing arrest.

The Officer in *Cavanaugh* was denied qualified immunity as should the instant Defendants be denied qualified immunity.  If an officer violates "clearly established" law at the time of his or her conduct then he or she is not entitled to qualified immunity. *Id.* "The dispositive inquiry in determining whether a right is clearly established is *whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted*." *Id.*

"In certain circumstances, law can be "clearly established" even "without a body of relevant case law," *Brosseau v. Haugen,* 543 U.S. 194, 199, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004), and "'even in novel factual circumstances.'" *Cortez v. McCauley,* 478 F.3d 1108, 1114 (10th Cir.2007) (en banc) (internal quotation marks and citation omitted) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)).   The court in *Cavanaugh*, without having to search for prior case decision, held that the Officer's use of a Taser violated the Fourth Amendment and the law was clearly established as of August 25, 2003, the date on which the incident occurred. *Id.* 625 F.3d at 666-67.

Similarly in *Brown v. City of Golden Valley*, 574 F.3d 491, 496-98 (8th Cir. 2009) the Court denied qualified immunity to the officer that used his Taser, on the grounds that it was clearly established, at the time of the misdemeanor arrestee, who was not fleeing or resisting arrest, constituted an unreasonable exercise of force.

<u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment should be granted and defendants should not be entitled to qualified immunity.

**RESPECTFULLY SUBMITTED:**
/s/Nathaniel V. Thompkins
Nathaniel V. Thompkins
NEW MEXICO FIRM, LLC
103 St. Francis Drive, Unit A
Santa Fe, NM  87501
Telephone:   (505) 988-9750
*Counsel for the Plaintiffs*

**CERTIFICATE OF SERVICE**
I HEREBY CERTIFY that on this
12th day of August, 2013, I filed the
foregoing electronically through the
CM/ECF system, which caused the
above named counsel to be served
by electronic means:

/s/Nathaniel V. Thompkins
Nathaniel V. Thompkins