```
                                                                    1
 1   SECOND JUDICIAL DISTRICT COURT
     COUNTY OF BERNALILLO
 2   STATE OF NEW MEXICO

 3                    No. DM-09-03202

 4
     KRISTIAN PETTINE,
 5
                      Petitioner,
 6
     vs.
 7
     LONDONO REALES,
 8
                      Respondent.
 9

10              TRANSCRIPT OF RECORDED PROCEEDINGS

11           On the 1st day of September, 2010, at

12   approximately 9:05 a.m., this matter came on for

13   hearing on Motion to Modify Previous Decree Judgment

14   of Order, Motion for Domestic Matters, Respondent's

15   Verified Emergency Motion for Sole Custody and to

16   Review Child Support, Emergency Motion to Enforce

17   Status Quo Custody and Time Sharing, and Respondent's

18   Amended Emergency Motion for Sole Custody and to

19   Review Child Support, before HONORABLE GERALD J.

20   LAVELLE, Division XI, Judge of Second Judicial

21   District Court.

22           The Petitioner, ANTONIO LONDONO REALES,

23   appeared in person and by Counsel of Record, LESLIE

24   BECKER, Attorney at Law, 1000 Lomas Blvd. NW,

25   Albuquerque, New Mexico  87102-1945, (505) 266-0656.
```

CUMBRE COURT REPORTING, INC.    (505) 984-2244



Exhibit G

Page 30

1  A. That's correct.
2  Q. Okay. And they are homosexual; correct?
3  A. To my understanding, yes.
4  Q. So it would seem that this was a young man
5  being upset that there were homosexuals at his dad's
6  business; correct?
7  A. Correct.
8  Q. Okay. Did you ever find evidence that
9  Ms. Pettine or her husband were the ones that were
10 upset with the homosexuals or anything of that nature?
11 A. That they were upset with them?
12 Q. Yes, sir.
13 A. They didn't appear to be upset with them
14 except for what Ms. Pettine's husband was telling them
15 to stop talking (inaudible), that it was not
16 appropriate.
17 Q. Okay. Did you ever determine the age of
18 your suspect here in this incident, sir?
19 A. I believe that was not specifically
20 confirmed, but we were told he was approximately like
21 early to mid 20s.
22 Q. But clearly not under the age of 18, right?
23 A. That's right. To the best of my knowledge
24 he was not below 18.
25 Q. Okay. During the course of your

Page 31

1  investigation, Officer Apodaca, where was Ms. Pettine
2  and the child as you were talking to all of these
3  folks?
4  A. During the course of my investigation, they
5  were basically on the front step area. They were
6  trying to keep the child on the front steps and not
7  inside the home. Ms. Pettine was going inside once or
8  twice. The child was either with her or right near
9  the front desk where there was a (inaudible).
10 Q. Okay. So would it be fair to say that
11 Colby, the child, was in Ms. Pettine's custody and
12 possession this entire time?
13 A. In and out within the immediate
14 (inaudible).
15 Q. Okay. And you and your fellow officers
16 felt comfortable in allowing Ms. Pettine and her child
17 to essentially move freely about the premises?
18 A. Well, as far as that goes, we were trying
19 to limit any type of danger to folks, but at the same
20 time we were trying to keep everybody in our view
21 which was hard to do due to the fact that they were
22 all intoxicated. With the limited number of officers
23 that were there, it was really hard to keep everybody
24 right there.
25 Q. Okay, and again, sir, you keep referring to

Page 32

1  intoxication, everybody was intoxicated. How do we
2  know the degree and severity of everyone's
3  intoxication?
4  A. Well, I can't honestly say the degree of
5  severity. However, based on my training and
6  experience, everybody there seemed to have a heavy
7  odor of alcohol when I spoke to them individually
8  coming from their person.
9  Q. Okay.
10 A. Maybe their breath. They all did appear to
11 me that they had drank alcohol that day.
12 Q. Okay.
13 A. It was stated to me that throughout the
14 people that I did interview there that they were at a
15 local restaurant where they had some drinks, and then
16 they returned to their home and had some more.
17 Q. Okay. Do you know how long in hours, sir,
18 they were allegedly at a restaurant before they got to
19 the office building?
20 A. I don't. I do not know exactly how long
21 they were at the restaurant.
22 Q. And with Ms. Pettine specifically, were you
23 aware that the beer that she had was what is called a
24 tomato beer? Did any of that ever come to your
25 attention?

