```
                                                              1
 1          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF NEW MEXICO
 2

 3
    ANTONIO GALLEGOS, KRISTIAN PETTINE,
 4  ANDRE GALLEGOS, and K.L.P.L., a
    minor child,
 5
              Plaintiffs,
 6
    vs.                          No. 1:12-CV-224-LH-/KBM
 7

 8  CITY OF ESPAÑOLA, a municipal corporation,
    JOE MARTINEZ, individually and in his official capacity;
 9  JEREMY APODACA, individually and in his official
    capacity; ROBERT VIGIL, individually and in his official
10  capacity; CITY OF ESPAÑOLA OFFICERS and SUPERVISORS JOHN
    DOES 1 through, individually and in their official
11  capacities,

12
              Defendants.
13
             DEPOSITION OF JEREMY APODACA
14              Wednesday, June 19, 2013
                      1:42 p.m.
15             Cumbre Court Reporting, Inc.
                  2019 Galisteo Street
16              Santa Fe, New Mexico 87505

17

18       PURSUANT TO THE NEW MEXICO RULES OF CIVIL
    PROCEDURE, this Deposition was:
19
    TAKEN BY:   NATHANIEL V. THOMPKINS
20              ATTORNEY FOR THE PLAINTIFFS

21
    REPORTED BY:  ALLISON ASH-HOYMAN
22                NEW MEXICO CCR #18
                  CUMBRE COURT REPORTING, INC.
23                2019 Galisteo, Suite A-1
                  Santa Fe, New Mexico 87505
24

25
                    Allison Ash-Hoyman, CCR 18
```

Exhibit J

Page 42

1  Q. You -- is that -- are they in your package?
2  A. I believe so, yes.
3  Q. Okay. Who was that for?
4  A. This is for Andre Gallegos.
5  Q. And who was the arresting officer?
6  A. Myself. I signed it.
7  Q. Okay. And is that correct, you arrested Andre
8  Gallegos?
9  A. No.
10 Q. Why is there a booking form -- was Andre
11 Gallegos booked?
12 A. No, he was not.
13 Q. Why is there a booking form for Andre Gallegos
14 if he wasn't booked?
15 A. The -- I believe at the time the detention
16 officer requested a booking form be filled out so that
17 we would have Andre Gallegos's information as him being
18 there. At the detention facility.
19 Q. Why was he at the detention facility?
20 A. He was taken there because he was a minor.
21 And at the scene, where I responded to after speaking
22 with the juvenile probation on-call person, she advised
23 me to basically take him with me so that he could be
24 taken to the youth shelter here in Santa Fe for
25 protective custody.

Page 43

1  And that was due to there not being an
2  immediate family member to release him to.
3  Q. He -- did you ascertain whether or not he had
4  a driver's license?
5  A. I can't recall that at this time.
6  Q. And if he is 17, he -- and he is at that home
7  that you picked him up at, you are saying he couldn't
8  have stayed there at the home by himself as -- because
9  he was 17?
10 A. In speaking with the juvenile probation
11 on-call person that day, she instructed me basically to
12 take him with me.
13 Q. Okay. Let me ask you: What law did he
14 violate in order for him to be taken from his home
15 because he was 17?
16 A. I --
17 Q. Did he break it? I'm sorry. If you
18 understand the question, try to answer it.
19 A. The reason for me calling the juvenile
20 probation department in regards to Andre was for the --
21 was for resisting, evading or obstructing an officer.
22 Q. For Andre.
23 A. For Andre.
24 Q. Did you charge him with resisting, evading or
25 obstructing an officer?

Page 44

1  A. No, I did not.
2  Q. Okay. So do you take -- as a police officer
3  do you take your orders from the juvenile probation
4  officer -- office or officer in terms of determining
5  whether or not to take a juvenile into custody?
6  A. On occasion, yes.
7  Q. You take your orders from the juvenile
8  probation office; if they tell you to take a juvenile in
9  custody, you take orders from the juvenile probation
10 office?
11      MR. BASHAM: Objection. Asked and answered.
12 BY MR. THOMPKINS:
13 Q. You can answer it.
14      MR. BASHAM: It's asked and answered.
15      Go ahead and answer again.
16 A. Occasionally I do take juveniles into custody
17 based off of what I'm told from them.
18 Q. Okay. And in the case of Andre, he was
19 handcuffed?
20 A. Yes.
21 Q. He was placed in a police car?
22 A. Yes.
23 Q. And he was arrested?
24      MR. BASHAM: Objection. Asked and answered.
25      Still answer. Unless I specifically instruct

