```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW MEXICO
 2

 3
    ANTONIO GALLEGOS, KRISTIAN PETTINE,
 4  ANDRE GALLEGOS, and K.L.P.L., a
    minor child,
 5
                 Plaintiffs,
 6
    vs.                              No. 1:12-CV-224-LH/KBM
 7

 8  CITY OF ESPAÑOLA, a municipal corporation,
    JOE MARTINEZ, individually and in his official capacity;
 9  JEREMY APODACA, individually and in his official
    capacity; ROBERT VIGIL, individually and in his official
10  capacity; CITY OF ESPAÑOLA OFFICERS and SUPERVISORS JOHN
    DOES 1 through 10, individually and in their official
11  capacities,

12
                 Defendants.
13

14            DEPOSITION OF ROBERT VIGIL

15              Monday, June 17, 2013
                    9:25 A.M.
16           Cumbre Court Reporting, Inc.
                 2019 Galisteo Street
17            Santa Fe, New Mexico 87505

18

19        PURSUANT TO THE NEW MEXICO RULES OF CIVIL
    PROCEDURE, this Deposition was:
20
    TAKEN BY:    NATHANIEL V. THOMPKINS
21               ATTORNEY FOR THE PLAINTIFFS

22
    REPORTED BY: ALLISON ASH-HOYMAN
23               NEW MEXICO CCR #18
                 CUMBRE COURT REPORTING, INC.
24               2019 Galisteo, Suite A-1
                 Santa Fe, New Mexico 87505
25
```

Exhibit K

1  Q. Okay. And who was present when you arrived
2  with Officer Apodaca?
3  A. I believe Ms. Kristian Pettine was there,
4  Antonio Gallegos was there, and a little child, I want
5  to say two years old or younger.
6  Q. Okay. Anybody else?
7  A. There were other individuals in the home but I
8  don't recall their names.
9  Q. Okay. Now, when you say "there were other
10 individuals in the home," Kristian, Antonio and the baby
11 were outside?
12  A. Yes.
13  Q. In relation to the home, where outside were
14 they?
15  A. Antonio Gallegos was -- Officer Apodaca's car
16 was parked in front of the front door of the home, not
17 all the way to the door, but was parked a little ways
18 back. Antonio Gallegos was on the right side of the
19 vehicle, I believe by the rear, the rear tire. If I'm
20 correct.
21  Q. Okay. And where was Kristian Pettine, do you
22 recall?
23  A. I don't recall.
24  Q. And how about the baby?
25  A. The baby was walking around, I remember. She

Page 103

1  was walking around in an obviously soiled diaper without
2  a shirt, without any shoes, without any pants on,
3  walking around on hot gravel.
4  Q. Okay. At the moment that you observe Antonio
5  Gallegos by the back of the car, Ms. Pettine somewhere
6  outside the house, and the baby walking around, did you
7  have reason to believe that any of them had committed a
8  crime or was involved in committing a crime?
9      MR. BASHAM: Objection as to form.
10  A. When I arrived and I spoke to Officer Apodaca,
11 I wasn't exactly sure who had the weapon.
12 BY MR. THOMPKINS:
13  Q. Okay.
14  A. So I didn't know at that time if somebody had
15 committed a crime or not.
16  Q. Okay. So you didn't have any facts or
17 information that indicated that Antonio Gallegos had a
18 weapon?
19  A. Well, I -- there was weapons in the home, from
20 what I was told from Officer Apodaca or -- I'm sorry,
21 there was a weapon somewhere, we weren't sure where it
22 was at. We didn't know who pointed the weapon at the
23 individual.
24  Q. Well, did you talk to the complainant?
25     Where was the complainant, by the way, when

Page 104

1  you arrived?
2  A. I'm thinking he was outside. If I'm -- it's
3  been so long. I want to say he was sitting on the rear
4  of a pickup truck, on the tailgate, but I'm not exactly
5  sure.
6  Q. Okay. And did you have any information that
7  he said Antonio Gallegos was the one who pointed the gun
8  at him?
9  A. No.
10  Q. Did he have -- or did you get any information
11 from him that Christine Pettine -- Christine -- Kristian
12 Pettine was the one who pointed the gun at him?
13  A. No.
14  Q. Did Officer Apodaca give you any information
15 that indicated that Antonio Gallegos was the person who
16 pointed the gun?
17  A. No.
18  Q. And did Officer Apodaca give you any
19 information that indicated that Kristian Pettine was the
20 one who pointed the gun?
21  A. No.
22  Q. And you didn't suspect the baby of pointing
23 the gun?
24  A. Obviously not.
25  Q. So as you are assisting Officer Apodaca, whose

