IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ANTONIO GALLEGOS, KRISTIAN PETTINE,
and ANDRE GALLEGOS,

      Plaintiffs,

   -vs-                                                                                                   No. Civ. 12-0224 LH/KBM

CITY OF ESPANOLA, a municipal corporation;
JOE MARTINEZ, individually and in his official
capacity; JEREMY APODACA, individually and in
his official capacity; ROBERT VIGIL, individually
and in his official capacity; CITY OF ESPANOLA
OFFICERS and SUPERVISORS JOHN DOES 1
through 10, individually and in his official
capacities,

      Defendants.

**MEMORANDUM OPINION AND ORDER**

      **THIS MATTER** comes before the Court on Plaintiffs', Antonio Gallegos, Kristian Pettine, and Andre Gallegos, Motion for Partial Summary Judgment ("Plaintiffs' Motion for Partial Summary Judgment") (ECF No. 68), filed August 12, 2013. The Court, having reviewed the Motion, the memoranda of the parties, and the applicable law, and otherwise being fully advised, finds Plaintiffs' Motion is not well taken and it will be **denied**.

      At least this much of what transpired on the afternoon of Saturday, July, 31, 2010, in Espanola, New Mexico, is not in dispute. At 12:46 p.m., Alfonso Gurule ("Mr. Gurule") called "911" to report an aggravated assault. Dispatch contacted Officer Jeremy Apodaca ("Officer

Apodaca") and informed him that Mr. Gurule had run across the street to a gas station and was hiding from the suspect, Estevan. Estevan had left the scene with a black handgun or pistol and was believed to be walking toward Northern New Mexico Community College. On his way to the address at 1201A North Paseo de Onate, Officer Apodaca drove along the route the suspect would have taken, but he did not see anyone matching his description.

The dispatch address was a mobile home at which Plaintiff Antonio Gallegos ("Mr. Gallegos") conducted a mobile home sales business and also used as a residence. That afternoon, Officer Apodaca and Officer Robert Vigil ("Officer Vigil"), who was called to assist, encountered a number of people: Mr. Gallegos; his wife, Plaintiff Kristian Pettine ("Ms. Pettine"); Ms. Pettine's two-year-old daughter ("KL"); Andre Gallegos ("Andre"), Mr. Gallegos's seventeen-year old son; Mr. Gurule; Steven Marquez ("Mr. Marquez"), and Jason Garcia ("Mr. Garcia"). Estevan, also Mr. Gallegos's son, whose alleged actions in confronting Mr. Gurule with a pistol and telling him "you faggots don't belong here" led to these events, did not return to the scene.

The encounter lasted about an hour and concluded with Officer Apodaca using his taser at least one time to "dry stun"[1] Mr. Gallegos, additional officers being called to the scene, and everyone present being taken into custody. Mr. Gallegos was arrested and charged with battery on a

---

1 "'Dry stun mode' is also known as 'drive stun mode.'" *Hoyt v. Cooks*, 672 F.3d 972, 976 n.4 (11th Cir. 2012). As the Tenth Circuit has explained:

> A taser has two functions, "dart mode" and "drive stun mode." In dart mode, a taser shoots probes into a subject and overrides the central nervous system. In drive stun mode, the operator removes the dart cartridge and pushes two electrode contacts located on the front of the taser directly against the victim. In this mode, the taser delivers an electric shock to the victim, but it does not cause an override of the victim's central nervous system . . . . Drive stun mode is used as a pain compliance tool with limited threat reduction.

*Estate of Booker v. Gomez*, 745 F.3d 405, 414 n.10 (10th Cir. 2014) (omission in original) (citations omitted) (internal quotation marks omitted).

peace officer and resisting, evading, or obstructing an officer. Ms. Pettine was arrested and charged with resisting, evading, or obstructing an officer. KL was transported by ambulance to the Espanola Hospital for medical evaluation and taken on a forty-eight hour hold by a Children, Youth, and Family Department ("CYFD") case worker. Andre was taken with the adults to the Espanola Detention Center for transfer to the Santa Fe Youth Center for protective custody, but ended up being released to a family friend. Finally, Messrs. Gurule, Marquez, and Garcia were taken into custody on an eight-hour "detox" hold.

