1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO


ANTONIO GALLEGOS, KRISTIAN PETTINE,
ANDRE GALLEGOS, and K.L.P.L., a
minor child,

            Plaintiffs,

vs.                              No. 1:12-CV-224-LH-/KBM

CITY OF ESPAÑOLA, a municipal corporation,
JOE MARTINEZ, individually and in his official capacity;
JEREMY APODACA, individually and in his official
capacity; ROBERT VIGIL, individually and in his official
capacity; CITY OF ESPAÑOLA OFFICERS and SUPERVISORS JOHN
DOES 1 through, individually and in their official
capacities,

            Defendants.

                DEPOSITION OF JEREMY APODACA
                  Wednesday, June 19, 2013
                        1:42 p.m.
                 Cumbre Court Reporting, Inc.
                    2019 Galisteo Street
                  Santa Fe, New Mexico 87505

                  **CERTIFIED COPY**

        PURSUANT TO THE NEW MEXICO RULES OF CIVIL
PROCEDURE, this Deposition was:

TAKEN BY:  NATHANIEL V. THOMPKINS
           ATTORNEY FOR THE PLAINTIFFS


REPORTED BY:  ALLISON ASH-HOYMAN
              NEW MEXICO CCR #18
              CUMBRE COURT REPORTING, INC.
              2019 Galisteo, Suite A-1
              Santa Fe, New Mexico 87505

                Allison Ash-Hoyman, CCR 18

EXHIBIT
__/__

Antonio Gallegos, et al. v.                                       Jeremy Apodaca
City of Espanola, et al.                                          June 19, 2013

---

**Page 46**

1  wasn't charged and technically he wasn't arrested?
2  A.  Well, I believe I stated technically he was
3  arrested --
4  Q.  Okay.
5  A.  -- by being placed in handcuffs.
6  Q.  Okay.
7  A.  However, the differentiation would be charged
8  -- arrested with charges.
9  Q.  Okay.  What is your definition of "arrest"?
10  A.  Arrest, I would define as an individual not
11  being able to leave the scene.
12  Q.  Okay.  And that was -- in Andre's case he
13  wasn't able to leave the scene?
14  A.  No.
15  Q.  Okay.  Does an order from the juvenile office
16  require a supervisor's approval?
17  A.  My own supervisor or --
18  Q.  Let's start with yours.  If you receive an
19  order from the juvenile office, are you required to get
20  approval from your supervisor?
21  A.  No.
22  Q.  If you receive an order from the juvenile
23  office are you required to have it come from a
24  supervisor at the juvenile office?
25  A.  Can you be more specific?

---

**Page 47**

1  Q.  Does it matter the level of the person working
2  in the juvenile office that is able to give you an order
3  to take a juvenile into custody?
4  A.  Yes.
5  Q.  And what level must a person in the juvenile
6  office be in order for you to take an order from them to
7  put a juvenile in custody?
8  A.  They have to hold the position of juvenile
9  probation officer.
10  Q.  Okay.  And who was the juvenile probation
11  officer in this instance that gave you the order to take
12  Andre into custody?
13  A.  I believe it was Martha -- I can't recall her
14  last name at this time.
15  Q.  Would you have documented the name of the
16  person in your investigation?
17  A.  Yes.
18  Q.  Can you look at your report and tell me if it
19  is documented as to who the person was that gave you the
20  order?
21  A.  (Witness complying.)
22  I have Martha listed here.
23  Q.  And last name?
24  A.  I don't recall.
25  Q.  Is there a title or position?

---

**Page 48**

1  A.  Her title or position is juvenile probation
2  officer, to the best of my knowledge.
3  Q.  Is there a requirement that you notify your
4  supervisor when you get an order from a juvenile
5  probation officer to arrest or take into custody a
6  juvenile?
7  A.  Not to my knowledge.
8  Q.  Let's go through your steps that you took when
9  you conducted your investigation, your preliminary
10  investigation.
11      You get -- when did you get the call?  Can you
12  tell from your Uniform Incident Report?
13  A.  I believe it was approximately 12:46 p.m.
14  Q.  And the 12:46 that you reference on your
15  incident report is on the upper left-hand corner of the
16  incident report, and that box says 12:46 indicates the
17  time that you received the call?
18  A.  Correct.
19  Q.  Okay.  What time did you arrive at the scene?
20  A.  I believe that would be 1345 hours.
21  Q.  And by the way, did you physically input the
22  information that is in the Uniform Incident Report?
23  A.  Yes.
24  Q.  Okay.  And when you put in 12:46, it was your
25  intent to establish the time that the call came in or

---

**Page 49**

1  the time that you got the call and were dispatched to
2  this incident?
3  A.  Yes.
4  Q.  And then the next time that you put in there
5  is 1345?
6  A.  Correct.
7  Q.  And when you input that information it was
8  your intent to indicate the time that you arrived at the
9  scene?
10  A.  No, not necessarily.
11  Q.  Okay.  What was -- what were you meaning to
12  note when you put the information of 1345 in?
13  A.  Basically the time frame of the call.
14  Something to that effect, with when the incident began
15  to when -- like when it was reported almost.
16  Q.  Okay.  I'm not following, then.
17  A.  As far as -- typically, with the initial --
18  the first box here where 12:46 is entered, dependent on
19  the call, the type of call that it is, it's -- it could
20  be whenever action started, basically.
21  Q.  What type of action?  What do you mean?
22  A.  In this instance, in relation to this case, it
23  would -- to the best of my knowledge 12:46 would be the
24  time that our dispatch received the call for service.
25  Q.  Okay.  And so when you typed in 12:46 you

---

Antonio Gallegos, et al. v.
City of Espanola, et al.

Jeremy Apodaca
June 19, 2013

---

Page 50

1  meant to note on the report the time that dispatch, you
2  believe dispatch received a call?
3    A.  I believe so, yes.
4    Q.  Okay.  So what's the next time?
5    A.  The 1345 next time would be, possibly I
6  believe it's when I requested my case number.
7    Q.  Okay.
8    A.  I believe that's when I requested my case
9  number.
10    Q.  So an hour and one minute after -- am I
11  correct, 12:46?  Okay, so it's just under an hour, 59
12  minutes after dispatch got the call, you would put in on
13  your Uniform Incident Report the time that you requested
14  from dispatch your case number?
15    A.  Yes.
16    Q.  And if you requested a case number from
17  dispatch, then there would be a dispatch log that shows
18  the time that you requested the case number?
19    A.  Yes.
20    Q.  And if what you are saying is true, then that
21  number, 1345, would match up with the records on the
22  dispatch log.
23    A.  I believe so.
24    Q.  Okay.  What time did you arrive?
25    A.  I cannot recall.

---

Page 51

1    Q.  Is that something that normally gets recorded
2  in a Uniform Incident Report?
3    A.  Yes.
4    Q.  Can you tell me why, in this incident, it's
5  not documented or you can't find it?
6    A.  I cannot.
7    Q.  Okay.  Do you keep your own daily log of
8  activities besides your Uniform Incident Report?
9    A.  No.
10    Q.  Do you know what CAD logs are?
11    A.  Yes.
12    Q.  What are those?
13    A.  They are logs of the dispatch.
14    Q.  And have you ever had occasion to look at a
15  CAD log?
16    A.  I don't believe so.
17    Q.  Okay.  In your documentation, or documenting
18  the incident on July 31st, 2010, would it be standard
19  procedure for you to document the time that the incident
20  ended?
21    A.  No.
22    Q.  How long did the incident on July 31st, 2010
23  last from the time you arrived to the time you left the
24  scene?
25    A.  I can't recall specifically.

---

Page 52

1    Q.  Do you think it was over an hour that you were
2  at the scene doing all your work, or longer?
3    A.  Most likely approximately an hour.
4    Q.  Okay.  You called -- there was a PSA that was
5  at the scene?
6    A.  Yes.
7    Q.  Let me back up.
8      You were the first to arrive at the scene?
9    A.  Yes.
10    Q.  Who arrived second?
11    A.  I can't recall specifically at this time.
12    Q.  Would you have documented that arrival in your
13  incident report?
14    A.  No.
15    Q.  Did anybody else -- what other officers
16  arrived?
17    A.  Officer Robert Vigil.
18    Q.  Okay.  And you don't recall what time he
19  arrived?
20    A.  No, I do not.
21    Q.  Besides Officer Robert Vigil, do you recall
22  any other officers arriving?
23    A.  Yes.
24    Q.  And who were they?
25    A.  Sergeant Jeff R. -- at the time he was a

---

Page 53

1  corporal, but Jeff R. Martinez.
2    Q.  Okay.  Do you recall what time he arrived?
3    A.  Not specifically.
4    Q.  Okay.  Besides Corporal Jeff R. Martinez, and
5  Officer Robert Vigil, were there any other officers that
6  arrived?
7    A.  No.
8    Q.  Was there a PSA aide?
9    A.  Yes.
10    Q.  Do you not consider him an officer?
11    A.  Technically speaking, yes, he is an officer.
12    Q.  Okay.  And who was that PSA aide?
13    A.  Brian Romero.
14    Q.  And do you know when he arrived?
15    A.  No, not specifically.
16    Q.  Okay.  If you don't know the time that they
17  arrived, do you know who arrived in what sequence in
18  terms of Officer Vigil, Corporal Martinez, and PSA
19  Romero.
20      MR. BASHAM:  I'm going to go ahead and just
21  throw in an objection.  Asked and answered.
22    A.  I don't specifically remember who arrived.
23  BY MR. THOMPKINS:
24    Q.  Besides the people that you have identified,
25  did you request anybody else to come to the scene?

---

Case 1:12-cv-00224-LH-KBM   Document 137-10   Filed 08/11/14   Page 4 of 5

Antonio Gallegos, et al. v.
City of Espanola, et al.

Jeremy Apodaca
June 19, 2013

---

**Page 54**

1  A. I believe so, yes.
2  Q. Okay. And who was that?
3  A. It would be the on-call person for the CYFD
4  office.
5  Q. And who was that?
6  A. I don't recall specifically.
7  Q. Okay. And how did you request that she come
8  to the scene?
9  A. I asked for dispatch to call them.
10  Q. Okay. And what happened in terms of when
11  dispatch called them?
12  A. I believe dispatch told me that -- something
13  to the effect that they were busy with another call at
14  that point in time.
15  Q. Uh-huh.
16  A. So I don't believe that they came directly to
17  the scene.
18  Q. Okay. Are officers required to notify
19  dispatch of their arrival time at a scene?
20  A. Yes.
21  Q. And did you do so in this case?
22  A. Yes, I believe so.
23  Q. And are you required to notify them of the
24  time that you are leaving the scene?
25  A. Yes.

