IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ANTONIO GALLEGOS, KRISTIAN PETTINE, and
ANDRE GALLEGOS,

      Plaintiffs,

v.                                 Case No. 12-CV-00224 LH/KBM

CITY OF ESPANOLA, a municipal corporation,
JOE MARTINEZ, individually and in his official capacity;
JEREMY APODACA, individually and in his official capacity;
ROBERT VIGIL, individually and in his official capacity;
CITY OF ESPANOLA OFFICERS and SUPERVISORS
JOHN DOES 1 THROUGH 10, individually and in their official
capacities,

      Defendants.

## DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST PLAINTIFF ANTONIO GALLEGOS ON QUALIFIED IMMUNITY GROUNDS

**COME NOW** the Defendants City of Espanola, Joe Martinez, Jeremy Apodaca, Robert Vigil, City of Espanola Officers and Supervisors John Does 1 through 10, by and through their attorneys of record Basham & Basham, P.C., and hereby respectfully submit Defendants' Motion for Partial Summary Judgment Against Plaintiff Antonio Gallegos on Qualified Immunity Grounds. Opposing counsel was contacted for his concurrence to this motion, and he does/does not concur with this motion.

## INTRODUCTION

Plaintiffs' Complaint seeks monetary damages for federal civil rights violations and state law tort claims. Plaintiff Antonio Gallegos alleges a § 1983 claim for purported Fourth Amendment violations in connection with his arrest on July 31, 2010. However, the *Terry* stop was supported by reasonable suspicion, and Antonio Gallegos' subsequent arrest was supported by probable cause. In addition, the individual Defendants did not violate Gallegos' clearly

1

established constitutional rights when employing a Taser in "dry-stun mode" when effectuating his arrest.  Qualified immunity applies to the individual Defendants' discretionary acts.  Since no genuine issues of material fact exist, partial summary judgment must be granted in Defendants' favor, dismissing with prejudice Plaintiff Antonio Gallegos' Unlawful Arrest and Seizure and Excessive Force claims.

### ADMITTED FACTS FROM PLAINTIFFS ANTONIO GALLEGOS, KRISTIAN PETTINE AND ANDRE GALLEGOS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT

<u>Material Fact No. 1.</u>   On July 31, 2010, Defendant Jeremy Apodaca ("Apodaca") was dispatched to Plaintiffs' home located at 1201 A North Paseo De Onate in reference to a 911 call regarding aggravated assault.  [DOC 68, p. 6] [DOC 94, p. 9]

<u>Material Fact No. 3.</u>   Defendant Apodaca was also advised by dispatch that the suspect had left the scene with a "black in color handgun" or "pistol".  *Id.*

<u>Material Fact No. 4.</u>   Defendant Apodaca and Defendant Robert Vigil ("Vigil") conducted an investigation of the 911 call and questioned Antonio Gallegos, Kristian Pettine and the victim, Alfonso Gurule, for close to one hour.  *Id.*

<u>Material Fact No. 8.</u>  Defendant Apodaca had a concern that Estevan had left the scene and was walking around with a hand gun.  [DOC 68, p. 7] [DOC 94, p. 9]

<u>Material Fact No. 12.</u>   Defendant Apodaca after speaking with the victim, Alfonso Gurule, stopped investigating the aggravated assault 911 call and began focusing on Mr. Gallegos and Mrs. Pettine.  *Id.*

<u>Material Fact No. 13.</u>   During the course of Defendant Apodaca's investigation, he ordered Mr. Gallegos to "stand there by my police car." *Id.*

Material Fact No. 15. Defendant Apodaca, during his investigation, observed Ms. Pettine walking around holding the minor child and placing her (the minor child) down. [DOC 68, p. 8] [DOC 94, p. 9]

Material Fact No. 18. Defendant Vigil physically placed himself in front of Mr. Gallegos and prevented him from entering his home. … Defendant Vigil testified that, "I got in front of Mr. Gallegos and I stopped him. I told him you can't go back in." *Id.*