Page 33

1  A. No, it did not.
2  Q. Did you find any evidence of any Clamato
3  or any other V8 type tomato beverage there on site,
4  sir?
5  A. No.
6  Q. Are you familiar with tomato beer, sir?
7  A. Yes.
8  Q. So you're aware that a tomato beer is, you
9  know, tomato juice and beer mixed together, right?
10 A. Correct.
11 Q. Okay. During this investigation, Officer
12 Apodaca, was Colby in any type of danger while she was
13 with the mother?
14 A. During the investigation, I wouldn't say
15 that was Colby was exposed to any danger while we were
16 there.
17 Q. Okay. Was Colby crying or otherwise
18 sneaking out or trying to get away from her mother?
19 A. The only time that she was crying was when
20 we actually had to separate the two of them.
21 Q. Okay.
22 A. That was done rather -- I guess I would say
23 I think the only time (inaudible) was where
24 Ms. Pettine was already separated from Colby, and
25 Colby was actually inside of the front door and

### Page 34

Kristian was outside.

Q. Okay.

A. I guess there was a little stressful indication that Colby was possibly (inaudible).

Q. Okay. So okay, Officer Apodaca, was it you that decided to remove Colby from her mother?

A. No, it was not. It was actually CYFD's decision.

Q. Okay. Was it your recommendation or did you have any input on whether or not the child should be removed from her mother?

A. CYFD did ask me. What they asked me is if the people were intoxicated. They didn't ask me what they were drinking. They did, I believe, (inaudible) she was actually at the detention center and they agreed that it would be best that she did not have Colby at the time due to her intoxicated condition.

Q. Okay. So to your knowledge, Officer Apodaca, CYFD did not speak to Ms. Pettine until she was in custody?

A. That's correct. What they do is they asked us to describe the situation to them. If charges will be filed and also due to the fact that charges were being filed and she was going to be arrested (inaudible).

### Page 35

Q. Okay. And most importantly, sir, why was she arrested on one citation of resisting or obstructing an officer?

A. She was arrested due to the fact, for one, that she was intoxicated, and also for the intoxication part, we didn't want to leave her at the scene or on her own just in case she got hurt, we didn't want her to get hurt, (inaudible) intoxicated, fall or something of that nature.

Q. Are you talking about Ms. Pettine getting hurt?

A. That's correct, yes. If we were to leave the area with her being intoxicated, nobody was there to take care of her, and also due to the fact that we asked her multiple times to cooperate with us, and she would walk away while we were talking and she was (inaudible) while we were talking.

Q. Okay. Sir, you had a belt tape, a belt tape recording or your discussion with Ms. Pettine, right?

A. Yes, sir. There was an officer with that.

Q. Did you have your belt tape on, sir?

A. I did not have mine, but the officer that was standing there with me the whole time did have his, sir.

### Page 36

Q. Is resisting, evading or obstructing an officer normally a (inaudible) criminal (inaudible) to court?

A. With our department, we typically arrest (inaudible) off of that.

Q. Even though we don't know the level of intoxication of Ms. Pettine?

A. That's correct, because again, the resisting and evading and obstruction part was the reason for the arrest of Ms. Pettine, and the intoxication was not a deciding factor of the arrest. It was also for her safety, but she did -- was (inaudible).

Q. Okay. Officer Apodaca, had you ever worked for any other police department?

A. Yes, I have.

Q. Which police departments are those, sir?

A. The City of Santa Fe Police Department for approximately two years.

Q. Have you ever worked for the New Mexico State Police Department?

A. No, I haven't.

Q. Had you ever been disciplined or reprimanded for pretending to work for the New Mexico State Police Department?

### Page 37

A. No, I have not.

Q. Have you ever been disciplined or reprimanded at all, be it the Santa Fe PD or Espanola PD?

A. Yes.

Q. And when was that, sir?

A. I believe that was approximately in about October or November of 2007.

Q. Okay. And what was that for, sir?

A. That was for -- the report was being that the department thought I was abusing sick leave.

Q. That you were abusing what? I'm sorry, sir, you cut out.

A. Sick leave.

Q. That you were abusing sick leave, okay. But again under oath today, you're saying that you have never been reprimanded or disciplined for any type of impersonation of another officer?

A. I don't believe that I have ever had anything like that ever (inaudible).

Q. Okay. So just in summary, Officer Apodaca, there was a call from dispatch saying that somebody was -- had a gun pointed at them, but you were never able to recover that gun?

A. Correct.