Page 45

1  you not to answer, ignore my objections, just respond.
2       THE WITNESS: Can you restate your question,
3  please.
4       MR. THOMPKINS: Can you repeat the question.
5       (Record read as requested.)
6  A. No.
7  BY MR. THOMPKINS:
8  Q. You don't -- if he is placed in handcuffs and
9  placed in a police car and taken to the detention center
10 and booked, you don't think -- you don't believe he was
11 arrested?
12      MR. BASHAM: Objection, asked and answered.
13 Argumentative.
14 A. I do believe technically that's an arrest,
15 yes.
16 BY MR. THOMPKINS:
17 Q. Okay. And why wasn't all of those things that
18 you did to him not an arrest?
19 A. In the terms of placing him in handcuffs, he
20 was technically, yes, arrested. As far as arrested with
21 charges, I say no.
22 Q. Okay. Does a person, in order for it to be an
23 arrest, have to be charged?
24 A. No.
25 Q. Okay. So how do you differentiate between he

Exhibit J

Antonio Gallegos, et al. v.
City of Espanola, et al.

Jeremy Apodaca
June 19, 2013

Page 54

Page 56

1  A. I believe so, yes.
2  Q. Okay. And who was that?
3  A. It would be the on-call person for the CYFD
4  office.
5  Q. And who was that?
6  A. I don't recall specifically.
7  Q. Okay. And how did you request that she come
8  to the scene?
9  A. I asked for dispatch to call them.
10 Q. Okay. And what happened in terms of when
11 dispatch called them?
12 A. I believe dispatch told me that -- something
13 to the effect that they were busy with another call at
14 that point in time.
15 Q. Uh-huh.
16 A. So I don't believe that they came directly to
17 the scene.
18 Q. Okay. Are officers required to notify
19 dispatch of their arrival time at a scene?
20 A. Yes.
21 Q. And did you do so in this case?
22 A. Yes, I believe so.
23 Q. And are you required to notify them of the
24 time that you are leaving the scene?
25 A. Yes.

1  station to call 911, and that the alleged suspect at
2  that point in time had walked towards the Northern New
3  Mexico Community College.
4  Q. Okay. Did you have any more information than
5  that?
6  A. And to the best of my memory I believe I was
7  notified that the suspect had a black in color handgun.
8  Q. What kind of a what?
9  A. A black in color handgun.
10 Q. Was it a pistol or a rifle?
11    MR. BASHAM: Objection, asked and answered.
12    He said a handgun.
13 BY MR. THOMPKINS:
14 Q. Tell me what your definition of a "handgun"
15 is.
16 A. It would be a handgun, a short --
17 Q. I'm sorry?
18 A. Short handgun.
19 Q. Okay. I'm not familiar. What is a short
20 handgun?
21 A. A short handgun is something like my service
22 weapon.
23 Q. Okay. And so would that -- if I said pistol,
24 would that mean the same thing?
25 A. Yes.

Page 55

Page 57

1  Q. And in this case, did you do so?
2  A. To the best of my knowledge, yes.
3  Q. Do you know what time you left?
4  A. I cannot specifically recall.
5  Q. Okay. And did you tell me you don't know what
6  time you arrived?
7  A. To be specific on the time, no, I don't
8  recall.
9  Q. Can you explain why there was a 59-minute
10 lapse between the time that you say dispatch received
11 the call and the time that you called in for a report
12 number?
13 A. I believe that time difference there was my
14 time at the scene and conducting my initial
15 investigation.
16 Q. What was the call that you received? What was
17 the matter that you were dispatched for? What type of
18 incident?
19 A. To the best of my memory, it was aggravated
20 assault.
21 Q. Okay. And what were the specific -- before
22 you got to the scene, what were the specifics you were
23 told when you were dispatched?
24 A. I was told that the caller, the alleged victim
25 at that point in time had run across the road to the gas

1  Q. Okay. So a pistol would be one that's in the
2  category of handgun?
3  A. Yes.
4  Q. At some point did Mr. Gallegos tell you that
5  he had a gun in his home? Antonio Gallegos.
6  A. Yes.
7  Q. And did he tell you the type of handgun that
8  was in his home?
9  A. No.
10 Q. Okay. Do you know what type of handgun was in
11 his home?
12 A. As far as what I found, yes.
13 Q. Okay. And what did you find?
14 A. It was -- to the best of my knowledge it was
15 a .22 rifle.
16 Q. Okay.
17 A. .22 caliber rifle.
18 Q. At any time did he tell you, or did anyone
19 involved in this incident tell you that the handgun that
20 the caller mentioned was in the house?
21 A. No.
22 Q. The complaining witness was Mr. Alfonzo
23 Gurule.
24    Do you recall that?
25 A. I believe so.