Page 105

1  questioning -- what questioning is being conducted of
2  either Mr. Gallegos or Ms. Pettine?
3     MR. BASHAM: Objection to form.
4  A. One thing that Officer Apodaca was trying to
5  find was the weapon, where the weapon was. We weren't
6  sure where the weapon was. And he was trying to sort
7  out exactly who pointed the weapon, or pointed the
8  weapon at the victim.
9  BY MR. THOMPKINS:
10  Q. Let me -- I may have confused you. I don't
11 want you to think or tell us what you think Officer
12 Apodaca was thinking or trying to do.
13     I want to know if you know what questions
14 either he was asking of Antonio Gallegos, or anybody
15 while you were assisting him.
16     Do you know or recall?
17  A. Some of the questions -- I don't know verbatim
18 what the questions were, but some of the questions
19 referred to where the weapon is at.
20  Q. Okay. And did any of the people that he was
21 questioning tell him where -- and the weapon that you
22 are referring to, is that the one that was pointed at
23 the complainant?
24  A. At the time that's the only weapon I knew
25 should have been around.

Page 106

1   Q. Okay. And did Officer Apodaca, or did you
2   hear any of the people that were being questioned
3   indicate to you where the weapon was that had been
4   pointed at the complainant?
5   A. No. What they did, I believe it was Ms.
6   Pettine that did confirm there was a weapon but didn't
7   know where it was at.
8   Q. Okay. Did -- would that -- as a police
9   officer, if Ms. Pettine had confirmed, like you said,
10  there was a weapon someplace, would that be information
11  that should make it into a report someplace?
12  A. What do you mean by "report someplace"? If a
13  report should be taken on this incident?
14  Q. Well, isn't there a report taken on this
15  incident?
16  A. Yes.
17  Q. Okay. In that report did you read anywhere
18  that Kristian Pettine said there was a weapon someplace?
19  A. No, I did not.
20  Q. Okay. If she had indicated -- because you
21  were concerned about a weapon, if she had indicated
22  there was a weapon someplace, would that piece of
23  information be something that is important enough to be
24  listed in the incident report?
25  A. Yes. And I'm not -- there is Antonio Gallegos

Page 107

1   going off threatening to tell Judge Naranjo what was
2   going on. He did admit to there being firearms in the
3   home. He did threaten myself and Officer Apodaca with a
4   civil suit, or with a lawsuit is what he said.
5   Q. Does that have any reference to the gun that
6   was alleged to have been pointed at the complainant?
7   A. Yes.
8   Q. What gun?
9   A. He admitted to there being guns in the home.
10  We didn't know if those were the guns.
11  Q. Did he admit to pointing a gun at the
12  complainant?
13  A. No, but there were guns. We didn't know which
14  gun it was. He admitted to there being guns in the
15  home. We didn't know where the gun was at, so we didn't
16  know if the guns in the home were the actual guns
17  pointed at the complainant.
18  Q. Okay. Did you have any information that
19  indicated to you that the gun in the house was the one
20  that was pointed at the complainant?
21  A. No.
22  Q. Did you have any information that Antonio
23  Gallegos had taken a gun out of the house and pointed it
24  at the complainant?
25  A. No.

Page 108

1   Q. At the time that you -- did you ask any
2   questions of either Antonio Gallegos --
3   A. I did ask Antonio Gallegos questions, I just
4   don't recall what the questions were.
5   Q. Did you ask him if he pointed a gun at the
6   complainant?
7   A. I don't recall.
8   Q. Did you ask him if he was involved -- did you
9   ask him if he knew who allegedly pointed a gun at the
10  complainant?
11  A. I don't recall if I asked him that.
12  Q. Did you ask the complainant any questions
13  about who pointed the gun at him?
14  A. I remember speaking to the complainant, but I
15  don't know exactly what questions I asked him, either.
16  Q. Do you recall if Officer Apodaca told you that
17  the complainant identified who pointed the gun at him?
18  A. He did.
19  Q. And who was it?
20  A. I want to -- I'm not sure I remember the name,
21  but I think it was Estevan, if I'm correct.
22  Q. And he didn't say Antonio Gallegos?
23  A. No.
24  Q. He didn't say Kristian Pettine?
25  A. No.

Page 109

1   Q. He didn't say anybody that was in the house?
2   A. No.
3   Q. Okay. At some point Mr. Gallegos -- well, how
4   many questions do you recall hearing Officer Apodaca ask
5   either Antonio Gallegos or Kristian Pettine about the
6   individual or the gun that was allegedly used on the
7   complainant or pointed at the complainant?
8       MR. BASHAM: Objection as to form.
9       Go ahead.
10  A. I don't recall.
11  BY MR. THOMPKINS:
12  Q. And do you know if you asked any questions of
13  the complainant about the events that happened and led
14  to him calling?
15  A. I'm sure I did. I talked to the complainant
16  but I don't remember what the questions are.
17  Q. Okay. And how long were you observing Officer
18  Apodaca and the individuals that were outside the home
19  before anything else happened?
20  A. I don't know.
21  Q. How long -- you said you were there for an
22  hour before Sergeant Martinez --
23  A. Approximately an hour, I'm not sure on the
24  time.
25  Q. Okay, approximately an hour.