Plaintiffs filed this suit in federal court on March 5, 2012. In their Third Amended Complaint ("Complaint") (ECF No. 50), filed May 5, 2013, they assert a number of claims, pursuant to 42 U.S.C. § 1983 and the New Mexico Tort Claims Act. Often, however, they fail to clearly delineate either the specific cause of action or the constitutional or statutory provisions upon which a stated claim is based. Count I, for example, is titled "42 U.S.C. § 1983 against Individual Defendants" and claims damages "for violations of [Plaintiffs'] constitutional rights under color of law" by Officers Apodaca and Vigil and Chief of Police Joe Martinez ("Chief Martinez"). Compl. ¶¶ 44-43. With nothing more definite, the Court assumes that in Count I Plaintiffs intend to bring claims for violation of their Fourth Amendment rights regarding their alleged illegal seizures and arrests and the subsequent search of the mobile home and a vehicle. Count II, "Assault and Battery against Individual Defendants," is brought on behalf of Plaintiffs against both Officers. *Id.* ¶¶ 46-48. Count III, "Civil Rights Violation – Excessive Use of Force (In Violation of the Fourth and Fourteenth Amendments)," *id.* ¶¶ 49-57, alleges "use of physical force against Plaintiffs . . . without reasonable suspicion or probable cause to believe that Plaintiffs posed any physical danger to anyone," *id.* ¶ 50. In this Count, Plaintiffs also assert that Defendants "subjected [them] to

3

unreasonable force, false arrest, [and] malicious prosecution," and further allege "unlawful search and seizure." *Id.* ¶ 57. Count IV, "False Imprisonment against Individual Defendants," brings claims of false arrest and imprisonment against both Officers. *Id.* ¶¶ 58-60. In Count V, "42 U.S.C. § 1983 against the City of Espanola," Plaintiffs claim violations of their rights because the City of Espanola ("City") "developed and maintained policies or customs exhibiting deliberate indifference to the constitutional rights of persons in Espanola," *id.* ¶ 62, and "[i]t was the policy and/or custom of [the City] to inadequately and improperly investigate citizen's complaints of police misconduct and acts of misconduct were instead tolerated," *id.* ¶ 63, and "to negligently hire, inadequately supervise, discipline and train its police officer [sic] . . . , thereby failing to adequately discourage further constitutional violations on the part of its police officers," *id.* ¶ 64. Count VI, "Malicious Abuse of Process against the City of Espanola," alleges that the City, "without probable cause, filed criminal charges against Plaintiffs," *id.* ¶ 68, with the "primary motive . . . to accomplish an illegitimate end," *id.* ¶ 70, with the charges against Mr. Gallegos subsequently being dismissed with prejudice, *id.* ¶ 68, and the charges dismissed against Ms. Pettine at trial in Magistrate Court, *id.* ¶ 69. Lastly, in Count VII, "Punitive Damages against Individual Defendant," Plaintiffs claim they "are entitled to an award of punitive damages against each individual Defendant, Officers and Supervisors Does 1 through 10, in their individual capacity." *Id.* ¶ 73.

Mr. Gallegos and Ms. Pettine now move for partial summary judgment.[2] Mr. Gallegos first argues that the Officers had no basis to detain and no probable cause to arrest him, thereby entitling him to judgment as a matter of law. Ms. Pettine maintains the same regarding her detention and