---

**Page 55**

1  Q. And in this case, did you do so?
2  A. To the best of my knowledge, yes.
3  Q. Do you know what time you left?
4  A. I cannot specifically recall.
5  Q. Okay. And did you tell me you don't know what
6  time you arrived?
7  A. To be specific on the time, no, I don't
8  recall.
9  Q. Can you explain why there was a 59-minute
10  lapse between the time that you say dispatch received
11  the call and the time that you called in for a report
12  number?
13  A. I believe that time difference there was my
14  time at the scene and conducting my initial
15  investigation.
16  Q. What was the call that you received? What was
17  the matter that you were dispatched for? What type of
18  incident?
19  A. To the best of my memory, it was aggravated
20  assault.
21  Q. Okay. And what were the specific -- before
22  you got to the scene, what were the specifics you were
23  told when you were dispatched?
24  A. I was told that the caller, the alleged victim
25  at that point in time had run across the road to the gas

---

**Page 56**

1  station to call 911, and that the alleged suspect at
2  that point in time had walked towards the Northern New
3  Mexico Community College.
4  Q. Okay. Did you have any more information than
5  that?
6  A. And to the best of my memory I believe I was
7  notified that the suspect had a black in color handgun.
8  Q. What kind of a what?
9  A. A black in color handgun.
10  Q. Was it a pistol or a rifle?
11          MR. BASHAM: Objection, asked and answered.
12  He said a handgun.
13  BY MR. THOMPKINS:
14  Q. Tell me what your definition of a "handgun"
15  is.
16  A. It would be a handgun, a short --
17  Q. I'm sorry?
18  A. Short handgun.
19  Q. Okay. I'm not familiar. What is a short
20  handgun?
21  A. A short handgun is something like my service
22  weapon.
23  Q. Okay. And so would that -- if I said pistol,
24  would that mean the same thing?
25  A. Yes.

---

**Page 57**

1  Q. Okay. So a pistol would be one that's in the
2  category of handgun?
3  A. Yes.
4  Q. At some point did Mr. Gallegos tell you that
5  he had a gun in his home? Antonio Gallegos.
6  A. Yes.
7  Q. And did he tell you the type of handgun that
8  was in his home?
9  A. No.
10  Q. Okay. Do you know what type of handgun was in
11  his home?
12  A. As far as what I found, yes.
13  Q. Okay. And what did you find?
14  A. It was -- to the best of my knowledge it was
15  a .22 rifle.
16  Q. Okay.
17  A. .22 caliber rifle.
18  Q. At any time did he tell you, or did anyone
19  involved in this incident tell you that the handgun that
20  the caller mentioned was in the house?
21  A. No.
22  Q. The complaining witness was Mr. Alfonzo
23  Gurule.
24          Do you recall that?
25  A. I believe so.

---

Antonio Gallegos, et al. v.
City of Espanola, et al.

Jeremy Apodaca
June 19, 2013

**Page 58**

1  Q. Did he tell you that the handgun that he was
2  allegedly threatened with was put in the house?
3  MR. BASHAM: Objection, hearsay.
4  A. I don't believe so.
5  BY MR. THOMPKINS:
6  Q. When you arrived at the scene somewhere
7  between 12:46 and 1345 — is that correct?
8  A. To the best of my memory, yes.
9  Q. — did you attempt to take Mr. Gurule to try
10  to find the person who allegedly used a handgun on him?
11  A. To the best of my memory, no.
12  Q. There is a reason why you didn't do that?
13  A. I believe I was told that he had walked
14  towards the direction of the college.
15  Q. And because of that fact you didn't attempt to
16  go with Mr. Gurule to find who this individual was?
17  A. Can you —
18  Q. No?
19  A. Can you be more specific?
20  Q. Okay. You got a call from dispatch that the
21  complainant had been threatened with a gun by an
22  individual.
23  A. Yes.
24  Q. And then you met the complainant, Mr. Gurule.
25  A. Correct.

**Page 59**

1  Q. And he then gave you the name of the
2  individual who he said had a gun.
3  A. Yes.
4  Q. Did he — and he told you in the direction of
5  which this individual had gone.
6  A. Yes.
7  Q. And there was no concern on your part that
8  this individual might have been walking with a handgun
9  in the direction that Mr. Gurule said he was traveling?
10  A. I had that concern, yes.
11  Q. But you didn't attempt to take Mr. Gurule and
12  try to go find and locate the individual he said had a
13  gun and pulled it out on him?
14  A. No.
15  Q. Okay. After you had found the .22 rifle that
16  you said was in the home, you knew that wasn't the —
17  the description of the handgun that Mr. Gurule gave you;
18  right?
19  A. Correct.
20  Q. So that individual is potentially out there
21  with a handgun walking towards Northern New Mexico
22  Community College; is that correct?
23  A. Yes.
24  Q. Did you do anything to further attempt to find
25  and locate the individual that was alleged to have had a

**Page 60**

1  gun, a handgun, and had threatened Mr. Gurule?
2  A. Yes.
3  Q. What did you do?
4  A. While I was en route to that location, I
5  passed directly the general area of where that
6  individual would have been walking, based off of what
7  was described to me.
8  Q. Okay.
9  A. And I checked that area on my way to the
10  residence, or the business.
11  Q. Okay. I'm — a little after that, because the
12  first question was Mr. Gurule told you the name of the
13  individual, the direction he was walking in, and the
14  fact that he had a handgun. At that point you didn't do
15  anything to try to locate this individual?
16  A. Not to my knowledge.
17  Q. Did you ask Mr. Gurule for a description of
18  the individual that pulled the handgun out on him?
19  A. I believe so.
20  Q. And what description did you get?
21  A. I can't specifically recall.
22  Q. Did you document the description of the
23  individual in your incident report?
24  A. I don't believe so.
25  Q. Wouldn't that be standard procedure in the

**Page 61**

1  investigation of an assault with a weapon, to document
2  the — a description of the individual that allegedly
3  had the weapon and committed the assault?
4  A. Yes.
5  Q. But why didn't you do it in this instance?
6  A. I believe in this instance I didn't document
7  that part because of how broad a situation this
8  developed into. And I don't know exactly why I did not.
9  Q. Okay. So did — is it fair to say from what
10  you described that your attention turned away from Mr.
11  — the suspect, and you began investigating the incident
12  with the individuals at the scene?
13  A. Yes.
14  Q. Did you put a description of the individual
15  suspect over the radio to dispatch?
16  A. I can't specifically recall if I did that or
17  if they obtained that information from the 911 caller.
18  Q. If who obtained the information?
19  A. If dispatch obtained that information and then
20  relayed it to me on my — I know that on my way to the
21  scene they described the individual, I believe. That's
22  how I was able to check the area and determine nobody
23  was there.
24  Q. Okay. But when you talked to Mr. Gurule, you
25  got a description of him?

Case 1:12-cv-00224-JAP-KBM   Document 139-1   Filed 08/29/14   Page 6 of 23

Antonio Gallegos, et al. v.
City of Espanola, et al.

Case 1:12-cv-00224-LH-KBM   Document 137-11   Filed 08/11/14   Page 1 of 4

Jeremy Apodaca
June 19, 2013

**Page 62**

1  A. Yes.
2  Q. And did you give that description to dispatch?
3  A. I cannot recall at this time.
4  Q. Wouldn't that be a standard part of the
5  operating procedures in terms of investigations?
6  A. Yes.
7  Q. Okay. And wouldn't it be important to provide
8  that information as soon as possible because a suspect
9  might still be in the area?
10  A. Yes.
11  Q. Why didn't you complete a separate gun
12  incident report about the incident when Mr. -- after Mr.
13  Gurule described to you what had happened?
14  A. I --
15  Q. How about --
16  MR. BASHAM: Let him answer the question,
17  please.
18  BY MR. THOMPKINS:
19  Q. I'm sorry, did you finish?
20  A. I cannot recall specifically why I did not.
21  Q. Okay. Did you have information that indicated
22  that this could potentially be a hate crime?
23  A. I'm sorry, can you restate that.
24  Q. Did you have any information when you were
25  doing your investigation that would indicate that the

**Page 63**

1  incident Mr. Gurule reported to you and called in to 911
2  for was a hate crime?
3  A. Yes.
4  Q. Did you make -- or why didn't you make a
5  separate report on the -- on a potential hate crime?
6  A. I don't know specifically why not.
7  Q. Okay. Did you write up a criminal complaint
8  for the individual that pulled the gun out on Mr.
9  Gurule?
10  A. No, I did not.
11  Q. Did you write a statement of probable cause on
12  the individual that allegedly pulled the gun out on Mr.
13  Gurule?
14  A. No, I did not.
15  Q. When you were doing your investigation, at one
16  point you began to focus on Ms. Pettine? Do you recall
17  that?
18  A. Yes.
19  Q. And do you recall if during the period of time
20  that you were questioning Ms. Pettine if the child, I
21  believe her name was Kolby, was in any danger while she
22  was with Ms. Pettine?
23  A. Yes.
24  Q. Okay. And what type of danger did you believe
25  she was in?

**Page 64**

1  A. I believe she was in danger from the elements
2  at that time.
3  Q. From?
4  A. The -- as far as weather. The heat.
5  Q. Okay.
6  A. She was also -- when I first made contact with
7  Ms. Pettine, she was barefoot, walking around on the hot
8  gravel, which is basically the driveway area and front
9  yard area of that business and residence.
10  Also in that area was broken glass, several
11  pieces of broken glass that I was able to see.
12  Q. Okay. So at the time that you were doing your
13  investigation and you were talking to Ms. Pettine, the
14  child was walking around on broken glass and rocks and
15  in a heated area?
16  A. Initial --
17  MR. BASHAM: Objection. That improperly
18  characterizes his testimony.
19  BY MR. THOMPKINS:
20  Q. Was that your testimony, that she was walking
21  around on hot rocks?
22  A. Initially, yes.
23  Q. Initially. Glass, broken glass?
24  MR. BASHAM: That's where I believe that my
25  objection stands.