Material Fact No. 27. Defendant Apodaca arrested Mr. Gallegos and charged him with (1) Battery upon a Peace Officer and (2) Resisting, Evading or Obstructing an Officer. [DOC 68, p. 9] [DOC 94, p. 9]

Material Fact No. 28. Defendant Apodaca made the decision to arrest Mrs. Pettine for Resisting, Evading or Obstructing an Officer. *Id.*

Material Fact No. 29. Defendant Apodaca testified at the Custody Hearing that Mrs. Pettine was arrested because, "[s]he was arrested due to the fact, for one, that she was intoxicated, and also for the intoxication part, we didn't want to leave her at the scene or on her own just in case she got hurt, we didn't want her to get hurt …". … Defendant Apodaca never criminally charged Mrs. Pettine for being intoxicated. [DOC 68, p. 10] [DOC 94, p. 9]

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

1.    Dispatch advised a City of Espanola Police Officer that the victim who had called 911 had run across the street to a gas station and was hiding from the suspect, "Estevan". Deposition of Officer Jeremy Apodaca, p. 48: lines 8-20, attached hereto as Defendants' Exhibit 1.

2.    Estevan is also Antonio Gallegos's son. Deposition of Antonio Gallegos, p. 10: lines 13-25, attached hereto as Defendants' Exhibit 2.

3.	Dispatch reported to the Officer that the suspect was believed to be walking toward Northern New Mexico Community College.  Incident Report, p. 1, attached hereto as Defendants' Exhibit 3.

4.	On his way to the incident site, the Officer travelled by the college and along the route the suspect may have been taking, but did not see him.  Exhibit 1, p. 60: lines 4-10.

5.	This Officer was the first law enforcement officer to arrive on the scene.  Exhibit 1, p. 52: lines 8-9.

6.	He parked his police vehicle in front of, but somewhat back from, the mobile home's door.  Deposition of Officer Robert Vigil, p. 102: lines 15-18, attached hereto as Defendants' Exhibit 4.

7.	Outside the mobile home business, Officer Apodaca saw a male, female and a female toddler.  The minor child was sitting on the steps to the mobile home wearing nothing but an obviously soiled heavy diaper.  Exhibit 3, p. 1.

8.	Officer Apodaca remained at the scene for almost an hour while he questioned various people and conducted his initial investigation.  Exhibit 1, p. 52: line 3.

9.	Antonio Gallegos was at home when he saw an Officer outside of his business office.  Exhibit 2, p. 20: lines 3-5.

10.	Mr. Gallegos thought the Officer might be a customer, so he went outside and asked Officer Vigil if he could help him.  Exhibit 2, p. 20:  lines 6-18, p. 21: line 16-17.

11.	The Officer advised Mr. Gallegos that "there was a 911 call" and "…somebody had pulled a gun on somebody else."  Exhibit 2, p. 21: lines 22-25, p. 22: line 1.

12.	Mr. Gallegos advised the Officer that he didn't know anything about the 911 call. Exhibit 2, p. 22: lines 3-4.

13.     Mr. Gallegos questioned Mr. Gurule and asked whether he saw Estevan with a gun.  Exhibit 2: p. 24: lines 9-11.

14.     Mr. Gurule told Gallegos that Estevan had pulled a gun on him.  Gallegos became aggressive towards Mr. Gurule.  He tried to grab him and told him to shut his "fucken mouth and quit lying."  Mr. Gurule responded, "I'm not lying.  He did and it's not okay."  …  Officer Apodaca separated the two men, and called for another officer to come to the location.  Exhibit 3, p. 1.

15.     Mr. Gallegos then said to Officer Vigil, "… obviously there is not anything going on here.  Somebody made a call saying there was a gun and now he [Alfonso Gurule] is saying no, and he doesn't know."  Exhibit 2, p. 26: lines 15-18.