Page 58

1 Q. Did he tell you that the handgun that he was
2 allegedly threatened with was put in the house?
3     MR. BASHAM: Objection, hearsay.
4 A. I don't believe so.
5 BY MR. THOMPKINS:
6 Q. When you arrived at the scene somewhere
7 between 12:46 and 1345 -- is that correct?
8 A. To the best of my memory, yes.
9 Q. -- did you attempt to take Mr. Gurule to try
10 to find the person who allegedly used a handgun on him?
11 A. To the best of my memory, no.
12 Q. There is a reason why you didn't do that?
13 A. I believe I was told that he had walked
14 towards the direction of the college.
15 Q. And because of that fact you didn't attempt to
16 go with Mr. Gurule to find who this individual was?
17 A. Can you --
18 Q. No?
19 A. Can you be more specific?
20 Q. Okay. You got a call from dispatch that the
21 complainant had been threatened with a gun by an
22 individual.
23 A. Yes.
24 Q. And then you met the complainant, Mr. Gurule.
25 A. Correct.

Page 59

1 Q. And he then gave you the name of the
2 individual who he said had a gun.
3 A. Yes.
4 Q. Did he -- and he told you in the direction of
5 which this individual had gone.
6 A. Yes.
7 Q. And there was no concern on your part that
8 this individual might have been walking with a handgun
9 in the direction that Mr. Gurule said he was traveling?
10 A. I had that concern, yes.
11 Q. But you didn't attempt to take Mr. Gurule and
12 try to go find and locate the individual he said had a
13 gun and pulled it out on him?
14 A. No.
15 Q. Okay. After you had found the .22 rifle that
16 you said was in the home, you knew that wasn't the --
17 the description of the handgun that Mr. Gurule gave you;
18 right?
19 A. Correct.
20 Q. So that individual is potentially out there
21 with a handgun walking towards Northern New Mexico
22 Community College; is that correct?
23 A. Yes.
24 Q. Did you do anything to further attempt to find
25 and locate the individual that was alleged to have had a

Page 60

1 gun, a handgun, and had threatened Mr. Gurule?
2 A. Yes.
3 Q. What did you do?
4 A. While I was en route to that location, I
5 passed directly the general area of where that
6 individual would have been walking, based off of what
7 was described to me.
8 Q. Okay.
9 A. And I checked that area on my way to the
10 residence, or the business.
11 Q. Okay. I'm -- a little after that, because the
12 first question was Mr. Gurule told you the name of the
13 individual, the direction he was walking in, and the
14 fact that he had a handgun. At that point you didn't do
15 anything to try to locate this individual?
16 A. Not to my knowledge.
17 Q. Did you ask Mr. Gurule for a description of
18 the individual that pulled the handgun out on him?
19 A. I believe so.
20 Q. And what description did you get?
21 A. I can't specifically recall.
22 Q. Did you document the description of the
23 individual in your incident report?
24 A. I don't believe so.
25 Q. Wouldn't that be standard procedure in the

Page 61

1 investigation of an assault with a weapon, to document
2 the -- a description of the individual that allegedly
3 had the weapon and committed the assault?
4 A. Yes.
5 Q. But why didn't you do it in this instance?
6 A. I believe in this instance I didn't document
7 that part because of how broad a situation this
8 developed into. And I don't know exactly why I did not.
9 Q. Okay. So did -- is it fair to say from what
10 you described that your attention turned away from Mr.
11 -- the suspect, and you began investigating the incident
12 with the individuals at the scene?
13 A. Yes.
14 Q. Did you put a description of the individual
15 suspect over the radio to dispatch?
16 A. I can't specifically recall if I did that or
17 if they obtained that information from the 911 caller.
18 Q. If who obtained the information?
19 A. If dispatch obtained that information and then
20 relayed it to me on my -- I know that on my way to the
21 scene they described the individual, I believe. That's
22 how I was able to check the area and determine nobody
23 was there.
24 Q. Okay. But when you talked to Mr. Gurule, you
25 got a description of him?

Exhibit J

Page 62

1 A. Yes.
2 Q. And did you give that description to dispatch?
3 A. I cannot recall at this time.
4 Q. Wouldn't that be a standard part of the
5 operating procedures in terms of investigations?
6 A. Yes.
7 Q. Okay. And wouldn't it be important to provide
8 that information as soon as possible because a suspect
9 might still be in the area?
10 A. Yes.
11 Q. Why didn't you complete a separate gun
12 incident report about the incident when Mr. -- after Mr.
13 Gurule described to you what had happened?
14 A. I --
15 Q. How about --
16 MR. BASHAM: Let him answer the question,
17 please.
18 BY MR. THOMPKINS:
19 Q. I'm sorry, did you finish?
20 A. I cannot recall specifically why I did not.
21 Q. Okay. Did you have information that indicated
22 that this could potentially be a hate crime?
23 A. I'm sorry, can you restate that.
24 Q. Did you have any information when you were
25 doing your investigation that would indicate that the