Exhibit K

Page 114

1 Kristian Pettine and the complainant? And his name is
2 Alfonzo Gurule.
3     MR. BASHAM: Objection as to form.
4 BY MR. THOMPKINS:
5   Q. Let's take it one at a time so we remove the
6 objection.
7     Is that what you observed, what you just
8 stated, in your training and experience did you observe
9 that about Antonio Gallegos?
10  A. Yes.
11  Q. Okay. Did you observe that also about
12 Kristian Pettine?
13  A. Yes.
14  Q. And did you observe that about Alfonzo Gurule?
15  A. Who is the complainant; correct? Yes.
16  Q. And where -- did any of them have any problems
17 being able to stand up and not sway?
18  A. I do believe that they were swaying. I do
19 believe that Ms. Kristian Pettine was swaying somewhat
20 when we talked to her. I do believe that Mr. Antonio
21 Gallegos was swaying when we talked to him.
22     I don't recall if I spoke to the complainant
23 while he was standing or just sitting.
24  Q. But you did observe the odor of alcohol,
25 bloodshot eyes, slurred speech?

Page 115

1   A. Yes.
2   Q. When you yelled, or raised your voice to Mr.
3 Gallegos to tell him he is not free to go into his
4 house, what did you do after that?
5   A. Mr. Gallegos continued to walk. Then I got in
6 front of Mr. Gallegos and I stopped him. I told him you
7 can't go back in.
8   Q. Okay. So you ran and got in front of Mr.
9 Gallegos before he could enter the house?
10  A. Yes.
11  Q. And told him he had to stop?
12  A. Yes.
13  Q. Okay. Did you at that point suspect Mr.
14 Gallegos of having committed or being about to commit a
15 crime?
16  A. I can't speculate if he was about to commit a
17 crime, but at the time I could not say he had already
18 committed a crime.
19  Q. You can't say he had. What crime did you
20 think he might have committed?
21  A. Let me rephrase myself.
22     I can't say he had already committed a crime.
23  Q. Okay.
24  A. Okay? But I can't speculate and say that he
25 was about to commit a crime.

Page 116

1   Q. Did you think he was about to commit a crime?
2   A. I don't know what he was thinking.
3   Q. Did you have any facts that would indicate
4 that he was about to commit a crime?
5   A. Nothing that led me to believe that he was
6 going to actually do something and commit a crime. But
7 the nature of the call, and being that there was weapons
8 in the home, which he himself stated, for the safety of
9 the officers involved we did not want him to enter back
10 into the home.
11  Q. And the call that was made was not about
12 Antonio Gallegos, was it?
13  A. It was -- no, not necessarily.
14  Q. In terms of Mr. Gallegos, when you ran in
15 front of him you restricted his movement?
16  A. By standing in front of him, yes.
17  Q. And when you ran in front of him and
18 restricted his movement, he couldn't go into the house?
19  A. No.
20  Q. Okay. And did Officer Apodaca also, when you
21 went to restrict Mr. Gallegos's movements, also follow
22 you towards Mr. Gallegos?
23  A. Yes.
24  Q. And did he assist you and also restrict Mr.
25 Gallegos's movement?

Page 117

1   A. After -- after Mr. Gallegos pushed me, and I
2 attempted to use hand techniques to control Mr.
3 Gallegos, yes, he did.
4   Q. What hand techniques did you use?
5   A. I was going to attempt to place Mr. Gallegos
6 in an arm bar, which we were trained in the academy, and
7 take him down to handcuff Mr. Gallegos. And Mr.
8 Gallegos began to struggle with us, fight with us, and
9 Officer Apodaca then dry stunned him.
10  Q. When you stopped or restricted Mr. Gallegos's
11 movements, that's when you attempted to use the hand
12 technique that you just described?
13  A. Say that again.
14  Q. You indicated that you went after Mr. Gallegos
15 and Officer Apodaca also followed?
16  A. Uh-huh.
17  Q. That you were able to get in front of Mr.
18 Gallegos?
19  A. Yes.
20  Q. And then to get Mr. Gallegos to comply you
21 attempted to use a hand technique?
22  A. Only after Mr. Gallegos battered me and pushed
23 me.
24  Q. Okay. How did he batter you?
25  A. Pushed me.

Exhibit K