---

2  Although Andre Gallegos also joined in the Motion for Partial Summary Judgment, he subsequently dismissed with prejudice all of his claims against all Defendants. *See* Stipulation of Dismissal with Prejudice of All Claims Against Defendants Joe Martinez, Jeremy Apodaca and Robert Vigil (ECF No. 115), filed Dec. 12, 2013; Joint Notice of

arrest. Mr. Gallegos also moves for summary judgment on his excessive force claim. Finally, while acknowledging that Defendants have not raised the defense of qualified immunity, Plaintiffs "address this issue in anticipation of it being raised" and argue that Defendants are not entitled to qualified immunity. Pls' Mot. Partial Summ. J. 22.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In applying this standard, the Court must "view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999). Initially, the moving party bears the burden of showing that no genuine issue of material fact exists. *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial. *Id.* The nonmoving party must go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.*; *Kaus v. Standard Ins. Co.*, 985 F. Supp. 1277, 1281 (D. Kan. 1997) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Fourth Amendment "protects the right of individuals to be free from improper arrest and detention." *Buck v. City of Albuquerque*, 549 F.3d 1269, 1281 (10th Cir. 2008). A Fourth

---

Settlement Between Plaintiff Andre Gallegos and Defendant City of Espanola (ECF No. 121), filed Jan. 29, 2014.

Amendment seizure occurs when an officer, "by means of physical force or show of authority, terminates or restrains . . . freedom of movement through means intentionally applied." *Morris v. Noe*, 672 F.3d 1185, 1192 (10th Cir. 2012) (quoting *Brendlin v. California*, 551 U.S. 249, 254 (2007)). In deciding "whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 439 (1991) (quoting *Brendlin*, 551 U.S. at 254. As the Tenth Circuit discussed in *Morris*,

> [t]he Supreme Court has identified three categories of police-citizen encounters: consensual encounters, investigative stops, and arrests. Consensual encounters are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing. An investigative detention, also called a *Terry* stop, is an encounter in which police may stop and briefly detain a person for investigative purposes. Such a stop is a Fourth Amendment seizure, but does not require probable cause. Rather, a *Terry* stop is justified if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause. Finally, an arrest is a form of Fourth Amendment seizure characterized by the intrusive or lengthy nature of the detention An arrest must be supported by probable cause A detention ceases to be a *Terry* stop and becomes an arrest if it continues for an excessive time or closely resembles a traditional arrest.

672 F.3d at 1191-92 (citations omitted) (internal quotation marks omitted).

While it is well settled that a police-citizen encounter which goes beyond the limits of a *Terry* stop is an arrest that must be supported by probable cause or consent to be valid, a *Terry* stop does not automatically become an arrest when officers use handcuffs or place a suspect on the ground. *Gallegos v. City of Colorado Springs*, 114 F.3d 1024, 1030 (10th Cir 1997) (citing *United States v. Perdue*, 8 F.3d 1455, 1462-63 (10th Cir.1993)). "Police officers are 'authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status

quo during the course of [a *Terry*] stop.'" *Id.* (quoting *Perdue,* 8 F.3d at 1462) (alteration in original) (internal quotation marks omitted). Thus, "the use of 'intrusive precautionary measures' (such as handcuffs or placing a suspect on the ground) during a *Terry* stop do[es] not necessarily turn a lawful *Terry* stop into an arrest under the Fourth Amendment." *Id.* Rather, "[a]s long as the precautionary measures employed by officers during a *Terry* stop are reasonable, they will be permitted without a showing of probable cause." *Id.* This determination is made applying an objective standard: "[W]ould the facts available to the officer at the moment of the seizure . . . 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." *Id.* at 1030-31 (internal quotation marks omitted) (quoting *United States v. McRae,* 81 F.3d 1528, 1536 (10th Cir.1996)). The inquiry into whether an arrest is justified also is an objective one: "'Probable cause to arrest exists where, under the totality of the circumstances, a reasonable person would believe that an offense has been committed by the person arrested.'" *Morris*, 672 F.3d at 1192 (quoting *United States v. Martin*, 613 F.3d 1295, 1302 (10th Cir. 2010)).

Claims of excessive force also are analyzed under the objective reasonableness standard of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 395-97 (1989). Thus,

> [w]hether the force used by police officers is 'excessive' or 'reasonable' is an objective inquiry depending on the facts and circumstances of each particular case. The focus is on the facts confronting the officers, not their underlying intent or motivation. Moreover, reasonableness is judged 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.
> Factors to consider include, but are not limited to, [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight. An officer who has a reasonable but mistaken belief about a suspect's dangerousness may nevertheless be justified in using more force than is necessary.