**Page 65**

1  BY MR. THOMPKINS:
2  Q. Did you believe she was walking around on
3  broken glass?
4  A. Initially, yes.
5  Q. Do you recall testifying in the -- and because
6  of those things you believe that Kolby was in danger?
7  A. Yes.
8  Q. Do you recall being called to testify in the
9  custody case that Ms. Pettine had against the child's
10  father?
11  A. Yes.
12  Q. And do you recall being asked the question
13  during your -- this investigation, Officer Apodaca, was
14  Kolby in any type of danger while she was with the
15  mother?
16  Do you recall being asked that question?
17  A. I don't recall specifically.
18  Q. Let me ask you if you recall answering that
19  question with this answer: During the investigation I
20  would say that Kolby was exposed -- excuse me -- during
21  the investigation I wouldn't say that Kolby was exposed
22  to any danger while we were there.
23  Do you recall giving that answer in the
24  custody case that Ms. Pettine had with Mr. Londo?
25  Londono. Excuse me.

Antonio Gallegos, et al. v.
City of Espanola, et al.

Jeremy Apodaca
June 19, 2013

---

**Page 66**

1  A.  I do recall slightly that.

2  Q.  Okay.  And that testimony that I just read to

3  you, if that were true, in terms of your testimony, is

4  inconsistent with what you just told us today about the

5  danger that Kolby was faced while she was with her

6  mother?

7  A.  I don't believe it's inconsistent.

8  Q.  Okay.  And how is it not inconsistent?

9  A.  Like I stated, initially I believe that she

10  was in danger upon my arrival, when I did observe her

11  walking around that area right there.

12  But once I was out and speaking with her, I

13  believe that that danger was — had subsided slightly

14  because I was there intervening now.

15  Q.  Okay.  How long did you observe Kolby when you

16  arrived?

17  A.  Approximately a couple minutes, I can't say

18  specifically.

19  Q.  A couple of minutes?

20  A.  Less than that.

21  Q.  Okay.

22  MR. BASHAM: Can I just go on the record here

23  and say perhaps from now on instead of referring to the

24  child by her name, refer to the two-year old, in the

25  event that some of this may be used at trial?

---

**Page 67**

1  MR. THOMPKINS: If we go to trial I'm going to

2  refer to the child by her name.  There is nothing to

3  prevent me from referring to her by her name.  He

4  referred to the child by her name in his report.

5  So why do we have to call her a two-year old

6  child?

7  MR. BASHAM: Then why can't you put it in a

8  complaint?  Because they don't want the child's —

9  that's — come on, Nate, we went through this with the

10  judge.

11  MR. THOMPKINS: We didn't go through a

12  deposition saying I couldn't mention the name.  Why did

13  he put it in the complaint?

14  MR. BASHAM: Never mind.  I'm on the record.

15  BY MR. THOMPKINS:

16  Q.  So you don't know how long you were there at

17  the scene?

18  A.  Not —

19  MR. BASHAM: Objection, asked and answered.

20  A.  Not specifically.

21  BY MR. THOMPKINS:

22  Q.  And so for the time period you were there,

23  whatever time that was, you didn't indicate when you

24  answered this question that the child was in any danger.

25  A.  I can't specifically say how long she was in

---

**Page 68**

1  that danger for.

2  Q.  Well, you were talking — during your

3  investigation you talked to other people besides Ms.

4  Pettine, didn't you?

5  A.  Yes.

6  Q.  And where was the child and where was Ms.

7  Pettine when you were talking to Alfonzo Gurule?

8  A.  She was walking around the area holding the

9  child.

10  Q.  Holding the child in her arms?

11  A.  She would hold her, place her down.

12  Q.  And in that period of time your testimony was

13  she was in no danger?

14  MR. BASHAM: Objection.  Mischaracterizes his

15  testimony.

16  BY MR. THOMPKINS:

17  Q.  Isn't it your testimony during the

18  investigation I would say that Kolby wasn't exposed to

19  any danger while we were there?

20  A.  I believe that's correct.

21  Q.  Okay.  So while you were there, and Ms.

22  Pettine is holding the child and putting her down, the

23  child wasn't in any danger?

24  A.  I don't believe so.

25  Q.  When you — when Mr. Gallegos was — did you

---

**Page 69**

1  instruct Mr. Gallegos to stand by the back of your

2  patrol car?

3  A.  Yes, I believe I did.

4  Q.  And at some point did Mr. Gallegos leave that

5  point and attempt to return to his house?

6  A.  Yes.

7  Q.  And what did you and Officer Vigil do when he

8  attempted to re-enter his home?

9  A.  We attempted to stop him from re-entering his

10  home.

11  Q.  Did you describe in your report that you ran

12  after him?

13  A.  Yes, I believe so.

14  Q.  And that you yelled at him to stop?

15  A.  I believe so, yes.

16  Q.  Okay.  And at that point you established your

17  authority as a police officer to get Mr. Gallegos to

18  comply.

19  A.  Yes.

20  Q.  And Mr. Gallegos then stopped.  He didn't

21  enter the house, did he?

22  A.  No.

23  Q.  And he was not free to leave at that point,

24  was he?

25  A.  No.

---

Antonio Gallegos, et al. v.
City of Espanola, et al.

Jeremy Apodaca
June 19, 2013

---

**Page 70**

1  Q.  And wasn't he therefore under arrest?
2  A.  Technically, yes.
3  Q.  Okay.  At that point, when you and Officer
4  Vigil prevented him from entering his house, what crime
5  did you suspect he had committed?
6  A.  At the point when we stopped him what crime
7  had he committed, you mean?
8  Q.  You yelled stop, you ran after him, and you
9  said he stopped.  And now at that point he is not free
10  to leave and he is under arrest.  What crime did you
11  suspect he had committed?
12  A.  The resisting, evading or obstructing a police
13  officer.
14  Q.  By walking from the car to his house he was
15  resisting, obstructing and evading a police officer?
16  MR. BASHAM: Objection.  Asked and answered.
17  A.  Yes, I believe so.
18  BY MR. THOMPKINS:
19  Q.  And that's the crime that you arrested him for
20  at that point when you arrested him, for obstructing,
21  evading and resisting?
22  A.  Yes.
23  Q.  How did he evade?
24  A.  By – during the course of my investigation I
25  instructed him to stand there by my police car.  Being

---

**Page 71**

1  that there was weapons involved and by his statement
2  that the only weapons there, were in his house.  So for
3  officer safety sake, I instructed him to stand by my
4  police car where I was able to observe him and keep an
5  eye there, that he didn't have access to any weapons.
6  And by him leaving that point and attempting
7  to re-enter the home where he just told us that the only
8  weapons were inside his home, he was therefore
9  committing the resisting, obstructing and evading a
10  police officer.
11  Q.  What facts did you have about the weapon that
12  was in the home at the time that you've told him to
13  stop?
14  A.  Only the presence that he had told me of there
15  being weapons in the home.
16  Q.  What facts did you have that would indicate
17  where the weapon was located at the time that you
18  prevented him from entering his home?
19  MR. BASHAM: Objection, asked and answered.
20  A.  I didn't have any facts as to where it was
21  located.
22  BY MR. THOMPKINS:
23  Q.  What facts did you have that would indicate
24  what type of weapon that it was that was in the home at
25  the time that you prevented him from entering his home?

---

**Page 72**

1  A.  The fact that he referred to it as a – the
2  gun or guns.
3  Q.  Okay.  At no point did he refer to it as the
4  gun that Mr. Gurule told you about, did he?
5  A.  No, not to my knowledge.
6  Q.  And at no point did Mr. Gurule refer to the
7  gun that Mr. Gallegos, Antonio Gallegos told you about,
8  as being the gun that was pointed at him, did he?
9  A.  I'm sorry?
10  Q.  Mr. Gallegos – excuse me, Mr. Gurule, did he
11  ever tell you that the gun that Antonio Gallegos
12  referred to was the gun that was pointed at him?
13  A.  No, I don't believe so.
14  Q.  Okay.  Do you recall being interviewed by
15  Chief Martinez, Chief Joe Martinez when a complaint was
16  filed about this incident?
17  A.  Yes.
18  Q.  And do you recall – did you ever get a copy
19  of and/or see his supplement to your report of that
20  incident, of that investigation?
21  A.  Yes, I believe so.
22  Q.  And do you recall what he said about where the
23  weapon was located when he documented it in his
24  supplemental report?
25  A.  I can't recall specifically.

---

**Page 73**

1  Q.  I'm going to place before you what's been
2  marked as Exhibit 5 to Mr. Vigil's deposition, and
3  direct your attention to, if we – it's easier to go up
4  from the bottom, one, two, three, third paragraph from
5  the bottom.
6  I'm sorry, second paragraph from the bottom,
7  beginning with, I contacted the officers involved and
8  had them give me their side of the story.  See report by
9  Jeremy Apodaca for details.
10  And he says, "officer," and I quote, "Officer
11  Robert Vigil stated that a weapon was believed to be
12  somewhere on the premises of the vehicle.  So they could
13  not allow anyone out of their sight."
14  Do you have any reason to believe that the
15  chief did not record what Robert Vigil told him
16  accurately in his supplemental report?
17  A.  I believe that's accurate.
18  Q.  Okay.
19  MR. BASHAM: You know, since your expert is
20  taking a break, maybe we can take a five-minute break.
21  We have been going for almost two hours.
22  MR. THOMPKINS: Sure.  Let's take a – how
23  much time do you need?
24  MR. BASHAM: Five.
25  MR. THOMPKINS: Five minutes?

---

Cumbre Court Reporting, Inc.
505-984-2244

Antonio Gallegos, et al. v.
City of Espanola, et al.

Jeremy Apodaca
June 19, 2013

---

**Page 74**

1  MR. BASHAM: Yes.
2  (Break taken.)
3  BY MR. THOMPKINS:
4  Q.  When Mr. Gurule made a description of the
5  individual that is alleged to have pointed the gun at
6  him, his father didn't fit that description, did he?
7  A.  No.
8  Q.  When you — you made a decision to — strike
9  that.
10  Who made the decision to arrest Kristian
11  Pettine?
12  A.  I believe I did.
13  Q.  You didn't charge her with neglect or abuse of
14  the minor child in this case, did you?
15  A.  No.
16  Q.  Did you have any facts that would support
17  that?
18  A.  I believe yes.
19  Q.  Why didn't you make the charge?
20  A.  I honestly don't recall at this point in time
21  why I did not.
22  Q.  What did you charge Ms. Pettine with?
23  A.  I believe I charged her with resisting,
24  evading or obstructing an officer.
25  Q.  And before you arrested her did you obtain a

---

**Page 75**

1  warrant to arrest her?
2  A.  No, I did not.
3  Q.  Can you tell us why you did not?
4  A.  Because she was resisting, evading or eluding
5  me by — at this point in time when she stopped, I was
6  trying to obtain information for the sake of the child
7  to place the child with either the child's father or
8  family member.
9  And she wouldn't give me any information as
10  far as anybody that would possibly be able to take the
11  child.
12  And then at the same time that all this was
13  happening with Mr. Gallegos, she was almost provoking
14  him in a sense, to — which was causing him to react in
15  a negative way and be more combative.
16  So she was therefore resisting, because we
17  kept telling her stay back, just stay out, stay back for
18  right now, and stuff to that effect.  And she just kept
19  on — I would say provoking him.
20  Q.  Okay.  What did she say that provoked him?
21  A.  I can't specifically recall.
22  Q.  Did you write it in your report?
23  A.  No, I did not.
24  Q.  Okay.  Did she lose her right to free speech
25  because you were arresting her husband?