16.     Mr. Gallegos then said, "[s]o there's nothing here, there is no reason for you to stay here … I have to go to work, I have to take care of my business, and I appreciate if you guys just left."  Exhibit 2: p. 34: lines 3-8.

17.     Mr. Gallegos started to walk towards his office to go back to work.  Exhibit 2: p. 35: lines 15-18.

18.     Antonio Gallegos now started walking around, yelling that the only guns he had were in his house, that he is a business man in this town and pays taxes.  Exhibit 3, p. 1.

19.     He threatened to call Judge Naranjo, a friend of his, and sue Officers Apodaca and Vigil.  He yelled that the Officers needed to leave because they were on his property.  Exhibit 3, p. 1.

20.     Officer Apodaca repeatedly told Gallegos to stand by the rear of his police car, but Gallegos made a hand gesture, said he was done here, and turned around and began walking to the mobile home.  Exhibit 3, p. 1; Exhibit 1, p. 69, lines 4-6.

21.     Not wanting Gallegos to go into the house where he had said he had guns, Officers Vigil and Apodaca yelled loudly several times for Gallegos to stop; when he did not, they ran after him.  Exhibit 3, p. 1; Exhibit 1, p. 69: lines 14-15; Exhibit 4, p. 111: lines 2-3.

22.     Antonio Gallegos ignored Officers Apodaca and Vigil's commands to stop.

23.     Based on Mr. Gallegos' anger, volatility and threats, Officers Apodaca and Vigil were concerned for their safety and "the safety of everybody involved" and had a reasonable basis to not want Gallegos to go into the home at that time.  Exhibit 4, p. 105: lines 4-8, p. 107: lines 9-10.

24.     Officers Apodaca and Vigil did not want Gallegos to be able to access any guns he said were in his house.  Exhibit 1, p. 71: lines 1-8; Exhibit 4: p. 107: lines 1-10, p. 116: lines 5-10.

25.     In the entryway of the home, Officer Vigil got between Gallegos and the door. Gallegos aggressively shoved Officer Vigil.  Exhibit 3, p. 2; Exhibit 4, p. 115: lines 2-7, p. 117: line 1-3.

26.     Officer Vigil used hand control techniques against Gallegos in an attempt to stop him and to handcuff him.  Gallegos combatively resisted, resulting in Officer Apodaca applying a dry stun to Gallegos' left shoulder; Gallegos was then put into handcuffs.  Exhibit 3, p. 2; Exhibit 4, p. 117: lines 1-9.

27.     The Officers ran after Gallegos only when he disregarded their commands to "stop".  No force was used on Gallegos until after he forcibly shoved Officer Vigil and then resisted being handcuffed.  Exhibit 3, pp. 1-2; Exhibit 1, p. 69: lines 4-15, p. 75: lines 12-15; Exhibit 4, p. 111: lines 2-19, p. 117: lines 1-23.

28.     When Gallegos started walking to his home and the Officers yelled at him to stop, Gallegos was not under arrest but was free to turn around and return to the parking area.  Exhibit 4, p. 111: lines 2-19, p. 117: lines 1-23.

29.     Nor was Gallegos under arrest when Officer Vigil blocked the door to the home as he did not restrain Gallegos, who could have turned around and returned to the parking area.  Exhibit 4, p. 111: lines 2-19.

30.     While Officer Apodaca had no information that the gun used in the aggravated assault on Alfonso Gurule was in Gallegos' house, the gun had not been located.  Exhibit 4, p. 105: lines 4-8, p. 107: lines 9-10.

31.     When the officers later entered the home, a rifle was found leaning against a wall in the master bedroom.  Gallegos also testified there was a gun in the house and that he owns numerous firearms, some of which he has given to his sons.  Exhibit 3, p. 1; Exhibit 1, p. 71: lines 1-8, Exhibit 4, p. 111: lines 2-19, p. 116: lines 5-10; Exhibit 2, p. 27: lines 13-25, p. 28: lines 1-9.