Page 63

1 incident Mr. Gurule reported to you and called in to 911
2 for was a hate crime?
3 A. Yes.
4 Q. Did you make -- or why didn't you make a
5 separate report on the -- on a potential hate crime?
6 A. I don't know specifically why not.
7 Q. Okay. Did you write up a criminal complaint
8 for the individual that pulled the gun out on Mr.
9 Gurule?
10 A. No, I did not.
11 Q. Did you write a statement of probable cause on
12 the individual that allegedly pulled the gun out on Mr.
13 Gurule?
14 A. No, I did not.
15 Q. When you were doing your investigation, at one
16 point you began to focus on Ms. Pettine? Do you recall
17 that?
18 A. Yes.
19 Q. And do you recall if during the period of time
20 that you were questioning Ms. Pettine if the child, I
21 believe her name was Kolby, was in any danger while she
22 was with Ms. Pettine?
23 A. Yes.
24 Q. Okay. And what type of danger did you believe
25 she was in?

Page 64

1 A. I believe she was in danger from the elements
2 at that time.
3 Q. From?
4 A. The -- as far as weather. The heat.
5 Q. Okay.
6 A. She was also -- when I first made contact with
7 Ms. Pettine, she was barefoot, walking around on the hot
8 gravel, which is basically the driveway area and front
9 yard area of that business and residence.
10 Also in that area was broken glass, several
11 pieces of broken glass that I was able to see.
12 Q. Okay. So at the time that you were doing your
13 investigation and you were talking to Ms. Pettine, the
14 child was walking around on broken glass and rocks and
15 in a heated area?
16 A. Initial --
17 MR. BASHAM: Objection. That improperly
18 characterizes his testimony.
19 BY MR. THOMPKINS:
20 Q. Was that your testimony, that she was walking
21 around on hot rocks?
22 A. Initially, yes.
23 Q. Initially. Glass, broken glass?
24 MR. BASHAM: That's where I believe that my
25 objection stands.

Page 65

1 BY MR. THOMPKINS:
2 Q. Did you believe she was walking around on
3 broken glass?
4 A. Initially, yes.
5 Q. Do you recall testifying in the -- and because
6 of those things you believe that Kolby was in danger?
7 A. Yes.
8 Q. Do you recall being called to testify in the
9 custody case that Ms. Pettine had against the child's
10 father?
11 A. Yes.
12 Q. And do you recall being asked the question
13 during your -- this investigation, Officer Apodaca, was
14 Kolby in any type of danger while she was with the
15 mother?
16 Do you recall being asked that question?
17 A. I don't recall specifically.
18 Q. Let me ask you if you recall answering that
19 question with this answer: During the investigation I
20 would say that Kolby was exposed -- excuse me -- during
21 the investigation I wouldn't say that Kolby was exposed
22 to any danger while we were there.
23 Do you recall giving that answer in the
24 custody case that Ms. Pettine had with Mr. Londo?
25 Londono. Excuse me.

Exhibit J

Page 66

1  A. I do recall slightly that.
2  Q. Okay. And that testimony that I just read to
3  you, if that were true, in terms of your testimony, is
4  inconsistent with what you just told us today about the
5  danger that Kolby was faced while she was with her
6  mother?
7  A. I don't believe it's inconsistent.
8  Q. Okay. And how is it not inconsistent?
9  A. Like I stated, initially I believe that she
10 was in danger upon my arrival, when I did observe her
11 walking around that area right there.
12     But once I was out and speaking with her, I
13 believe that that danger was -- had subsided slightly
14 because I was there intervening now.
15 Q. Okay. How long did you observe Kolby when you
16 arrived?
17 A. Approximately a couple minutes, I can't say
18 specifically.
19 Q. A couple of minutes?
20 A. Less than that.
21 Q. Okay.
22     MR. BASHAM: Can I just go on the record here
23 and say perhaps from now on instead of referring to the
24 child by her name, refer to the two-year old, in the
25 event that some of this may be used at trial?