7

*Cavanaugh v. Woods Cross City*, 718 F.3d 1244, 1248-49 (10th Cir. 2013) (citations omitted) (internal quotations marks omitted).

Mr. Gallegos and Ms. Pettine first move for summary judgment on their claims that Officers Apodaca and Vigil falsely arrested and falsely imprisoned them in violation of their Fourth Amendment rights. According to Plaintiffs, when Mr. Gallegos attempted to enter the mobile home, approximately an hour into the officers' investigation, both ran after him and yelled for him to stop, "thereby placing him under arrest."[3] Pls.' Mot. Summ. J. 8, Statement of Undisputed Material Facts ("PUMF") ¶ 17. Officer Vigil "physically placed himself in front of Mr. Gallegos and prevented him from entering his home[,] . . . went after him[,] physically detained [ ] Mr. Gallegos and took him to the ground." *Id.* PUMF ¶¶ 18, 19 (internal quotations omitted).[4] Additionally, Mr. Gallegos maintains that Officer Apodaca used his taser on him three times, applying it to his neck, his side, and "[f]inally, . . . the middle of [his] back, after he had been handcuffed and was lying face down on the ground." *Id.* PUMF ¶ 21.

---

3   Mr. Gallegos also argues that though he initially may have been subject to an investigative detention, this immediately turned into an arrest when Officer Vigil ordered him to stand by a police car. Pls.' Mot. Summ. J. 13.

4   Plaintiffs cite their Exhibit E, Chief Martinez's "Supplemental Report," in support of PUMF ¶ 19. The Court notes that it is an undated, unsigned document allegedly written by Chief Martinez. Similarly, Plaintiffs' Exhibits A and H are, respectively, an unsigned, undated "Incident Narrative" and a signed, but undated, "Supplemental Narrative," both attributed to Officer Apodaca. Defendants also have provided the Court with these documents and reference them in their response memorandum. Defs.' Resp. Exs. 9, 1, and 4.
   The Court questions whether these exhibits, or the other documents submitted by parties as exhibits to their memoranda, meet the evidentiary requirements set forth in Federal Rule of Civil Procedure 56(c). As no party has objected, however, and, indeed, all parties have relied upon these exhibits, the Court deems any objections waived with respect to this Motion. *See, e.g., Ruby v. Springfield R-12 Pub. Sch. Dist.*, 76 F.3d 909, 912 n.8 (8th Cir. 1996) (quoting parenthetically *Williams v. Evangelical Ret. Homes*, 594 F.2d 701, 703 (8th Cir. 1979) ("The general rule is that defects in the form of affidavits are waived if not objected to at the trial court level. Absent a motion to strike or other timely objection, the trial court may consider a document which fails to conform to the formal requirements of Rule 56[ ].")).

Mr. Gallegos argues that the Officers had "no information that [he] was engaged in any criminal activity or had committed a crime or was about to commit a crime," and they had no reason to believe that he "was a suspect in the alleged aggravated assault incident" that they were investigating. *Id.* PUMF ¶¶ 22-24. He further maintains that Officer Apodaca "had no information that an unidentified weapon in the home was involved in the aggravated assault call . . . or that the weapon posed any danger to anyone." *Id.* PUMF ¶ 25.

Regarding Ms. Pettine's arrest, Defendants point out that although Officer Apodaca testified at a subsequent custody hearing that he arrested her "'due to the fact, for one, that she was intoxicated, and also for the intoxication part, we didn't want to leave her at the scene on her own just in case she got hurt, we didn't want her to get hurt . . . ,'" he never criminally charged her for being intoxicated. *Id.* PUMF ¶ 29 (quoting Pls.' Ex. G, Hr'g Tr. 35:1-9). Also, although Officer Apodaca stated that he arrested Ms. Pettine because she "'wouldn't give me any information as far as anybody that would possibly be able to take the child'" and because she "'was almost provoking him (Antonio Gallegos) in a sense, to – which causing [sic] him to react in a negative way and be more combative,'" he did not document what Ms. Pettine allegedly said, nor could he later recall "'specifically'" what she said. *Id.* PUMF ¶¶ 30, 31 (quoting Pls.' Ex. J, Apodaca Dep. 75:4-23). Plaintiffs further observe that in his "Statement of Probable Cause" for the Criminal Complaint, Officer Apodaca did not "state that Mrs. Pettine resisted arrest or used 'fighting words.'" *Id.* PUMF ¶ 32. Finally, Defendants quote Officer Apodaca to the effect that while he was conducting his investigation, KL "was not ' . . . exposed to any danger . . . ." *Id.* PUMF ¶ 33 (quoting Ex. G 33:11-16).