---

**Page 76**

1  A.  No.
2  Q.  Which — what is your training — what did
3  your training teach you with respect to what you need in
4  order to make a warrantless arrest?
5  A.  Probable cause.
6  Q.  Anything else?
7  A.  Basically the facts that you can see while you
8  are conducting your investigations.
9  Q.  Okay.  Let me make sure I understand.  What is
10  your definition of probable cause?  Or what is your
11  understanding the definition of probable cause is?
12  A.  Probable cause is the reasonable belief
13  basically that a crime occurred, based off of facts that
14  you obtain or come by throughout the course of your
15  investigation, which are then used to — well, which a
16  reasonable person would believe a crime occurred.  And
17  it's used to effect an arrest.
18  Q.  Okay.  So, in order for an officer to make a
19  warrantless arrest, he only needs probable cause and
20  facts that support the probable cause?
21  A.  Basically, yes.
22  Q.  And you learned that from your training at the
23  law enforcement academy?
24  A.  Yes.
25  Q.  And did you learn — or did you have any

---

**Page 77**

1  training on warrantless arrests while you were employed
2  at the Española Police Department?
3  A.  I can't specifically recall at this time.
4  Q.  When you did your field training, did your
5  field trainer go over with you what is required to make
6  a warrantless arrest?
7  A.  Yes.
8  Q.  And did what he trained you on include what
9  you just described as probable cause?
10  A.  Yes, I believe so.
11  Q.  And the facts that support the probable cause?
12  A.  Yes.
13  Q.  And he didn't tell you that you needed
14  anything else?
15  A.  In regards to evidence or part of the facts?
16  Q.  Anything.
17  MR. BASHAM: Objection, calls for hearsay.
18  A.  I can't specifically recall at this time.
19  BY MR. THOMPKINS:
20  Q.  Did he — when you were trained at the
21  academy, did they make a distinction between the type
22  and level of crime that was required for a warrantless
23  arrest?
24  A.  I don't specifically recall.
25  Q.  When you were in your field training at the

---

Antonio Gallegos, et al. v.
City of Espanola, et al.

Jeremy Apodaca
June 19, 2013

---

**Page 90**

1   A. Not that I can recall.
2   Q. I'm going to direct your attention to Exhibit
3   3 to Mr. Vigil's, or Officer Vigil's deposition, and ask
4   you to turn to page 2. It's numbered at the bottom.
5        And on the left-hand column it says
6   Responsibility of Department Members. In looking at
7   this directive you considered yourself a member of the
8   department for Española —
9   A. Yes.
10  Q. — and this would apply to you?
11  A. Yes.
12  Q. It says "all persons shall acquire a working
13  knowledge of the Española Police Department Directives
14  manual."
15       Did you acquire a working knowledge of the
16  Española Police Department Directives manual?
17  A. I believe so.
18  Q. And did you have a working knowledge of the
19  policies and procedures with respect to the less than
20  lethal weapon that we just reviewed?
21  A. Again, I believe so.
22  Q. Can you tell us why, if you had a working
23  knowledge of the less than lethal weapon policy, why you
24  did not obtain photographs of the affected area that you
25  tasered Mr. Gallegos?

**Page 91**

1   A. I cannot say why I did not do that.
2   Q. Did you understand the next sentence, 27.1.08,
3   that "ignorance of any provision of the directives
4   manual shall not be considered an excuse or serve as a
5   defense for violations of these materials."
6        Did you have that understanding of the
7   directives of the Española Police Department?
8   A. Can you be more specific?
9   Q. Did you understand that if you violated the
10  Española Police Department Directives, that your
11  ignorance of any provision would not be an excuse or a
12  defense to your violation of those procedures?
13  A. I did not understand that.
14  Q. The next paragraph under the same category,
15  Responsibility to Department Members is 27.1.09, "all
16  personnel required to immediately report observation of
17  any violation of the directives manual or state
18  municipal law to their supervisor or commander."
19       Did you understand that as a part of the
20  directives manuals for the Española Police Department
21  that you would be required to report any violations of
22  the directive manuals to your supervisor?
23  A. No.
24  Q. Did you report any violations of the directive
25  manuals to your supervisor?

**Page 92**

1   A. No.
2   Q. In terms of taking custody of Kolby — excuse
3   me — the minor child, did you make the decision that
4   she would be taken into custody?
5   A. Yes.
6   Q. Do you recall being asked that question in the
7   custody hearing with Ms. Pettine and Mr. Londono-Reales?
8   A. I don't recall.
9   Q. Do you recall if you gave a different answer
10  to that question at the custody hearing?
11  A. I don't recall.
12  Q. I'm going to ask you if you recall being asked
13  this question. Okay.
14       "Question: So, okay, Officer Apodaca, was it
15  you that decided to remove Kolby from her mother?
16       Answer: No, it was not. It was actually
17  CYFD's decision."
18       Do you recall that question being asked at the
19  custody hearing and you providing that answer?
20  A. I don't fully recall that question. However,
21  and the taking in the custody, a child, it's the officer
22  who requests what they call the 48-hour hold.
23  Q. Okay. So let's go back to this question.
24       "Officer Apodaca, was it you that decided to
25  remove Kolby from her mother?" And is your answer still

**Page 93**

1   the same, "no, it was not"?
2   A. Yes, it's still the same.
3   Q. And it was actually CYFD's decision to remove
4   the child from the mother?
5   A. Yes.
6   Q. And your answer today about making a decision
7   to take Kolby into custody, it was not your decision, it
8   was CYFD?
9   A. I said that it was my decision because I
10  requested the 48-hour hold and CYFD approved it. They
11  take her into custody.
12  Q. There is a procedure that you understand for
13  CYFD to approve a 48-hour hold that you instituted?
14  A. To my understanding, when there is no family
15  members available that the child could otherwise be
16  placed with.
17  Q. Wasn't Andre Gallegos a family member to the
18  minor child?
19  A. Yes.
20  Q. Did you have any factual information or any
21  reasonable basis to believe that 17-year-old Andre
22  Gallegos was not capable of watching or taking care of
23  his two-year-old sister?
24  A. You asked if I had —
25  Q. Did you have any factual basis or reasonable

---

Antonio Gallegos, et al. v.
City of Espanola, et al.

Jeremy Apodaca
June 19, 2013

---

**Page 94**

1  basis to believe that Andre Gallegos could not take care
2  of his two-year old sister?
3     A.  Yes.
4     Q.  And what was that?
5     A.  The fact that it was his stepsister, and also
6  being that he was a child himself and all the adults
7  were being removed from the home.
8     Q.  So the fact that it was his stepsister
9  indicates -- is one factor that he cannot care for his
10 two-year-old sister?
11    A.  Well, not necessarily.  I just didn't feel
12 comfortable leaving a child to care for a child.
13    Q.  Okay.  The fact that his parents were arrested
14 was another factor that you believed led you to the
15 conclusion that Mr. Andre Gallegos, 17 years old, could
16 not care for his two-year-old sister?
17    A.  Right.
18    Q.  And why does that factor make him not able to
19 watch out and care for his two-year-old sister?
20    A.  Because I don't know if he -- I didn't know at
21 the time if he had the means to care for an infant.
22    Q.  Did you -- I'm sorry.
23    A.  And again, I did not feel comfortable leaving
24 a child in the care of another child.
25    Q.  Can you tell me where in your report you ask

---

**Page 95**

1  the questions of Andre Gallegos if he had the means to
2  take care of his two-year-old sister?  Is that
3  documented in your report?
4     A.  I do not believe so.
5     Q.  Did you ask him those questions?
6     A.  I do not believe so.
7     Q.  Did you ask him if his relationship as -- if
8  he, as a 17-year-old, was capable of taking care of his
9  two-year-old sister?
10    A.  I do not believe I did.
11    Q.  Did you ask him if any other family members
12 were -- his, were in close proximity to the home that
13 you had arrested him at?
14    A.  If I asked Andre, you mean?
15    Q.  Yes.
16    A.  I believe I did ask him that.
17    Q.  Did you document that in your report?
18    A.  I do not believe so.
19    Q.  Did you document his answer in your report?
20    A.  I do not believe I did.
21    Q.  Did you ask the mother if there were any other
22 family members in the area that could look after a
23 two-year-old?
24    A.  I believe I did.
25    Q.  And did you document that in your report?

---

**Page 96**

1     A.  I believe I did.
2     Q.  And did you document her response?
3     A.  Yes, I believe I did.
4     Q.  And what was the response?
5     A.  I have to refer to my report.
6     Q.  Go ahead.
7     A.  I put in my report, I asked Ms. Pettine where
8  her daughter's father was, and she told me he was
9  somewhere in Albuquerque and very abusive.
10       I asked Ms. Pettine if there was anyone else
11 in the home, in an attempt to find someone suitable to
12 take care of the baby identified as Kolby Pettine and
13 two years of age, at which point two other males walked
14 out of the home.  And so I was basically interrupted
15 when they walked out of discussing that matter with her.
16    Q.  You asked if anybody was in the home.  Did you
17 ask if anybody was in the area that could come and take
18 care of the minor child?
19    A.  To the best of my knowledge, I did.
20    Q.  And did you document that in your report?
21    A.  I don't believe so.
22    Q.  You say that Ms. Pettine was obstructing
23 government -- or obstructing your investigation,
24 resisting, and there was one other, evading?
25    A.  Resisting, evading or eluding.