32.     Antonio Gallegos refused medical care from the ambulance attendants who came to the scene.  Exhibit 2, p. 41: lines 10-17.

33.     Officer Apodaca suspected a Hate Crime may have been committed.  Exhibit 1, p. 62: lines 24-24, p. 63: lines 1-3.

## ARGUMENT

### A.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Once the party moving for summary judgment has made a prima facie showing of entitlement to such relief, the

burden then shifts to the party opposing summary judgment to show that specific evidentiary facts exists which would require a trial on the merits. *See, Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Alder v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998) *citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505 (1986). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id. citing Anderson* 477 U.S. at 248.

If the moving party meets this burden, then the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256; *Adler,* 144 F.3d at 671, n.1. "In a response to a motion for summary judgment, a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988). Likewise, the non-moving party may not simply rest upon his or her pleadings to satisfy this burden. *Anderson,* 477 U.S. at 256. The mere existence of some alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment. *FDIC v. Hulsey,* 22 F.3d 1472, 1481 (10th Cir. 1994).

**B.  QUALIFIED IMMUNITY**

A police officer is entitled to raise qualified immunity as a defense if (1) he was performing a discretionary function and (2) he did not violate a clearly established constitutional or statutory right of which a reasonable person in his position would have known. *Anderson v. Creighton,* 483 U.S. 635, 638-39, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In other words, if a police officer reasonably believed that his actions were lawful in light of clearly established law and based upon all information available to him at the time, then he shall be immune from

liability. *Davis v. Scherer,* 468 U.S. 183, 191, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). His

reasonable belief, however, will be tested under an objective, rather than a subjective, standard.

*Id.*

      "The general proposition, for example, that an unreasonable search or seizure violates the

Fourth Amendment is of little help in determining whether the violative nature of particular

conduct is clearly established. … Instead, for any court to reach a determination that a violation

of clearly established law has taken place a "more particularized" inquiry is required. The court

must ask whether 'every reasonable official would have understood that *what he [did]* violate[d]

that right. … To satisfy this standard, '[w]e do not require a case directly on point,' but neither

may a district court deny immunity unless 'existing precedent [has] placed the statutory or

constitutional question *beyond debate.*'" *Kerns v. Bader,* 663 F.3d 1173, 1183 (10th Cir.

2011)(internal citations omitted).

      However, the initial burden typically accorded to the moving party is shifted when the

motion for summary judgment is based on qualified immunity. *See, Koch v. City of Del City,*

660 F.3d 1228, 1238 (10th Cir. 2011). Whenever a moving party asserts qualified immunity at

the summary judgment phase, it is the non-moving party that bears the burden of showing that

(1) the defendant violated a constitutional right, and (2) the right was clearly established at the

time of the alleged unlawful activity. *Id.; Lundstrom v. Romero,* 616 F.3d 1108, 1118 (10th Cir.

2010) *citing Riggins v. Goodman,* 572 F.3d 1101, 1107 (10th Cir. 2009). "If, and only if, the

plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant

for summary judgment—showing that there are no genuine issues of material fact and that he or

she is entitled to judgment as a matter of law. *Koch,* 660 F.3d at 1228 (internal quotations and

citations omitted).

In *Eddy,* the Third Circuit Court of Appeals noted that failing to raise affirmative defenses in an answer does not result in automatic waiver. … The court in *Eddy* went on to adopt this more lenient standard already employed by the First and Sixth Circuits. … With these considerations in mind, the court in *Eddy* noted that qualified immunity could be raised (1) in a motion to dismiss at the pleading stage, (2) in a motion for summary judgment after discovery, or (3) as an affirmative defense at trial. … Thus, the last possible opportunity to raise qualified immunity is by a motion for judgment as a matter of law." *Adamo v. Dillon,* 900 F.Supp.2d 499, 506 (M.D. Pa. 2012) *citing Eddy v. V.I. Water and Power Auth.,* 256 F.3d 204 (3rd Cir. 2001)(internal citations and quotations omitted).