Page 67

1     MR. THOMPKINS: If we go to trial I'm going to
2  refer to the child by her name. There is nothing to
3  prevent me from referring to her by her name. He
4  referred to the child by her name in his report.
5     So why do we have to call her a two-year old
6  child?
7     MR. BASHAM: Then why can't you put it in a
8  complaint? Because they don't want the child's --
9  that's -- come on, Nate, we went through this with the
10 judge.
11    MR. THOMPKINS: We didn't go through a
12 deposition saying I couldn't mention the name. Why did
13 he put it in the complaint?
14    MR. BASHAM: Never mind. I'm on the record.
15 BY MR. THOMPKINS:
16 Q. So you don't know how long you were there at
17 the scene?
18 A. Not --
19    MR. BASHAM: Objection, asked and answered.
20 A. Not specifically.
21 BY MR. THOMPKINS:
22 Q. And so for the time period you were there,
23 whatever time that was, you didn't indicate when you
24 answered this question that the child was in any danger.
25 A. I can't specifically say how long she was in

Page 68

1  that danger for.
2  Q. Well, you were talking -- during your
3  investigation you talked to other people besides Ms.
4  Pettine, didn't you?
5  A. Yes.
6  Q. And where was the child and where was Ms.
7  Pettine when you were talking to Alfonzo Gurule?
8  A. She was walking around the area holding the
9  child.
10 Q. Holding the child in her arms?
11 A. She would hold her, place her down.
12 Q. And in that period of time your testimony was
13 she was in no danger?
14    MR. BASHAM: Objection. Mischaracterizes his
15 testimony.
16 BY MR. THOMPKINS:
17 Q. Isn't it your testimony during the
18 investigation I would say that Kolby wasn't exposed to
19 any danger while we were there?
20 A. I believe that's correct.
21 Q. Okay. So while you were there, and Ms.
22 Pettine is holding the child and putting her down, the
23 child wasn't in any danger.
24 A. I don't believe so.
25 Q. When you -- when Mr. Gallegos was -- did you

Page 69

1  instruct Mr. Gallegos to stand by the back of your
2  patrol car?
3  A. Yes, I believe I did.
4  Q. And at some point did Mr. Gallegos leave that
5  point and attempt to return to his house?
6  A. Yes.
7  Q. And what did you and Officer Vigil do when he
8  attempted to re-enter his home?
9  A. We attempted to stop him from re-entering his
10 home.
11 Q. Did you describe in your report that you ran
12 after him?
13 A. Yes, I believe so.
14 Q. And that you yelled at him to stop?
15 A. I believe so, yes.
16 Q. Okay. And at that point you established your
17 authority as a police officer to get Mr. Gallegos to
18 comply.
19 A. Yes.
20 Q. And Mr. Gallegos then stopped. He didn't
21 enter the house, did he?
22 A. No.
23 Q. And he was not free to leave at that point,
24 was he?
25 A. No.

Exhibit J

Page 70

1 Q. And wasn't he therefore under arrest?
2 A. Technically, yes.
3 Q. Okay. At that point, when you and Officer
4 Vigil prevented him from entering his house, what crime
5 did you suspect he had committed?
6 A. At the point when we stopped him what crime
7 had he committed, you mean?
8 Q. You yelled stop, you ran after him, and you
9 said he stopped. And now at that point he is not free
10 to leave and he is under arrest. What crime did you
11 suspect he had committed?
12 A. The resisting, evading or obstructing a police
13 officer.
14 Q. By walking from the car to his house he was
15 resisting, obstructing and evading a police officer?
16         MR. BASHAM: Objection. Asked and answered.
17 A. Yes, I believe so.
18 BY MR. THOMPKINS:
19 Q. And that's the crime that you arrested him for
20 at that point when you arrested him, for obstructing,
21 evading and resisting?
22 A. Yes.
23 Q. How did he evade?
24 A. By -- during the course of my investigation I
25 instructed him to stand there by my police car. Being

Page 71

1 that there was weapons involved and by his statement
2 that the only weapons there, were in his house. So for
3 officer safety sake, I instructed him to stand by my
4 police car where I was able to observe him and keep an
5 eye there, that he didn't have access to any weapons.
6         And by him leaving that point and attempting
7 to re-enter the home where he just told us that the only
8 weapons were inside his home, he was therefore
9 committing the resisting, obstructing and evading a
10 police officer.
11 Q. What facts did you have about the weapon that
12 was in the home at the time that you've told him to
13 stop?
14 A. Only the presence that he had told me of there
15 being weapons in the home.
16 Q. What facts did you have that would indicate
17 where the weapon was located at the time that you
18 prevented him from entering his home?
19         MR. BASHAM: Objection, asked and answered.
20 A. I didn't have any facts as to where it was
21 located.
22 BY MR. THOMPKINS:
23 Q. What facts did you have that would indicate
24 what type of weapon that it was that was in the home at
25 the time that you prevented him from entering his home?