Mr. Gallegos also moves for summary judgment on his claim of excessive use of force. He contends that Officer Apodaca dry stunned him three times in a short period of time, the last when he was handcuffed, lying face down on the ground, and not resisting or presenting a danger to anyone. He asserts that the evidence contradicts both Officer Apodaca's incident report and his statement that he only tased Mr. Gallegos once. He also complains that Officer Apodaca failed to follow Department directives regarding the use of tasers and the filing of required documentation and concludes the existence of an undescribed "department cover-up of the excessive force on Mr. Gallegos." Pls.' Mot. Summ. J. 24-25.

In sum, Plaintiffs contend that Defendants have not established any genuine dispute over their undisputed material facts in this case, have not shown reasonable suspicion of criminal activity to support any investigative detention or probable cause to arrest, and that Mr. Gallegos was not suspected of engaging in any criminal activity, did not pose a threat to anyone, and was not actively resisting arrest or fleeing arrest, all entitling Mr. Gallegos and Ms. Pettine to entry of partial summary judgment. The Court does not agree.

Plaintiffs have presented the Court with a severely abbreviated and, thus, incomplete statement of the facts material to determination of this case. As the Court must analyze claims of both illegal seizure and use of excessive force under the "totality of the circumstances" standard, this alone is grounds for denial of the Motion. Furthermore, while Plaintiffs do provide a more complete rendition of the factual background to this case in their "Introduction" to the Motion,

comparing that to the Defendants' version of the events only provides additional grounds for denial, as many, if not most, of the material facts in this matter are disputed.[5]

Thus, Plaintiffs relate the following:

> Antonio Gallegos . . . was at home when he saw the Defendant Officer Robert Vigil . . . outside of his business office. Mr. Gallegos thought Defendant Vigil might be a customer so he went outside and asked Defendant Vigil if he could help him. Defendant Vigil advised Mr. Gallegos that "there was a 911 call" and "… somebody had pulled a gun on somebody else." Mr. Gallegos advised Defendant Vigil that he didn't know anything about the 911 call. Further, after a considerable period of time, Mr. Gallegos advised both Defendant Vigil and Defendant Apodaca that "I didn't know of any phone call or any gun or anything that he (Alfonso Gurule) was talking about."

> Mr. Gallegos questioned Mr. Gurule and asked whether he saw Estevan with gun [sic]. Mr. Gurule responded, "no, I don't know". [sic] Mr. Gallegos then said to Defendant Vigil, "… obviously there is not anything going on here. Somebody made a call saying there was a gun and now he (Alfonso Gurule) is saying no, and he doesn't know." Mr. Gallegos, not being suspected of having committed any crime stated, "[s]o there's nothing here, there is no reason for you to stay here. … I have to go to work, I have to take care of my business, and I appreciate if you guys just left." After this statement was made by Antonio, Defendant Vigil became "got [sic] combative … raised his voice … got in my face … told me no, we are not – we are not going anywhere."