---

**Page 97**

1     Q.  Or eluding.
2        And that's your definition of what her actions
3  were on the day that you were investigating?
4        MR. BASHAM:  Objection, asked and answered.
5     A.  Yes.
6  BY MR. THOMPKINS:
7     Q.  And did you describe the reasons why she was
8  arrested for those specific instances when you testified
9  at the custody hearing in which Ms. Pettine was against
10 Mr. Londono?
11    A.  I don't recall.
12    Q.  Let me ask you if you recall this question
13 being asked and this answer being given.
14       "And most importantly, sir, why was she
15 arrested on one citation of resisting or obstructing an
16 officer?
17       "Answer:  She was arrested due to the fact,
18 for one, that she was intoxicated, and also for the
19 intoxication part, we didn't want to leave her at the
20 scene or own her own just" -- excuse me.  "We did not
21 want to leave her at the scene or on her own just in
22 case she got hurt.  We didn't want her to get hurt," and
23 then there is an inaudible, "intoxicated, fall or
24 something of that nature.
25       "Question:  Are you talking about Ms. Pettine

---

```
                                                                    1


 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW MEXICO
 2


 3
     ANTONIO GALLEGOS, KRISTIAN PETTINE,
 4   ANDRE GALLEGOS, and K.L.P.L., a
     minor child,
 5
                    Plaintiffs,
 6
     vs.                                 No. 1:12-CV-224-LH/KBM
 7


 8   CITY OF ESPAÑOLA, a municipal corporation,
     JOE MARTINEZ, individually and in his official capacity;
 9   JEREMY APODACA, individually and in his official
     capacity; ROBERT VIGIL, individually and in his official
10   capacity; CITY OF ESPAÑOLA OFFICERS and SUPERVISORS JOHN
     DOES 1 through, individually and in their official
11   capacities,

12
                         Defendants.
13
                    DEPOSITION OF ANTONIO GALLEGOS
14                      Friday, June 21, 2013
                            9:03 a.m.
15                   Cumbre Court Reporting, Inc.
                        2019 Galisteo Street
16                   Santa Fe, New Mexico 87505

17                        CERTIFIED COPY

18         PURSUANT TO THE NEW MEXICO RULES OF CIVIL
     PROCEDURE, this Deposition was:
19
     TAKEN BY:  MARK A. BASHAM
20              ATTORNEY FOR THE DEFENDANTS

21
     REPORTED BY:  ALLISON ASH-HOYMAN
22                 NEW MEXICO CCR #18
                   CUMBRE COURT REPORTING, INC.
23                 2019 Galisteo, Suite A-1
                   Santa Fe, New Mexico 87505
24

25
                    Allison Ash-Hoyman, CCR 18
```

EXHIBIT

2

Antonio Gallegos, et al. v.
City of Espanola, et al.

Antonio Gallegos
June 21, 2013

**Page 10**

1  didn't -- we just didn't get along.
2  Q.  Okay.  And who were you married to the second
3  time?
4  A.  Veronica Martinez.
5  Q.  And how long were you married?
6  A.  Just right over a year, I believe.
7  Q.  And who filed for divorce?
8  A.  I did.
9  Q.  And what were the grounds?
10  A.  The same thing.
11  Q.  Which is the mother of Andre?
12  A.  Alice.
13  Q.  Okay.  And who is the mother of Estevan?
14  A.  Alice.
15  Q.  What were the custody arrangements?
16  A.  We shared custody.  I guess we had 50/50
17  custody.
18  Q.  And do Estevan and Andre live with you now?
19  A.  No.
20  Q.  When was the last time they lived with you?
21  Let's take it one by one.
22      When is the last time Estevan lived with you?
23  A.  The boys haven't really actually lived with me
24  since they were -- since they were kids.  Since they
25  were small.  Since they were, you know, five, six years

**Page 11**

1  old, whatever.
2  Q.  When you got divorced?
3  A.  Right.
4  Q.  So they didn't live you, but you claim you had
5  50/50 custody?
6  A.  We did have 50/50 custody.  I would see them
7  on the weekends and we would share custody.  I would
8  have them, you know, several times a month, other than
9  the weekends.
10  Q.  How old is Estevan?
11  A.  Estevan just turned 23.
12  Q.  And how old is Andre?
13  A.  He is 20.
14  Q.  When did you marry, is it Kristian or --
15  MR. THOMPKINS: Kristian.
16  BY MR. BASHAM:
17  Q.  Kristian?
18  A.  Got married May 31st, 2010.
19  Q.  And how long had you dated prior to that?
20  A.  I've known Kristian my whole life.
21  Q.  Where did you meet her?
22  A.  In Las Vegas, New Mexico.
23  Q.  Okay.  But my question was how long did you
24  date her before you married her?
25  A.  I would say -- I'd say about six months.

**Page 12**

1  Q.  Okay.  But you had known her prior to that?
2  A.  Yeah.
3  Q.  Had you ever dated her prior to that?
4  A.  Yes.
5  Q.  Okay.  I want to take you back to July 31st,
6  2010.
7      Where did you wake up that morning?
8  A.  July 31st, the day of the incident?
9  Q.  Yes.
10  A.  At our home in Albuquerque, New Mexico.
11  Q.  Okay.  And about what time do you think you
12  woke up?
13  A.  I don't -- I don't recall.
14  Q.  Okay.  Well, tell me everything you did until
15  the time that you got to Española.
16  A.  I woke up, I took a shower, made some
17  breakfast.  Oh, yeah.  No, I didn't take a shower.  I
18  worked on the yard outside, then I had some breakfast
19  and then went to work.
20  Q.  Okay.  Was Kristian with you?
21  A.  Yes.
22  Q.  Okay.  And was the minor child with you as
23  well?
24  A.  Yes.
25  Q.  Okay.  Was anyone else with you?

**Page 13**

1  A.  No.
2  Q.  Now when you say you "went to work," what does
3  that mean?
4  A.  I went to -- I went to Española, to my mobile
5  home dealership.
6  MR. THOMPKINS: Excuse me.  You have to turn
7  that off.  Is it off?
8  THE WITNESS: Yes.
9  BY MR. BASHAM:
10  Q.  What time did you take off?
11  A.  I don't recall the time.
12  Q.  Okay.  Was it before noon?
13  A.  Before noon, yes, of course.  In the morning.
14  Q.  Well, what time does your business open?
15  A.  Usually we try to open our business, on a
16  Saturday, any time from 10:00 to 12:00.  We are kind of
17  flexible on Saturdays.
18  Q.  Okay.  And so who was with you?
19  A.  Kristian and our daughter Kolby.
20  Q.  Okay.  Do me a favor and just let's refer to
21  her as the minor child.  Okay?
22  A.  Sure.
23  Q.  Thanks.
24      Did they have breakfast with you?
25  A.  Yes.

Case 1:12-cv-00224-LH-KBM   Document 137-13   Filed 08/11/14   Page 1 of 4

Antonio Gallegos, et al. v.
City of Espanola, et al.

Antonio Gallegos
June 21, 2013

---

**Page 26**

1   Q.  **Without raising your voice?**
2   A.  Yeah.
3   Q.  **Okay. So tell us about your conversation with**
4   **Alfonzo.**
5   A.  I asked him if he knew anything about what the
6   police were asking.
7   Q.  **And what was his response?**
8   A.  I asked -- he said that him and my older son
9   had some words. And I said, do you know anything about
10  a gun? Did you see a gun? And he said no, I don't
11  know.
12  Q.  **That's what Alfonzo said?**
13  A.  Yes.
14  Q.  **Okay. Then what happened?**
15  A.  And then I talked to Officer Vigil and told
16  him well, obviously there is not anything going on here.
17  Somebody made a call saying there was a gun and now he
18  is saying no, and he doesn't know.
19  Q.  **Now you would agree at this point in time you**
20  **told Officer Vigil that the only guns here are the ones**
21  **in the house; correct?**
22  MR. THOMPKINS: Objection as to the form of
23  the question.
24  A.  No.
25  BY MR. BASHAM:

---

**Page 27**

1   Q.  **What did you say about the guns?**
2   MR. THOMPKINS: Objection as to form.
3   A.  I didn't.
4   MR. THOMPKINS: Hold on. Objection as to the
5   form of the question.
6   Go ahead.
7   THE WITNESS: Repeat the question for me.
8   BY MR. BASHAM:
9   Q.  **What did you say about the guns?**
10  MR. THOMPKINS: Same objection.
11  A.  What guns?
12  BY MR. BASHAM:
13  Q.  **Did you have guns in the house/business,**
14  **whatever it is?**
15  A.  Was there a gun in the house?
16  Q.  **Or guns.**
17  A.  There was a gun in the house, I believe.
18  Q.  **Okay. What type of gun was it?**
19  A.  A .22 rifle.
20  Q.  **How many guns do you possess? Firearms that**
21  **is. So that includes rifles.**
22  A.  I don't know. A handful.
23  Q.  **Okay. Can you tell us what they are?**
24  A.  Uhm, what do I own. I have a .270 rifle; I
25  have 7 millimeter rifle; I have -- I have a 12 gauge

---

**Page 28**

1   shotgun, a .22 rifle. I believe that's it.
2   Q.  **So you don't own any handguns?**
3   A.  Handguns? I have a -- I have a .500 Smith &
4   Wesson Magnum.
5   Q.  **Okay. Is that it?**
6   A.  I believe so.
7   Q.  **But you don't know for sure?**
8   A.  I've given some -- I've given some of my
9   rifles and guns to my sons.
10  Q.  **Okay. At the time you were talking to Alfonzo**
11  **Gurule, where was Kristian?**
12  A.  Kristian was in the office.
13  Q.  **Okay. Well, in your complaint it says that**
14  **Officer Apodaca became aggressive and focusing his**
15  **attention on Kristian Pettine.**
16  Can you define what you mean by "aggressive"?
17  A.  Can you repeat the question?
18  Q.  **In the complaint that you have filed, it**
19  alleges that Officer Apodaca became aggressive and
20  focusing his attention on Kristian, and I asked you can
21  you describe what you mean by "aggressive"?
22  MR. THOMPKINS: I'm going to object to the
23  form of the question as the complaint is filed by more
24  than Mr. Gurule -- I'm sorry, Mr. Gallegos. So I'm
25  objecting to the characterization in the question that

---

**Page 29**

1   he is the only one that filed the complaint and he is
2   the only one that has information.
3   BY MR. BASHAM:
4   Q.  **Go ahead and answer.**
5   A.  I don't understand your question.
6   Q.  **Can you describe what you mean by aggressive?**
7   A.  I still don't understand what -- I don't
8   understand what you are talking about.
9   Q.  **In your complaint you allege that Officer**
10  Apodaca became aggressive and focusing his attention on
11  Kristian.
12  MR. THOMPKINS: Objection as to the form of
13  the question.
14  BY MR. BASHAM:
15  Q.  **Can you describe what you mean by**
16  **"aggressive"?**
17  MR. THOMPKINS: Same objection.
18  A.  I don't understand the question.
19  BY MR. BASHAM:
20  Q.  **What part don't you understand?**
21  A.  The whole thing. The whole thing I don't
22  understand.
23  Q.  **Well, can you explain what you mean by**
24  **"focusing his attention on Kristian"?**
25  MR. THOMPKINS: Same objection as to the form

---



EXHIBIT

3

## Incident Narrative
## 10-07-476

On Saturday, July 31st 2010 I was dispatched to 1201A North Paseo De Onate in reference to an Assault. While en-route, dispatch told me that the victim who called 911 had run across the road to the Chevron gas station and was hiding from the suspect only identified as "Estevan" who had walked toward the Northern New Mexico Community College. I traveled to the location from the area of Spruce Street and passed the College but was UN able to locate anyone.