### C.    UNLAWFUL ARREST AND SEIZURE

"The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Herrera v. City of Albuquerque,* 589 F.3d 1064, 1070 (10th Cir. 2009).

"In applying the Fourth Amendment's protections against unreasonable searches and seizures, the Supreme Court has recognized three types of police-citizen encounters:  consensual encounters, investigative detentions, and arrests." *Koch,* 660 F.3d at 1238.

"An investigative detention must be 'justified at its inception' by a reasonable suspicion of criminal activity, and it must be 'reasonably related in scope to the circumstances which justified the [detention] in the first place.'" *Hernandez v. Grant,* p. 8, Civ. No. 11-822 BB/SMV (D.N.M. August 24, 2012)(*citing Terry v. Ohio,* 392 U.S. 1, 21-22 (1968).  "[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot' even if the officer lacks probable cause." *United States v. Sokolow,* 490 U.S. 1, 7 (1989).  "When the officer has

stopped a person based on reasonable suspicion of criminal activity, the officer may briefly detain the individual 'in order to determine his identity or to maintain the status quo momentarily while obtaining more information." *Oliver v. Woods,* 209 F.3d 1179, 1186 (10th Cir. 2000).

"In reviewing an investigatory stop for reasonable suspicion, we must consider 'the totality of the circumstances' of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Neff,* 681 F.3d 1134, 1138 (10th Cir. 2012)(citing *United States v. Arvizu,* 534 U.S. 266, 273 (2002). "[S]howing reasonable suspicion is a low burden that is generally easy for an officer to meet." *Sisneros v. Fisher,* 685 F.Supp.2d 1188, 1214 (D.N.M. 2010).

"The Tenth Circuit has expressly agreed that a police/citizen encounter that goes beyond the limits of a *Terry* stop is an arrest which must be supported by probable cause or consent to be valid." *Id.* at 1206. "Probable cause to arrest exists where, under the totality of the circumstances, a reasonable person would believe that an offense has been committed by the person arrested." *Morris v. Noe,* 672 F.3d 1185, 1192 (10th Cir. 2012).

In the case at bar, the *Terry* stop was supported by reasonable suspicion and the arrest was supported by probable cause.

Plaintiff Antonio Gallegos was briefly detained in order to investigate an alleged aggravated assault. It is undisputed that Defendant Jeremy Apodaca took a 911 call in which an "Estevan" pulled a gun on the victim. (Admitted Material Facts Nos. 1 & 3; Defendants' Material Fact No. 1) Defendant drove in the area in the immediate vicinity of the Northern New Mexico College to see if he could see anyone matching the suspect's description. (Defendants' Material Facts Nos. 3 & 4) It is also undisputed that "Estevan" was Plaintiff Antonio Gallegos' son. (Defendants" Material Fact No. 2) At all times, "Estevan" had not returned to the crime

scene and was otherwise still at large. (Admitted Material Fact No. 8) The investigation even explored the possibility of a Hate Crime. (Defendants' Material Fact No. 33) While Plaintiff Gallegos was never suspected in the aggravated assault, the individual Defendants, nevertheless, acted well within their discretion by detaining him in order to preserve the status quo while they continued their criminal investigation. (Admitted Material Fact No. 4; Defendants' Material Facts Nos. 5, 6, 7, 8 & 11) Accordingly, no genuine issue of a material fact exists that reasonable suspicion was present during this *Terry* stop, and summary judgment in Defendants' favor is appropriate.

Likewise, the reasonable suspicion evident under the totality of the circumstances ripened into probable cause—justifying in the arrest of Plaintiff Antonio Gallegos.