Page 72

1 A. The fact that he referred to it as a -- the
2 gun or guns.
3 Q. Okay. At no point did he refer to it as the
4 gun that Mr. Gurule told you about, did he?
5 A. No, not to my knowledge.
6 Q. And at no point did Mr. Gurule refer to the
7 gun that Mr. Gallegos, Antonio Gallegos told you about,
8 as being the gun that was pointed at him, did he?
9 A. I'm sorry?
10 Q. Mr. Gallegos -- excuse me, Mr. Gurule, did he
11 ever tell you that the gun that Antonio Gallegos
12 referred to was the gun that was pointed at him?
13 A. No, I don't believe so.
14 Q. Okay. Do you recall being interviewed by
15 Chief Martinez, Chief Joe Martinez when a complaint was
16 filed about this incident?
17 A. Yes.
18 Q. And do you recall -- did you ever get a copy
19 of and/or see his supplement to your report of that
20 incident, of that investigation?
21 A. Yes, I believe so.
22 Q. And do you recall what he said about where the
23 weapon was located when he documented it in his
24 supplemental report?
25 A. I can't recall specifically.

Page 73

1 Q. I'm going to place before you what's been
2 marked as Exhibit 5 to Mr. Vigil's deposition, and
3 direct your attention to, if we -- it's easier to go up
4 from the bottom, one, two, three, third paragraph from
5 the bottom.
6         I'm sorry, second paragraph from the bottom,
7 beginning with, I contacted the officers involved and
8 had them give me their side of the story. See report by
9 Jeremy Apodaca for details.
10         And he says, "officer," and I quote, "Officer
11 Robert Vigil stated that a weapon was believed to be
12 somewhere on the premises of the vehicle. So they could
13 not allow anyone out of their sight."
14         Do you have any reason to believe that the
15 chief did not record what Robert Vigil told him
16 accurately in his supplemental report?
17 A. I believe that's accurate.
18 Q. Okay.
19         MR. BASHAM: You know, since your expert is
20 taking a break, maybe we can take a five-minute break.
21 We have been going for almost two hours.
22         MR. THOMPKINS: Sure. Let's take a -- how
23 much time do you need?
24         MR. BASHAM: Five.
25         MR. THOMPKINS: Five minutes?

Exhibit J

Page 74

1  MR. BASHAM: Yes.
2  (Break taken.)
3  BY MR. THOMPKINS:
4  Q. When Mr. Gurule made a description of the
5  individual that is alleged to have pointed the gun at
6  him, his father didn't fit that description, did he?
7  A. No.
8  Q. When you -- you made a decision to -- strike
9  that.
10    Who made the decision to arrest Kristian
11 Pettine?
12  A. I believe I did.
13  Q. You didn't charge her with neglect or abuse of
14 the minor child in this case, did you?
15  A. No.
16  Q. Did you have any facts that would support
17 that?
18  A. I believe yes.
19  Q. Why didn't you make the charge?
20  A. I honestly don't recall at this point in time
21 why I did not.
22  Q. What did you charge Ms. Pettine with?
23  A. I believe I charged her with resisting,
24 evading or obstructing an officer.
25  Q. And before you arrested her did you obtain a

Page 75

1  warrant to arrest her?
2  A. No, I did not.
3  Q. Can you tell us why you did not?
4  A. Because she was resisting, evading or eluding
5  me by -- at this point in time when she stopped, I was
6  trying to obtain information for the sake of the child
7  to place the child with either the child's father or
8  family member.
9    And she wouldn't give me any information as
10 far as anybody that would possibly be able to take the
11 child.
12    And then at the same time that all this was
13 happening with Mr. Gallegos, she was almost provoking
14 him in a sense, to -- which was causing him to react in
15 a negative way and be more combative.
16    So she was therefore resisting, because we
17 kept telling her stay back, just stay out, stay back for
18 right now, and stuff to that effect. And she just kept
19 on -- I would say provoking him.
20  Q. Okay. What did she say that provoked him?
21  A. I can't specifically recall.
22  Q. Did you write it in your report?
23  A. No, I did not.
24  Q. Okay. Did she lose her right to free speech
25 because you were arresting her husband?