> As Mr. Gallegos "started up the stairs" to his home, "Officer Vigil ran up, he ran up behind me, said stop, stop, you can't – you can't – he told me to stop … *So I stopped at the top of the stairs* …". [sic] Defendant Vigil then "grabbed my arm and he cuffed my arm. And then he was going to get this other arm he grabbed my head and started to force my head into the wall… then Officer Apodaca ran up at the same time and used a Taser on my neck". [sic]

> As Mr. Gallegos was being accosted by the Defendants, his wife . . . and his son Andre . . . were both inside their home. Kristina [sic] was getting ready to take a shower with her two year old daughter. Mrs. Pettine then suddenly heard screaming, coming from the direction of the living-room. When she walked into the living-room she saw her husband (Antonio) "on the ground getting tased". [sic]

---

5   While the parties provided these factual renditions as general introductory narratives to their briefs, not as statements of undisputed material facts, they do cite evidentiary materials in the record in support of their versions.

. . . . While inside the home, Andre went to the lobby and he witnessed Defendants Vigil and Apodaca following his dad towards the house. Andre witnessed the two Defendants attack his father and push him against a concrete wall. As the Defendant Vigil pushed Antonio's face against the concrete wall, Defendant Apodaca reached over and applied his Taser to Antonio's neck. As his father and Defendant Vigil went towards the steps and a cement slab in front of the home, Defendant Apodaca Tased his father again on the left side. After Defendant Vigil handcuffed his father [sic] other arm and Antonio was lying face down on the ground and not resisting, Defendant Apodaca applied his Taser a third time and to the middle of Antonio's back.

Immediately following the third (3rd) application of the Taser, Andre exited the house and shouted "stop tasing my dad". [sic] Defendant Apodaca responded by running "up the stairs, and he put the Taser to my face and told me – he cursed at me. 'You shut the Fuck up, and you get against the wall,' put my hands up. And I asked, 'Why am I being arrested" [sic] What did I do? Defendant Apodaca stated "shut up" and he put "… my hand against the wall, hands up. … [sic] then he patted me down and arrested me."

Following Andre's arrest, Defendant Apodaca approached Mrs. Pettine and began screaming at her, "where is Estevan?" Defendant Apodaca did not ask Mrs. Pettine about any other family members. When the Defendant Apodaca asked about the minor child's father, Steven Marquez, a witness responded, "please don't call him because he is very abusive." This prompted the victim (Alfonso Gurule) to state, leave her (Kristian) out of this, she had nothing to do with any of this.

Shortly thereafter the Defendant Vigil, without a warrant, entered the home of the Plaintiffs and grabbed the minor child. Mrs. Pettine then immediately went and took the child from Defendant Vigil. Later, Defendant Vigil then came up to Mrs. Pettine and insisted that she give him her daughter or he would mace her face. When Mrs. Pettine stated that she did not want to give her child to the Defendant Vigil, he then "clawed" the minor child off of Mrs. Pettine, who at this time was crying and felt like she couldn't breathe." [sic] When Mrs. Pettine ran after the minor child, Defendant Vigil arrested her and while placing her in the police car, he kicked her in the legs. Defendant Vigil then laughed and exclaimed, "there goes your baby."

Pls.' Mot. Partial Summ. J. 2-5 (alterations in original) ("…" omissions in original, ". . ." added) (citations omitted).

Defendants, on the other hand, present the following:

12

Apodaca was the first law enforcement officer to arrive on the scene. He is unsure of his exact time of arrival. He parked his police vehicle in front of, but somewhat back from, the mobile home's door. Outside the mobile home business, Officer Apodaca saw a male, female and a female toddler. The minor child was sitting on the steps to the mobile home wearing nothing but an obviously soiled heavy diaper. Officer Apodaca asked the male and female what had happened; both said "nothing" and began to giggle. He asked if they had called 911 or knew anything about a gun. They giggled. The male, Steven Marquez, pointed at a man crossing the road and said "here he comes now." A male who seemed very upset was crossing Paseo De Onate towards them and another male, also upset, was just stepping out of the mobile home office. The male who had crossed the road identified himself as Alfonso Gurule. He told Officer Apodaca that a male had pulled a gun on him, saying "you fagots don't belong here."