I proceeded to the residence and immediately saw a male, female and a female toddler who was wearing nothing but a very obviously soiled and thick, heavy diaper in 80 degree plus weather, sitting on the front steps of the home which is also the office of American Spirit Mobile Homes. I asked the male and female what happened, and they both told me nothing and started to giggle. I asked the two if they had called 911 or heard anything about a gun, and they continued to giggle and the male later identified as Mr. Steven Marquez pointed behind me and said here he comes now, at which point another male stepped out of the home seeming very upset and a third male was crossing Paseo De Onate and also seemed very upset. I asked the male who was crossing the road what was going on? And he told me a male had pulled a gun on him and told him "you fagots don't belong here". The male who was the reporting person, identified himself as Mr. Alfonso Gurule. Mr. Gurule told me he was in Espanola with his friends, one of whom was visiting her husband who was the home owner of the residence, and father of the suspect.

While I was speaking to Mr. Gurule the female who was identified as Mrs. Kristian Pettine walked up and said there was no problem. I asked Mrs. Pettine who was the child's parents? And she told me the child was her daughter. While speaking to Mrs. Pettine I detected the odor of an intoxicating beverage on her person and also saw several bottles of beer on the front step, inside the house, and broken in the front yard. I asked Mrs. Pettine how much alcohol she had to drink, and she told me "just a couple". Mrs. Pettine was having a difficult time standing still and not swaying, and was also slurring her words and yelling during normal conversation periods. Mr. Gurule continued to tell me what had happened and that he "just wanted to make a report because it was not cool." I asked Mrs. Pettine where her daughter's father was and she told me he was somewhere in Albuquerque, and very abussive. I asked Mrs. Pettine if there was anyone else in the home in an attempt to find someone suitable to take care of the baby identified as Kolby Pettine and two years of age, at which point two other males walked out of the home. I then spoke to the two males later identified as Mr. Antonio Gallegos, and Mr. Andre Gallegos.

Mr. Gallegos was highly intoxicated as were the rest of the adults at the location and Andre was not, however Andre is seventeen years of age and the step brother to Kolby. Mr. Gallegos is Mrs. Pettine's current husband. I had dispatch contact the on call person for Children Youth and Families Department due to the fact that all the adults were highly intoxicated and the only sober individual beside Kolby was Andre, a child himself. While I was waiting for CYFD to call me, Mr. Gallegos started stumbling around asking myself, Mrs. Pettine, and Mr. Gurule what was going on and was told by Mr. Gurule that Estevan had pulled a gun on him. After speaking to everyone I found out Estevan is Mr. Gallegos's other son. Mr. Gallegos became very passive aggressive towards Mr. Gurule and tried grabbing him and telling him to shut his "fucken mouth and quit lying." Mr. Gurule told him "I'm not lying. He did and it's not ok." I separated Mr. Gallegos and Mr. Gurule and requested for another Officer to my location.

Kamille, the on call CYFD case worker called me and I informed her of the situation and Officer Robert Vigil arrived and assisted me. While I was waiting for CYFD to call me back with a determination to take Kolby into State custody or not, Mr. Gallegos started to walk around yelling that the only guns he had were in his house, and he is a business man in this town, and pays taxes and also threatening Officer Vigil and myself that he was going to sew us, and call Judge Naranjo and also stated that we needed to leave now because we were on his property. Andre walked back into the home, and after repeatedly telling Mr. Gallegos to stand by the rear of my Police car Mr. Gallegos made a hand gesture and said I'm done here and turned around walking into his home. Officer Vigil and my-self yelled loudly several times for Mr. Gallegos to stop and had to run after Mr. Gallegos, who then turned around in the entryway of his home and pushed Officer Vigil in an

## Incident Narrative
## 10-07-476

aggressive manner when Officer Vigil Stopped Mr. Gallegos from entering the house. Officer Vigil used hand control techniques in an attempt to stop and place Mr. Gallegos in hand cuffs, at which time Mr. Gallegos started combatively resisting and I applied a drive stun to the left shoulder of Mr. Gallegos and he was placed into hand cuffs. Mrs. Pettine continued to move around the area instigating arguments and not give accurate or proper information and completely withheld information about herself and Kolby.

I arrested Mr. Gallegos for Battery on a Police Officer and Resisting, Evading, or Obstructing an Officer. I arrested Mrs. Pettine for Resisting, Evading, or Obstructing an Officer and I took into custody for detoxification Mr. Jason Garcia, Mr. Steven Marquez, and Mr. Alfonzo Gurule. I asked dispatch to have the Juvenile Probation Office contact me and I advised them of the information and shortly thereafter authorized for Andre to be taken to the Youth Shelter for protective custody.

I had dispatch send an ambulance to my location to have Kolby transported to the Espanola Hospital for a medical evaluation where Kamille from CYFD took custody of Kolby for a forty eight hour hold, due to the fact that Mrs. Pettine would not provide any contact information for Kolby's biological father, and was in no condition to properly care for Kolby. Through further investigation I found Kolby's father identified as Mr. Antonio Londono-Reales, does share custody.

Officer Vigil obtained verbal consent from Mrs. Pettine to search her silver in color Jeep SUV which had a very apparent smell of alcohol, and found a small brown in color dog inside, and I located a very large clear bottle of clear alcohol, and limes. I also found several bullets and a loaded 9mm hand gun magazine on top of the center console, the car seat was not properly buckled in and very loose and filthy, I also found dog urine in the center console next to a bag containing one diaper, and vomit on the right middle rear floor board area by Kolby's car seat. Officer Vigil requested for Animal Control to pick up the dog and the keys to the jeep were secured inside the ignition.

Sgt. Jeff Martinez and I walked through the home to make sure all doors and windows were secured and locked and while doing so I saw a rifle appearing to be a .22 caliber leaning against the wall next to the bed in the master bedroom, which could have been easily accessible to Kolby. I also saw beer bottles throughout the home and broken glass which could have been very hazardous to Kolby due to the fact that she was not wearing any shoes or clothes. Sgt. Martinez, Officer Vigil, and Myself all transported the adults and Andre to EDC, where they were booked accordingly. This report will be forwarded to CYFD. There is no further information at this time, and if any further information becomes available this officer will submit a supplemental report.

Officer Jeremy Apodaca #14

1

1     IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW MEXICO
2

3
      ANTONIO GALLEGOS, KRISTIAN PETTINE,
4     ANDRE GALLEGOS, and K.L.P.L., a
      minor child,
5
                  Plaintiffs,
6
      vs.                               No. 1:12-CV-224-LH/KBM
7

8     CITY OF ESPAÑOLA, a municipal corporation,
      JOE MARTINEZ, individually and in his official capacity;
9     JEREMY APODACA, individually and in his official
      capacity; ROBERT VIGIL, individually and in his official
10    capacity; CITY OF ESPAÑOLA OFFICERS and SUPERVISORS JOHN
      DOES 1 through 10, individually and in their official
11    capacities,

12
                  Defendants.
13

14              DEPOSITION OF ROBERT VIGIL

15              Monday, June 17, 2013
                      9:25 A.M.
16          Cumbre Court Reporting, Inc.
                2019 Galisteo Street
17          Santa Fe, New Mexico 87505

18          **CERTIFIED COPY**

19          PURSUANT TO THE NEW MEXICO RULES OF CIVIL
      PROCEDURE, this Deposition was:
20
      TAKEN BY:  NATHANIEL V. THOMPKINS
21              ATTORNEY FOR THE PLAINTIFFS

22
      REPORTED BY:  ALLISON ASH-HOYMAN
23                  NEW MEXICO CCR #18
                    CUMBRE COURT REPORTING, INC.
24                  2019 Galisteo, Suite A-1
                    Santa Fe, New Mexico 87505
25

              Allison Ash-Hoyman, CCR 18

EXHIBIT
4

Antonio Gallegos, et al. v.
City of Espanola, et al.

Robert Vigil
June 17, 2013

---

**Page 102**

1  Q. Okay. And who was present when you arrived
2  with Officer Apodaca?
3  A. I believe Ms. Kristian Pettine was there,
4  Antonio Gallegos was there, and a little child, I want
5  to say two years old or younger.
6  Q. Okay. Anybody else?
7  A. There were other individuals in the home but I
8  don't recall their names.
9  Q. Okay. Now, when you say "there were other
10 individuals in the home," Kristian, Antonio and the baby
11 were outside?
12 A. Yes.
13 Q. In relation to the home, where outside were
14 they?
15 A. Antonio Gallegos was -- Officer Apodaca's car
16 was parked in front of the front door of the home, not
17 all the way to the door, but was parked a little ways
18 back. Antonio Gallegos was on the right side of the
19 vehicle, I believe by the rear, the rear tire. If I'm
20 correct.
21 Q. Okay. And where was Kristian Pettine, do you
22 recall?
23 A. I don't recall.
24 Q. And how about the baby?
25 A. The baby was walking around, I remember. She

**Page 103**

1  was walking around in an obviously soiled diaper without
2  a shirt, without any shoes, without any pants on,
3  walking around on hot gravel.
4  Q. Okay. At the moment that you observe Antonio
5  Gallegos by the back of the car, Ms. Pettine somewhere
6  outside the house, and the baby walking around, did you
7  have reason to believe that any of them had committed a
8  crime or was involved in committing a crime?
9  MR. BASHAM: Objection as to form.
10 A. When I arrived and I spoke to Officer Apodaca,
11 I wasn't exactly sure who had the weapon.
12 BY MR. THOMPKINS:
13 Q. Okay.
14 A. So I didn't know at that time if somebody had
15 committed a crime or not.
16 Q. Okay. So you didn't have any facts or
17 information that indicated that Antonio Gallegos had a
18 weapon?
19 A. Well, I -- there was weapons in the home, from
20 what I was told from Officer Apodaca or -- I'm sorry,
21 there was a weapon somewhere, we weren't sure where it
22 was at. We didn't know who pointed the weapon at the
23 individual.
24 Q. Well, did you talk to the complainant?
25 Where was the complainant, by the way, when