Plaintiff Antonio Gallegos was ultimately charged with (1) Battery upon a Peace Officer and (2) Resisting, Evading or Obstructing an Officer. (Admitted Material Fact No. 27) For the Battery Charge, probable cause is evident since Plaintiff Gallegos shoved Defendant Robert Vigil when he attempted to re-enter his home/business office. (Admitted Material Fact No. 18; Defendants' Material Facts No. 25) For the Obstruction charge, it is undisputed that Plaintiff Gallegos confronted the alleged victim, Alfonso Gurule, and unilaterally determined that there was nothing more to investigate. (Admitted Material Fact No. 12; Defendants' Material Facts Nos. 9-15) Gallegos then instructed the individual Defendants to leave his property. (Defendants' Material Facts Nos. 16, 19) Yet, at this time, "Estevan" had not returned to the crime scene or been found. (Admitted Material Fact No. 8) During this time period, Plaintiff Gallegos refused police commands to stay behind the police vehicle as he attempted to re-enter his home/business office, which by Gallegos' own admission housed a weapon. (Admitted Material Fact No. 13; Defendants' Material Facts Nos. 17-32) Ample evidence exists to support

the Obstruction charge. Therefore, summary judgment is proper on qualified immunity grounds because the individual Defendants could have reasonably believed that Plaintiff Gallegos violated the law in these two (2) key respects.

### D.    EXCESSIVE FORCE

"Qualified immunity shields government officials from liability were 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Sisneros,* 685 F.Supp.2d at 1201 (D.N.M. 2010) *citing Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).  "Qualified immunity operates to protect officers from the sometimes hazy border between excessive and acceptable force and to ensure that, before they are subjected to suit, officers are on notice that their conduct is unlawful."  *Fancher v. Barrientos,* p. 13, No. Civ. 11-118 LH/LAM (D.N.M. June 13, 2012) *citing Saucier v. Katz,* 533 U.S. 194, 206, 150 L.Ed.2d 272 (2001).

The question of whether the officers' use of force is objectively reasonable is analyzed in light of the facts and circumstances confronting the officers, without regard to their underlying intent or motivation.  *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).  Factors to consider in evaluating the reasonableness of the amount of force used are (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight.  *Id.* at 396.

The reasonableness of the particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.  *Id.*  The determination of reasonableness must allow for the fact that police officers are often forced to

make split-second judgments, in circumstances that are tense, uncertain, and rapidly evolving, about the amount of force that is necessary in a particular situation. *Id.* at 396-97.

"Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officers or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Tennessee v. Garner,* 471 U.S. 1, 11 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). "Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if where feasible, some warning has been given." *Id.* at 11-12.

## 1.    Constitutional Violation

"[I]t is excessive to use a Taser to control a target without having any reason to believe that a lesser amount of force—or a verbal command—could not exact compliance." *Casey v. City of Federal Heights,* 509 F.3d 1278, 1286 (10th Cir. 2007)(*citing Draper v. Reynolds,* 369 F.3d 1270, 1276-78 (11th Cir. 2004)(In *Draper,* taser use "reasonably proportionate" to situation where truck driver was belligerent and hostile and refused commands when asked to provide insurance information.) *See, Porro v. Barnes,* 624 F.3d 1322, 1329 (10th Cir. 2010)("The use of tasers in at least some circumstances—such as in a good faith effort to stop a detainee who is attempting to inflict harm on others—can comport with due process."); *see also, Hinton v. City of Elwood,* 997 F.2d 774, 776-7, 781 (10th Cir. 1993)("electrical stun gun" use not excessive when man ignored warnings, shoved officer and actively resisted arrest.)

"A reasonable officer need not await the glint of steel before taking self-protective action; by then, it is often too late to take safety precautions." *Estate of Larsen ex. rel. Sturdivan v. Murr,* 511 F.3d 1255, 1260 (10th Cir. 2008).