Page 76

1  A. No.
2  Q. Which -- what is your training -- what did
3  your training teach you with respect to what you need in
4  order to make a warrantless arrest?
5  A. Probable cause.
6  Q. Anything else?
7  A. Basically the facts that you can see while you
8  are conducting your investigations.
9  Q. Okay. Let me make sure I understand. What is
10 your definition of probable cause? Or what is your
11 understanding the definition of probable cause is?
12  A. Probable cause is the reasonable belief
13 basically that a crime occurred, based off of facts that
14 you obtain or come by throughout the course of your
15 investigation, which are then used to -- well, which a
16 reasonable person would believe a crime occurred. And
17 it's used to effect an arrest.
18  Q. Okay. So, in order for an officer to make a
19 warrantless arrest, he only needs probable cause and
20 facts that support the probable cause?
21  A. Basically, yes.
22  Q. And you learned that from your training at the
23 law enforcement academy?
24  A. Yes.
25  Q. And did you learn -- or did you have any

Page 77

1  training on warrantless arrests while you were employed
2  at the Española Police Department?
3  A. I can't specifically recall at this time.
4  Q. When you did your field training, did your
5  field trainer go over with you what is required to make
6  a warrantless arrest?
7  A. Yes.
8  Q. And did what he trained you on include what
9  you just described as probable cause?
10  A. Yes, I believe so.
11  Q. And the facts that support the probable cause?
12  A. Yes.
13  Q. And he didn't tell you that you needed
14 anything else?
15  A. In regards to evidence or part of the facts?
16  Q. Anything.
17    MR. BASHAM: Objection, calls for hearsay.
18  A. I can't specifically recall at this time.
19 BY MR. THOMPKINS:
20  Q. Did he -- when you were trained at the
21 academy, did they make a distinction between the type
22 and level of crime that was required for a warrantless
23 arrest?
24  A. I don't specifically recall.
25  Q. When you were in your field training at the

Exhibit J

Page 82

1  Q. And so it was the responsibility of your
2  supervisor to fill out the taser report form in this
3  incident?
4  A. Yes.
5  Q. And do you have an understanding as to why a
6  taser report form was not completed and made a part of
7  your Uniform Incident Report?
8  A. I do not know why.
9  Q. Did you take photographs -- strike that.
10      Can you tell me how many times you tasered Mr.
11 Gallegos?
12 A. To the best of my knowledge, I believe it was
13 twice. Two times.
14 Q. Can you look through your incident report and
15 tell me how many times in your incident report it says
16 that you tasered Mr. Gallegos?
17     MR. BASHAM: I believe it's the top of the
18 second page.
19     MR. THOMPKINS: I think he is looking at the
20 probable cause statement instead of the incident report.
21     MR. BASHAM: Oh.
22     MR. THOMPKINS: I thought maybe it was -- I
23 mean, they are both the same maybe, but I thought it was
24 faster for him to find it there.
25 A. It appears that I did it once.

Page 83

1 BY MR. THOMPKINS:
2  Q. Okay. In your report you reported it once?
3  A. Yes.
4  Q. Did your supervisor, Jeff Martinez, review
5  your Uniform Incident Report and the incident narrative
6  and sign off on it?
7  A. I can't honestly say whose signature this is,
8  on my report, of the approving officer.
9  Q. Okay. But normally your Uniform Incident
10 Reports get approved and signed by your supervisor?
11 A. Yes.
12 Q. And did you, after Mr. Gallegos was handcuffed
13 and on his stomach on the porch, did you taser him
14 again?
15 A. I don't believe so.
16 Q. Okay. Do you -- if you -- never -- strike
17 that.
18     Did Officer Vigil have a taser at the time
19 that you were arresting Mr. Gallegos?
20 A. I can't honestly say for sure.
21 Q. Did you observe Officer Vigil use a taser on
22 Mr. Gallegos?
23 A. I can't recall at this time.
24 Q. If he had used a taser on Mr. Gallegos, would
25 that go into your Uniform Incident Report?

Page 84

1  A. Yes, I believe it's something I would have put
2  in.
3  Q. Is it your understanding that, given what
4  Officer Vigil had done that day, in reference to Mr.
5  Gallegos, that he would be required to fill out his own
6  incident report of what his involvement was and what
7  activities he observed?
8  A. Yes, typically.
9  Q. And would that then become a part of your
10 Uniform Incident Report because his would be a
11 supplemental to your report?
12 A. Yes.
13 Q. And do you recall if -- in your copy of the
14 Uniform Incident Report if Officer Vigil provided a
15 supplemental report?
16 A. I don't recall.
17 Q. Do you know why?
18 A. No, I do not.
19 Q. If Mr. Gallegos had three taser burns on his
20 body, can you explain why your report only mentions one
21 taser use and there are three on his body?
22 A. I cannot.
23 Q. In the information that's downloaded from the
24 taser unit, does it provide information about -- in
25 terms of the sequence and timing of when the taser is

Page 85

1  used, how close in time or how far apart in time the
2  taser is actually used?
3       MR. BASHAM: Objection, compound.
4  A. I can't honestly say or answer to that.
5  BY MR. THOMPKINS:
6  Q. Have you ever seen a taser -- the data that is
7  downloaded from a taser unit when it's downloaded?
8  A. No, I have not.
9  Q. Let me draw your attention to Exhibit 2 to
10 Robert Vigil's deposition, which is the less than lethal
11 weapons. And I'm going to direct your attention to page
12 5. It's numbered, they are numbered at the bottom.
13     In the right-hand column it says Reporting,
14 and 73.1.30, "officers will photograph the person's
15 affected area as soon as possible under normal
16 circumstances whenever a less" than "lethal weapon was
17 deployed."
18     Were you aware that the taser policy for the
19 Española Police Department required that an officer
20 photograph the person's affected area?
21 A. No, I was not.
22 Q. Did you receive any training on the policy and
23 directives for the Española Police Department with
24 respect to the use of tasers?
25 A. Yes.