While talking with Mr. Gurule, Plaintiff Pettine walked up to Officer Apodaca and said "there was no problem." Officer Apodaca smelled an odor of alcohol on her. She slurred her words, yelled during normal conversation and appeared to have a difficult time standing still and not swaying. Seeing several bottles of beer on the front step and inside the house and broken bottles in the front yard, Apodaca asked Pettine who are the parents of the toddler. She replied the child was her daughter, but refused to provide the name of the father or his contact information, saying only that he was somewhere in Albuquerque and very abusive. When asked if she had been drinking any alcohol, Pettine admitted to having had "just a couple."

Attempting to find someone suitable to care for the minor child, Officer Apodaca asked Pettine if there was anyone else in the mobile home. At this point two more males walked out of the home, Antonio Gallegos and Andre Gallegos. Antonio Gallegos was highly intoxicated, as were the rest of the adults at the scene. Andre was sober. As all adults at the scene were highly drunk, Officer Apodaca had dispatch contact the on-call person for the Children Youth [sic] and Families Department ("CYFD") to determine if he should take the toddler into State custody.

While Officer Apodaca was waiting for CYFD to call, Antonio Gallegos began stumbling around and asking him, Ms. Pettine and Alfonso Gurule "what was going on." Mr. Gurule told Gallegos that Estevan had pulled a gun on him. Gallegos became aggressive towards Mr. Gurule. He tried to grab him and told him to shut his "fucken' mouth and quit lying." Mr. Gurule responded, "I'm not lying. He did and it's not ok."

Officer Apodaca separated the two men, and called for another officer to come to the location. The on-call CYFD case worker, Camille, called Officer Apodaca and told him to wait, that CYFD would advise him as to a decision regarding the toddler. Officer Robert Vigil came to the scene to assist Officer Apodaca.

> Mr. Gallegos now started walking around, yelling that *the only guns he had were in his house*, that he is a business man in this town and pays taxes. He threatened to call Judge Naranjo, a friend of his, and sue Officers Apodaca and Vigil. He yelled that the Officers needed to leave because they were on his property. During this time, Pettine also was walking around, verbally encouraging her husband's behavior and egging him on.
>
> Andre Gallegos went back into the mobile home. Officer Apodaca repeatedly told Gallegos to stand by the rear of his police car, but Gallegos made a hand gesture, said he was done here, and turned around and began walking to the mobile home. Not wanting Gallegos to go into the house where he had said he had guns, Officers Vigil and Apodaca yelled loudly several times for Gallegos to stop; when he did not, they ran after him.
>
> In the entryway of the home, Officer Vigil got between Gallegos and the door. Gallegos aggressively shoved Officer Vigil. Vigil used hand control techniques against Gallegos in an attempt to stop him and to handcuff him. Gallegos combatively resisted, resulting in Officer Apodaca applying a dry stun to Gallegos' left shoulder; Gallegos was then put into handcuffs. Gallegos refused medical care from the ambulance attendants who came to the scene.
>
> While Gallegos was being handcuffed, Andre Gallegos became aggressive, uncooperative and encouraged his father to resist the officers. Officers Vigil and Apodaca repeatedly told Andre to stay back and to stop enticing his father to be combative. Due to his behavior, Andre was placed in handcuffs by Officer Apodaca.
>
> Ms. Pettine continued to move around the area instigating arguments and refusing
> to give accurate or proper information, including withholding all information about herself, her toddler and the toddler's father. Officer Apodaca arrested Pettine for resisting, evading or obstructing an officer. Jason Garcia, Steven Marquez and Alfonzo Gurule were taken into custody for detoxification.

Defs.' Resp. (ECF No. 94), filed Aug. 30, 2013, 2-5 (citations omitted).

Therefore, given the record before it, the Court finds that Plaintiffs have not met their initial burden of showing no genuine issue of material fact, and viewing the evidence and drawing reasonable inferences in the light most favorable to the Defendants, the Court must deny the Motion

14

in its entirety, including to the extent it moves for summary judgment on any prospective claim by Defendants of qualified immunity.

WHEREFORE,

**IT IS HERBY ORDERED** that Plaintiffs' Motion for Partial Summary Judgment (ECF No. 68), filed August 12, 2013, is **DENIED**.

_____
**SENIOR UNITED STATES DISTRICT JUDGE**