**Page 104**

1  you arrived?
2  A. I'm thinking he was outside. If I'm -- it's
3  been so long. I want to say he was sitting on the rear
4  of a pickup truck, on the tailgate, but I'm not exactly
5  sure.
6  Q. Okay. And did you have any information that
7  he said Antonio Gallegos was the one who pointed the gun
8  at him?
9  A. No.
10 Q. Did he have -- or did you get any information
11 from him that Christine Pettine -- Christine -- Kristian
12 Pettine was the one who pointed the gun at him?
13 A. No.
14 Q. Did Officer Apodaca give you any information
15 that indicated that Antonio Gallegos was the person who
16 pointed the gun?
17 A. No.
18 Q. And did Officer Apodaca give you any
19 information that indicated that Kristian Pettine was the
20 one who pointed the gun?
21 A. No.
22 Q. And you didn't suspect the baby of pointing
23 the gun?
24 A. Obviously not.
25 Q. So as you are assisting Officer Apodaca, whose

**Page 105**

1  questioning -- what questioning is being conducted of
2  either Mr. Gallegos or Ms. Pettine?
3  MR. BASHAM: Objection to form.
4  A. One thing that Officer Apodaca was trying to
5  find was the weapon, where the weapon was. We weren't
6  sure where the weapon was. And he was trying to sort
7  out exactly who pointed the weapon, or pointed the
8  weapon at the victim.
9  BY MR. THOMPKINS:
10 Q. Let me -- I may have confused you. I don't
11 want you to think or tell us what you think Officer
12 Apodaca was thinking or trying to do.
13 I want to know if you know what questions
14 either he was asking of Antonio Gallegos, or anybody
15 while you were assisting him.
16 Do you know or recall?
17 A. Some of the questions -- I don't know verbatim
18 what the questions were, but some of the questions
19 referred to where the weapon is at.
20 Q. Okay. And did any of the people that he was
21 questioning tell him where -- and the weapon that you
22 are referring to, is that the one that was pointed at
23 the complainant?
24 A. At the time that's the only weapon I knew
25 should have been around.

---

Min-U-Script®

Cumbre Court Reporting, Inc.
505-984-2244

(26) Pages 102 - 105

Antonio Gallegos, et al. v.
City of Espanola, et al.

Robert Vigil
June 17, 2013

---

**Page 106**

1  Q. Okay. And did Officer Apodaca, or did you
2  hear any of the people that were being questioned
3  indicate to you where the weapon was that had been
4  pointed at the complainant?
5  A. No. What they did, I believe it was Ms.
6  Pettine that did confirm there was a weapon but didn't
7  know where it was at.
8  Q. Okay. Did -- would that -- as a police
9  officer, if Ms. Pettine had confirmed, like you said,
10  there was a weapon someplace, would that be information
11  that should make it into a report someplace?
12  A. What do you mean by "report someplace"? If a
13  report should be taken on this incident?
14  Q. Well, isn't there a report taken on this
15  incident?
16  A. Yes.
17  Q. Okay. In that report did you read anywhere
18  that Kristian Pettine said there was a weapon someplace?
19  A. No, I did not.
20  Q. Okay. If she had indicated -- because you
21  were concerned about a weapon, if she had indicated
22  there was a weapon someplace, would that piece of
23  information be something that is important enough to be
24  listed in the incident report?
25  A. Yes. And I'm not -- there is Antonio Gallegos

---

**Page 107**

1  going off threatening to tell Judge Naranjo what was
2  going on. He did admit to there being firearms in the
3  home. He did threaten myself and Officer Apodaca with a
4  civil suit, or with a lawsuit is what he said.
5  Q. Does that have any reference to the gun that
6  was alleged to have been pointed at the complainant?
7  A. Yes.
8  Q. What gun?
9  A. He admitted to there being guns in the home.
10  We didn't know if those were the guns.
11  Q. Did he admit to pointing a gun at the
12  complainant?
13  A. No, but there were guns. We didn't know which
14  gun it was. He admitted to there being guns in the
15  home. We didn't know where the gun was at, so we didn't
16  know if the guns in the home were the actual guns
17  pointed at the complainant.
18  Q. Okay. Did you have any information that
19  indicated to you that the gun in the house was the one
20  that was pointed at the complainant?
21  A. No.
22  Q. Did you have any information that Antonio
23  Gallegos had taken a gun out of the house and pointed it
24  at the complainant?
25  A. No.

---

**Page 108**

1  Q. At the time that you -- did you ask any
2  questions of either Antonio Gallegos --
3  A. I did ask Antonio Gallegos questions, I just
4  don't recall what the questions were.
5  Q. Did you ask him if he pointed a gun at the
6  complainant?
7  A. I don't recall.
8  Q. Did you ask him if he was involved -- did you
9  ask him if he knew who allegedly pointed a gun at the
10  complainant?
11  A. I don't recall if I asked him that.
12  Q. Did you ask the complainant any questions
13  about who pointed the gun at him?
14  A. I remember speaking to the complainant, but I
15  don't know exactly what questions I asked him, either.
16  Q. Do you recall if Officer Apodaca told you that
17  the complainant identified who pointed the gun at him?
18  A. He did.
19  Q. And who was it?
20  A. I want to -- I'm not sure I remember the name,
21  but I think it was Estevan, if I'm correct.
22  Q. And he didn't say Antonio Gallegos?
23  A. No.
24  Q. He didn't say Kristian Pettine?
25  A. No.

---

**Page 109**

1  Q. He didn't say anybody that was in the house?
2  A. No.
3  Q. Okay. At some point Mr. Gallegos -- well, how
4  many questions do you recall hearing Officer Apodaca ask
5  either Antonio Gallegos or Kristian Pettine about the
6  individual or the gun that was allegedly used on the
7  complainant or pointed at the complainant?
8     MR. BASHAM: Objection as to form.
9     Go ahead.
10  A. I don't recall.
11  BY MR. THOMPKINS:
12  Q. And do you know if you asked any questions of
13  the complainant about the events that happened and led
14  to him calling?
15  A. I'm sure I did. I talked to the complainant
16  but I don't remember what the questions are.
17  Q. Okay. And how long were you observing Officer
18  Apodaca and the individuals that were outside the home
19  before anything else happened?
20  A. I don't know.  .,
21  Q. How long -- you said you were there for an
22  hour before Sergeant Martinez --
23  A. Approximately an hour, I'm not sure on the
24  time.
25  Q. Okay, approximately an hour.

---

Cumbre Court Reporting, Inc.
505-984-2244

Antonio Gallegos, et al. v.
City of Espanola, et al.

Robert Vigil
June 17, 2013

---

**Page 110**

1   In that approximate time before Sergeant
2   Martinez arrived, what happened besides asking
3   questions?
4   A.   Well, Officer Apodaca was -- Officer Apodaca
5   and myself were speaking with Mr. Antonio Gallegos. Mr.
6   Antonio Gallegos at one point threw his arms up and said
7   I'm done, and started walking back into the home, or the
8   office.
9   Q.   Okay. Let me ask you, at that point when you
10  say he said "I'm done" and started walking back into the
11  house, did you suspect him of committing a crime, having
12  committed a crime, or about to commit a crime?
13  A.   With the child in the condition it was, it was
14  a possibility that a child neglect could have been in
15  place, but at that point, no.
16  Q.   Okay. You said "a possibility." So did you
17  have facts that indicated that he was the parent of that
18  child and responsible for any neglect that might have
19  happened to that child?
20  A.   No. At that point no, I did not have facts.
21  Q.   Okay. And you didn't have -- you didn't
22  advise him that he was under arrest for possible neglect
23  of the child?
24  A.   No.
25  Q.   When he said "I'm done," he started walking

---

**Page 111**

1   towards the house, or to the house, what did you do?
2   A.   I raised my voice and instructed him several
3   times to stop, that he could not go back in the house.
4   Q.   Okay. At that point when you -- you say you
5   raised your voice, are you aware in the incident report
6   it says that you and Officer Apodaca yelled?
7   A.   I don't know if it said yell or not, but yeah,
8   we advised him not to go back in the house.
9   Q.   So as Officer Apodaca wrote in his incident
10  narrative that you and he yelled, would be incorrect?
11  A.   No.
12  Q.   Okay. And when you yelled at Mr. Gallegos
13  that he could not enter back into his house, he did not
14  go into the house, did he?
15  A.   He continued to walk towards the house.
16  Q.   But he didn't go back into the house?
17  A.   No.
18  Q.   And at some point he turned around?
19  A.   No.
20  Q.   If Officer Apodaca wrote in his incident
21  narrative that Mr. Gallegos did not enter the house and
22  turned around, would his incident report be incorrect?
23  A.   I'm not going to say it would be incorrect,
24  but I don't recall him turning around.
25  Q.   Okay. But from what you recall, if he wrote

---

**Page 112**

1   that, it wouldn't be correct to what your recollection
2   is?
3   A.   I don't recall him turning around, so
4   obviously with my recollection, then, that would be
5   incorrect.
6   Q.   Okay. And when you arrived you were in your
7   full uniform?
8   A.   Yes, sir.
9   Q.   You had your badge --
10  A.   Yes, sir.
11  Q.   -- which is -- it's a show of your authority
12  as a police officer?
13  A.   It's a show of being a police officer, yes.
14  Q.   Okay. And you told and advised Mr. Gallegos
15  that he was not free to walk back into his home.
16  A.   I did not say you are not free to walk back
17  into your home. I said stop, you cannot go back into
18  your home.
19  Q.   "Stop, you cannot go back into your home."
20  A.   (Nodding head.)
21  Q.   Do you believe that Mr. Gallegos, when you
22  yelled that, or you raised your voice and stated that,
23  believed he was not free to leave?
24  A.   No.
25  Q.   Okay. When you raised your voice, did you run

---

**Page 113**

1   towards Mr. Gallegos?
2   A.   I don't know if I ran, but I walked -- I don't
3   know if I ran or walked at a fast pace, but I did walk
4   towards him, yes, or moved towards him.
5   Q.   If Officer Apodaca wrote in his report that
6   you and he ran after Mr. Gallegos, would that
7   description be inaccurate in his report?
8   A.   No, no.
9   Q.   Was Mr. Gallegos free to leave and walk away
10  from the front of his house when he -- if he wanted to?
11  A.   Yes, but not to go back into the house.
12  Q.   What was the state of the people that were --
13  the condition of the people that you observed outside of
14  the house?
15  A.   From my knowledge and experience and training,
16  I would believe the individuals outside of the house
17  were all intoxicated.
18  Q.   And what leads you to believe, based on your
19  experience, that they were intoxicated?
20  A.   The strong smell of alcoholic beverage.
21  Q.   Okay.
22  A.   They weren't talking exactly like you and I
23  are talking now, they had slurred speech or slightly
24  slurred speech, bloodshot watery eyes.
25  Q.   Is that for everyone? Antonio Gallegos,

---

Antonio Gallegos, et al. v.
City of Espanola, et al.