### 2. Clearly Established

"In *Casey,* we faced very similar factual circumstances: a police officer used her Taser against a non-violent misdemeanant who appeared to pose no threat and who was given no warning or chance to comply with the officer's demands. … There we held that the officer's actions violated the Fourth Amendment, and that the law was clearly established as of August 25, 2003, the date on which the incident occurred." *Cavanaugh v. Woods Cross City,* 625 F.3d 661, 666-67 (10th Cir. 2010)(internal citation omitted)(*citing Casey,* 509 F.3d at 1279, 1281-82, 1286 (10th Cir. 2007).

### 3. Application of law to case facts

The *Graham* factors all weigh in Defendants' favor.

The first *Graham* factor looks at the severity of the crime that formed the basis of the arrest. Here, Plaintiff Antonio Gallegos was arrested for Battery on a Peace Officer. (Admitted Material Fact No. 27) It is important to note that the complained-of "dry-stun" Taser usage occurred after Plaintiff Gallegos shoved Defendant Robert Vigil when he attempted to re-enter his home/business office. (Admitted Material Fact No. 18; Defendants' Material Facts Nos. 25-26)

The second *Graham* factor delves into whether a plaintiff posed an immediate threat to officers and others. Ample evidence supports this finding in Defendants' favor. It is undisputed that Plaintiff Gallegos informed the officers that "the only guns were in his house" and that a .22 rifle was found inside the house following his arrest. (Defendants' Material Facts Nos. 18 & 31) In addition, Plaintiff Gallegos was intoxicated and belligerent and hostile towards the officers when he unilaterally decided that there was nothing more to investigate. (Defendants' Material Facts Nos. 8-19) Gallegos then refused police commands to stay behind the police vehicle as he

attempted to re-enter his home/business office.  (Admitted Fact No. 13; Defendants' Material Facts Nos. 20-22)  By disregarding lawful orders to stop and by attempting to re-enter a dwelling in which a weapon was located, the individual Defendants could reasonably believe that their own safety as well as the safety of others were threatened.  (Defendants' Material Facts Nos. 23-24, 27-30)

The third *Graham* factor focuses on whether the plaintiff resisted arrest.   Again, the complained-of "dry-stun" Taser use occurred after Plaintiff Antonio Gallegos was taken down by the individual Defendants.   (Defendants' Material Facts Nos. 25-26)   Plaintiff Gallegos continued to struggle while on the ground.  *Id.*  And the Taser was employed only after Gallegos actively resisted attempts to be hand-cuffed.   *Id.*   Throughout this time, verbal commands directed towards Gallegos did not exact compliance and he continued to be non-cooperative. (Admitted Fact No. 13; Defendants' Material Facts Nos. 20-22)  No factual allegation exist that the Taser was employed against Plaintiff Gallegos long after he was securely restrained.  As a result, the force used was proportionate to the circumstances.

The Defendants are entitled to qualified immunity on Plaintiff Antonio Gallegos' excessive force claim.

**WHEREFORE**, the Defendants City of Espanola, Joe Martinez, Jeremy Apodaca, Robert Vigil, City of Espanola Officers and Supervisors John Does 1 through 10 respectfully request that the Court grant Partial Summary Judgment in their favor and against Plaintiff Antonio Gallegos, and for such other and further relief as the Court deems just.

Respectfully submitted by:

Basham & Basham, P.C.

*/s/ Mark A. Basham*
Mark A. Basham
2205 Miguel Chavez, Suite A
Santa Fe, New Mexico 87505
505-988-4575
Fax: 505-992-6170
mbasham@bbpcnm.com
Attorneys for City Defendants


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 29th day of August, 2014, I filed the foregoing Defendants' Motion for Partial Summary Judgment against Defendant Antonio Gallegos on Qualified Immunity Grounds which caused counsel of record to be served by electronic means or by US Mail, as more fully reflected on the Notice of Electronic Filing:

Nathaniel Thompkins
New Mexico Firm, L.L.C.
103 N. St. Francis Drive, Unit A
Santa Fe, NM  87501
Attorney for Plaintiffs

*/s/ Mark A. Basham*
Mark A. Basham