Exhibit J

Page 86

1  Q. Who provided you with that training?
2  A. I can't specifically recall at this time.
3  Q. Okay. Was it another officer at the Española
4  Police Department?
5  A. I don't believe so.
6  Q. Okay.
7  A. I believe it was possibly an instructor from
8  another agency that came and did that training.
9  Q. And the training was conducted at the Española
10 Police Department?
11 A. Yes.
12 Q. And they went over this training, this outside
13 trainer went over the directives of the Española Police
14 Department?
15 A. I can't specifically recall.
16 Q. Okay. Did you take photographs of the
17 affected areas that you dry stunned Mr. Gallegos?
18 A. No, I did not.
19 Q. Did you instruct anyone to take photographs of
20 the area that you dry stunned Mr. Gallegos?
21 A. I don't believe so.
22 Q. When your supervisor reviewed your report, and
23 signed off on it, did he ask you if you photographed the
24 area that you dry stunned Mr. Gallegos?
25 A. I don't believe so.

Page 87

1  Q. Did your supervisor go over this report with
2  you?
3  A. No.
4  Q. Did the chief, when he did his supplemental
5  investigation, go over the report with you?
6  A. I don't recall.
7  Q. The second paragraph under Reporting is
8  73.1.31. "A Use-of-Force form shall be completed and
9  submitted to the office of the chief of police any time
10 the expandable baton, OC spray, taser, is utilized as a
11 weapon. Use-of-force forms will be completed and
12 submitted in accordance with the use of force policy."
13      Did you comply with this requirement and
14 submit the use of form force -- excuse me --
15 Use-of-Force form in your use of the taser on July 31st,
16 2010?
17 A. No, I did not.
18 Q. Do you have an understanding that there is a
19 separate use of force policy within the Española Police
20 Department aside from the less than lethal weapon
21 requirement or directive?
22 A. No, I was not.
23 Q. Were you ever trained while you were at the
24 Española Police Department that a separate use of force
25 policy is in existence for force that is used other than

Page 88

1  OC spray, baton, or taser?
2  A. I do not recall that.
3  Q. The next paragraph under Reporting is 73.1.32,
4  "all additional deployment forms will be completed and
5  submitted through the office of the chief of police
6  and/or to their appropriate tracking unit, I.E.,
7  Offense, Incident, Criminal Complaints/Probable Cause
8  Statements and Taser Use Report" forms.
9      When you completed your Uniform Incident
10 Report, did you submit it to the office of the chief of
11 police?
12 A. No, I did not.
13 Q. Did you attach the reports that are identified
14 in I.E. offense incident, criminal complaints, probable
15 cause statements and taser report -- use report?
16 A. I submitted them with --
17 Q. Where is it -- I'm sorry, I didn't mean to cut
18 you off. Were you finished?
19 A. It was my report.
20 Q. There is a taser report -- Taser Use Report in
21 your -- in there?
22 A. No, there is not.
23 Q. You have an I.E. offense incident?
24 A. No. Well, it's offense incident, uniform
25 report.

Page 89

1  Q. Is that what an I.E. offense incident is?
2  A. To my understanding.
3  Q. Okay. What's the appropriate tracking unit?
4  What does that -- do you have an understanding as to
5  what that refers to?
6  A. I do not.
7  Q. Okay. In the next and final paragraph of the
8  reporting section on page 5 of 73.1.33 "video recordings
9  and/or photographs shall be submitted to the property
10 section as evidence."
11      In completing your Uniform Incident Report,
12 did you submit any videos or photographs to the property
13 section as evidence?
14 A. I did not, no.
15 Q. Did your supervisor discuss with you any of
16 the reporting requirements that are contained in the
17 department's directives 73.1, and ask you why these
18 weren't complied with?
19 A. Not that I can recall.
20 Q. Did the chief ever sit down and discuss any of
21 this information with you?
22 A. I can't recall that at this time.
23 Q. Did your supervisor ever tell you that he was
24 not going to submit a taser use of force -- or a taser
25 report form?

Exhibit J