Robert Vigil
June 17, 2013

---

**Page 114**

1   Kristian Pettine and the complainant? And his name is
2   Alfonzo Gurule.
3       MR. BASHAM: Objection as to form.
4   BY MR. THOMPKINS:
5       Q. Let's take it one at a time so we remove the
6   objection.
7       Is that what you observed, what you just
8   stated, in your training and experience did you observe
9   that about Antonio Gallegos?
10      A. Yes.
11      Q. Okay. Did you observe that also about
12  Kristian Pettine?
13      A. Yes.
14      Q. And did you observe that about Alfonzo Gurule?
15      A. Who is the complainant; correct? Yes.
16      Q. And where -- did any of them have any problems
17  being able to stand up and not sway?
18      A. I do believe that they were swaying. I do
19  believe that Ms. Kristian Pettine was swaying somewhat
20  when we talked to her. I do believe that Mr. Antonio
21  Gallegos was swaying when we talked to him.
22      I don't recall if I spoke to the complainant
23  while he was standing or just sitting.
24      Q. But you did observe the odor of alcohol,
25  bloodshot eyes, slurred speech?

---

**Page 115**

1       A. Yes.
2       Q. When you yelled, or raised your voice to Mr.
3   Gallegos to tell him he is not free to go into his
4   house, what did you do after that?
5       A. Mr. Gallegos continued to walk. Then I got in
6   front of Mr. Gallegos and I stopped him, I told him you
7   can't go back in.
8       Q. Okay. So you ran and got in front of Mr.
9   Gallegos before he could enter the house?
10      A. Yes.
11      Q. And told him he had to stop?
12      A. Yes.
13      Q. Okay. Did you at that point suspect Mr.
14  Gallegos of having committed or being about to commit a
15  crime?
16      A. I can't speculate if he was about to commit a
17  crime, but at the time I could not say he had already
18  committed a crime.
19      Q. You can't say he had. What crime did you
20  think he might have committed?
21      A. Let me rephrase myself.
22      I can't say he had already committed a crime.
23      Q. Okay.
24      A. Okay? But I can't speculate and say that he
25  was about to commit a crime.

---

**Page 116**

1       Q. Did you think he was about to commit a crime?
2       A. I don't know what he was thinking.
3       Q. Did you have any facts that would indicate
4   that he was about to commit a crime?
5       A. Nothing that led me to believe that he was
6   going to actually do something and commit a crime. But
7   the nature of the call, and being that there was weapons
8   in the home, which he himself stated, for the safety of
9   the officers involved we did not want him to enter back
10  into the home.
11      Q. And the call that was made was not about
12  Antonio Gallegos, was it?
13      A. It was -- no, not necessarily.
14      Q. In terms of Mr. Gallegos, when you ran in
15  front of him you restricted his movement?
16      A. By standing in front of him, yes.
17      Q. And when you ran in front of him and
18  restricted his movement, he couldn't go into the house?
19      A. No.
20      Q. Okay. And did Officer Apodaca also, when you
21  went to restrict Mr. Gallegos's movements, also follow
22  you towards Mr. Gallegos?
23      A. Yes.
24      Q. And did he assist you and also restrict Mr.
25  Gallegos's movement?

---

**Page 117**

1       A. After -- after Mr. Gallegos pushed me, and I
2   attempted to use hand techniques to control Mr.
3   Gallegos, yes, he did.
4       Q. What hand techniques did you use?
5       A. I was going to attempt to place Mr. Gallegos
6   in an arm bar, which we were trained in the academy, and
7   take him down to handcuff Mr. Gallegos. And Mr.
8   Gallegos began to struggle with us, fight with us, and
9   Officer Apodaca then dry stunned him.
10      Q. When you stopped or restricted Mr. Gallegos's
11  movements, that's when you attempted to use the hand
12  technique that you just described?
13      A. Say that again.
14      Q. You indicated that you went after Mr. Gallegos
15  and Officer Apodaca also followed?
16      A. Uh-huh.
17      Q. That you were able to get in front of Mr.
18  Gallegos?
19      A. Yes.
20      Q. And then to get Mr. Gallegos to comply you
21  attempted to use a hand technique?
22      A. Only after Mr. Gallegos battered me and pushed
23  me.
24      Q. Okay. How did he batter you?
25      A. Pushed me.

---

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW MEXICO
 2

 3
     ANTONIO GALLEGOS, KRISTIAN PETTINE,
 4   ANDRE GALLEGOS, and K.L.P.L., a
     minor child,
 5
                    Plaintiffs,
 6
     vs.                             No. 1:12-CV-224-LH/KBM
 7

 8   CITY OF ESPAÑOLA, a municipal corporation,
     JOE MARTINEZ, individually and in his official capacity;
 9   JEREMY APODACA, individually and in his official
     capacity; ROBERT VIGIL, individually and in his official
10   capacity; CITY OF ESPAÑOLA OFFICERS and SUPERVISORS JOHN
     DOES 1 through, individually and in their official
11   capacities,

12
                    Defendants.
13
                   DEPOSITION OF KRISTIAN PETTINE
14                    Friday, June 21, 2013
                          1:10 p.m.
15                 Cumbre Court Reporting, Inc.
                      2019 Galisteo Street
16                 Santa Fe, New Mexico 87505

17

18           PURSUANT TO THE NEW MEXICO RULES OF CIVIL
     PROCEDURE, this Deposition was:
19
     TAKEN BY:   MARK A. BASHAM
20               ATTORNEY FOR THE DEFENDANTS

21
     REPORTED BY:   ALLISON ASH-HOYMAN
22                  NEW MEXICO CCR #18
                    CUMBRE COURT REPORTING, INC.
23                  2019 Galisteo, Suite A-1
                    Santa Fe, New Mexico 87505
24

25
```

Allison Ash-Hoyman, CCR 18

EXHIBIT

5

Antonio Gallegos, et al. v.
City of Espanola, et al.

Kristian Pettine
June 21, 2013

---

**Page 50**

1  Q. Okay.
2  A. Like I am clinging to her.
3  Q. And then what happened?
4  A. He is insisting that I give my child to him.
5  Q. What is he saying?
6  A. He is going to mace me in the face if I don't.
7  Q. With the child right there being held to your
8  chest?
9  A. My child is held tight to me.
10  Q. Okay. Describe that for the court reporter so
11  she can put it in the deposition.
12  A. My daughter has her legs around me, her arms
13  around me and I am holding her so tight and I'm crying
14  at this point and I'm crying and I feel like I can't
15  breathe, I feel like I'm losing my air. My heart is
16  racing and I'm very frightened.
17  Q. Okay. How did the officer get the child?
18  A. He basically clawed her off of me.
19  Q. Okay. And then what did you do?
20  A. Cried. Was in fear..
21  Q. And what were the other gentlemen saying at
22  that point in time?
23  A. I wasn't aware of anything. I was aware of my
24  daughter at that point, I wasn't aware -- I wasn't
25  looking around at anyone else.

---

**Page 51**

1  Q. Okay. So what did Robert Vigil do once he got
2  the baby, or the minor child?
3  A. Put her in the ambulance.
4  Q. And what did you do?
5  A. Run after her.
6  Q. And then what happened next?
7  A. He handcuffed me.
8  Q. And then what happened?
9  A. He opened the left of the back of his car and he
10  threw me in there. And my legs were hanging out and he
11  kicked me, in my legs.
12  Q. Okay. Kind of describe for the court reporter
13  how he kicked your legs.
14  A. They were hanging like if he threw me in the
15  back of the car with his might, and so my legs are
16  hanging out like this (indicating), and then he kicked
17  me with his boots, like with my legs, and I still have a
18  scar here (indicating) from that.
19  Q. Okay. So your legs are kind of hanging off
20  your chair. And I guess --
21  A. He didn't sit me down in the police car, he
22  threw me in the police car.
23  Q. Okay.
24  A. Which is why I'm laying down in the police
25  car, my legs are outside of the police car and I don't

---

**Page 52**

1  have any shoes on, I'm still in my pajamas.
2  Q. Okay.
3  A. And he starts laughing, there goes your baby.
4  Q. Robert Vigil told you that?
5  A. Yes. Over and over and over.
6  Q. How many times?
7  A. Till we got to the jail.
8  Q. Okay. Did you -- were you saying anything
9  while you were in the unit traveling to the detention
10  center?
11  A. I am screaming and crying and my screaming and
12  crying never stops. And today, up until today, I scream
13  and cry.
14  Q. Okay. So you go to the detention facility;
15  correct?
16  A. Correct.
17  Q. A lady from CYFD contacts you; correct?
18  A. From the telephone, the minute I get there she
19  is on the phone.
20  Q. Okay. And she is asking for information about
21  who to contact for --
22  A. She asks who my daughter's father is.
23  Q. Okay. And what did you say?
24  A. I said Antonio Londono.
25  Q. Oh, you told her?

---

**Page 53**

1  A. I did tell her.
2  Q. Okay. And did you tell her how to get ahold
3  of him?
4  A. I told her I did not know his number because
5  Jeremy had my phone at that point, but that he lived on
6  Springcroft Boulevard.
7  Q. Okay.
8  A. Then do you want to know later what she did?
9  Q. No, not yet. I just want to find out what you
10  told her while at the detention center. And you have
11  already answered that question.
12  A. And she said I will be there shortly to see
13  you.
14  Q. Now isn't it true that you gave the police
15  consent to search your vehicle?
16  A. I don't remember.
17  Q. So it's possible?
18  A. Giving them -- I don't remember giving them
19  consent to search my vehicle.
20  Q. Is it possible that you gave them consent to
21  search your vehicle?
22  A. It's impossible or possible, I don't know.
23  Q. Have you ever called 911?
24  A. Yes.
25  Q. Let's strike that question for right now. I

---