1

1       IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW MEXICO
2


3
ANTONIO GALLEGOS, KRISTIAN PETTINE,
4  ANDRE GALLEGOS, and K.L.P.L., a
minor child,
5
            Plaintiffs,
6
vs.                              No. 1:12-CV-224-LH-/KBM
7


8  CITY OF ESPAÑOLA, a municipal corporation,
JOE MARTINEZ, individually and in his official capacity;
9  JEREMY APODACA, individually and in his official
capacity; ROBERT VIGIL, individually and in his official
10 capacity; CITY OF ESPAÑOLA OFFICERS and SUPERVISORS JOHN
DOES 1 through, individually and in their official
11 capacities,

12
            Defendants.
13
            DEPOSITION OF JEREMY APODACA
14            Wednesday, June 19, 2013
                    1:42 p.m.
15          Cumbre Court Reporting, Inc.
                2019 Galisteo Street
16          Santa Fe, New Mexico 87505

17              **CERTIFIED COPY**

18       PURSUANT TO THE NEW MEXICO RULES OF CIVIL
   PROCEDURE, this Deposition was:
19
   TAKEN BY:  NATHANIEL V. THOMPKINS
20              ATTORNEY FOR THE PLAINTIFFS

21

22 REPORTED BY:  ALLISON ASH-HOYMAN
                NEW MEXICO CCR #18
23              CUMBRE COURT REPORTING, INC.
                2019 Galisteo, Suite A-1
24              Santa Fe, New Mexico 87505

25

EXHIBIT

_1_

Antonio Gallegos, et al. v.
City of Espanola, et al.

Jeremy Apodaca
June 19, 2013

---

**Page 46**

1   wasn't charged and technically he wasn't arrested?
2   A.   Well, I believe I stated technically he was
3   arrested --
4   Q.   Okay.
5   A.   -- by being placed in handcuffs.
6   Q.   Okay.
7   A.   However, the differentiation would be charged
8   -- arrested with charges.
9   Q.   Okay.  What is your definition of "arrest"?
10  A.   Arrest, I would define as an individual not
11  being able to leave the scene.
12  Q.   Okay.  And that was -- in Andre's case he
13  wasn't able to leave the scene?
14  A.   No.
15  Q.   Okay.  Does an order from the juvenile office
16  require a supervisor's approval?
17  A.   My own supervisor or --
18  Q.   Let's start with yours.  If you receive an
19  order from the juvenile office, are you required to get
20  approval from your supervisor?
21  A.   No.
22  Q.   If you receive an order from the juvenile
23  office are you required to have it come from a
24  supervisor at the juvenile office?
25  A.   Can you be more specific?

---

**Page 47**

1   Q.   Does it matter the level of the person working
2   in the juvenile office that is able to give you an order
3   to take a juvenile into custody?
4   A.   Yes.
5   Q.   And what level must a person in the juvenile
6   office be in order for you to take an order from them to
7   put a juvenile in custody?
8   A.   They have to hold the position of juvenile
9   probation officer.
10  Q.   Okay.  And who was the juvenile probation
11  officer in this instance that gave you the order to take
12  Andre into custody?
13  A.   I believe it was Martha -- I can't recall her
14  last name at this time.
15  Q.   Would you have documented the name of the
16  person in your investigation?
17  A.   Yes.
18  Q.   Can you look at your report and tell me if it
19  is documented as to who the person was that gave you the
20  order?
21  A.   (Witness complying.)
22       I have Martha listed here.
23  Q.   And last name?
24  A.   I don't recall.
25  Q.   Is there a title or position?

---

**Page 48**

1   A.   Her title or position is juvenile probation
2   officer, to the best of my knowledge.
3   Q.   Is there a requirement that you notify your
4   supervisor when you get an order from a juvenile
5   probation officer to arrest or take into custody a
6   juvenile?
7   A.   Not to my knowledge.
8   Q.   Let's go through your steps that you took when
9   you conducted your investigation, your preliminary
10  investigation.
11       You get -- when did you get the call?  Can you
12  tell from your Uniform Incident Report?
13  A.   I believe it was approximately 12:46 p.m.
14  Q.   And the 12:46 that you reference on your
15  incident report is on the upper left-hand corner of the
16  incident report, and that box says 12:46 indicates the
17  time that you received the call?
18  A.   Correct.
19  Q.   Okay.  What time did you arrive at the scene?
20  A.   I believe that would be 1345 hours.
21  Q.   And by the way, did you physically input the
22  information that is in the Uniform Incident Report?
23  A.   Yes.
24  Q.   Okay.  And when you put in 12:46, it was your
25  intent to establish the time that the call came in or

---

**Page 49**

1   the time that you got the call and were dispatched to
2   this incident?
3   A.   Yes.
4   Q.   And then the next time that you put in there
5   is 1345?
6   A.   Correct.
7   Q.   And when you input that information it was
8   your intent to indicate the time that you arrived at the
9   scene?
10  A.   No, not necessarily.
11  Q.   Okay.  What was -- what were you meaning to
12  note when you put the information of 1345 in?
13  A.   Basically the time frame of the call.
14  Something to that effect, with when the incident began
15  to when -- like when it was reported almost.
16  Q.   Okay.  I'm not following, then.
17  A.   As far as -- typically, with the initial --
18  the first box here where 12:46 is entered, dependent on
19  the call, the type of call that it is, it's -- it could
20  be whenever action started, basically.
21  Q.   What type of action?  What do you mean?
22  A.   I mean, in relation to this case, it
23  would -- to the best of my knowledge 12:46 would be the
24  time that our dispatch received the call for service.
25  Q.   Okay.  And so when you typed in 12:46 you

---

Antonio Gallegos, et al. v.
City of Espanola, et al.

Jeremy Apodaca
June 19, 2013

**Page 50**

1  meant to note on the report the time that dispatch, you
2  believe dispatch received a call?
3  A. I believe so, yes.
4  Q. Okay. So what's the next time?
5  A. The 1345 next time would be, possibly I
6  believe it's when I requested my case number.
7  Q. Okay.
8  A. I believe that's when I requested my case
9  number.
10  Q. So an hour and one minute after -- am I
11  correct, 12:46? Okay, so it's just under an hour, 59
12  minutes after dispatch got the call, you would put in on
13  your Uniform Incident Report the time that you requested
14  from dispatch your case number?
15  A. Yes.
16  Q. And if you requested a case number from
17  dispatch, then there would be a dispatch log that shows
18  the time that you requested the case number?
19  A. Yes.
20  Q. And if what you are saying is true, then that
21  number, 1345, would match up with the records on the
22  dispatch log.
23  A. I believe so.
24  Q. Okay. What time did you arrive?
25  A. I cannot recall.

**Page 51**

1  Q. Is that something that normally gets recorded
2  in a Uniform Incident Report?
3  A. Yes.
4  Q. Can you tell me why, in this incident, it's
5  not documented or you can't find it?
6  A. I cannot.
7  Q. Okay. Do you keep your own daily log of
8  activities besides your Uniform Incident Report?
9  A. No.
10  Q. Do you know what CAD logs are?
11  A. Yes.
12  Q. What are those?
13  A. They are logs of the dispatch.
14  Q. And have you ever had occasion to look at a
15  CAD log?
16  A. I don't believe so.
17  Q. Okay. In your documentation, or documenting
18  the incident on July 31st, 2010, would it be standard
19  procedure for you to document the time that the incident
20  ended?
21  A. No.
22  Q. How long did the incident on July 31st, 2010
23  last from the time you arrived to the time you left the
24  scene?
25  A. I can't recall specifically.

**Page 52**

1  Q. Do you think it was over an hour that you were
2  at the scene doing all your work, or longer?
3  A. Most likely approximately an hour.
4  Q. Okay. You called -- there was a PSA that was
5  at the scene?
6  A. Yes.
7  Q. Let me back up.
8  You were the first to arrive at the scene?
9  A. Yes.
10  Q. Who arrived second?
11  A. I can't recall specifically at this time.
12  Q. Would you have documented that arrival in your
13  incident report?
14  A. No.
15  Q. Did anybody else -- what other officers
16  arrived?
17  A. Officer Robert Vigil.
18  Q. Okay. And you don't recall what time he
19  arrived?
20  A. No, I do not.
21  Q. Besides Officer Robert Vigil, do you recall
22  any other officers arriving?
23  A. Yes.
24  Q. And who were they?
25  A. Sergeant Jeff R. -- at the time he was a

**Page 53**

1  corporal, but Jeff R. Martinez.
2  Q. Okay. Do you recall what time he arrived?
3  A. Not specifically.
4  Q. Okay. Besides Corporal Jeff R. Martinez, and
5  Officer Robert Vigil, were there any other officers that
6  arrived?
7  A. No.
8  Q. Was there a PSA aide?
9  A. Yes.
10  Q. Do you not consider him an officer?
11  A. Technically speaking, yes, he is an officer.
12  Q. Okay. And who was that PSA aide?
13  A. Brian Romero.
14  Q. And do you know when he arrived?
15  A. No, not specifically.
16  Q. Okay. If you don't know the time that they
17  arrived, do you know who arrived in what sequence in
18  terms of Officer Vigil, Corporal Martinez, and PSA
19  Romero.
20  MR. BASHAM: I'm going to go ahead and just
21  throw in an objection. Asked and answered.
22  A. I don't specifically remember who arrived.
23  BY MR. THOMPKINS:
24  Q. Besides the people that you have identified,
25  did you request anybody else to come to the scene?

Antonio Gallegos, et al. v.
City of Espanola, et al.

Jeremy Apodaca
June 19, 2013

---

**Page 58**

1  Q.  Did he tell you that the handgun that he was
2  allegedly threatened with was put in the house?
3       MR. BASHAM: Objection, hearsay.
4  A.  I don't believe so.
5  BY MR. THOMPKINS:
6  Q.  When you arrived at the scene somewhere
7  between 12:46 and 1345 — is that correct?
8  A.  To the best of my memory, yes.
9  Q.  — did you attempt to take Mr. Gurule to try
10 to find the person who allegedly used a handgun on him?
11 A.  To the best of my memory, no.
12 Q.  There is a reason why you didn't do that?
13 A.  I believe I was told that he had walked
14 towards the direction of the college.
15 Q.  And because of that fact you didn't attempt to
16 go with Mr. Gurule to find who this individual was?
17 A.  Can you —
18 Q.  No?
19 A.  Can you be more specific?
20 Q.  Okay. You got a call from dispatch that the
21 complainant had been threatened with a gun by an
22 individual.
23 A.  Yes.
24 Q.  And then you met the complainant, Mr. Gurule.
25 A.  Correct.

---

**Page 59**

1  Q.  And he then gave you the name of the
2  individual who he said had a gun.
3  A.  Yes.
4  Q.  Did he — and he told you in the direction of
5  which this individual had gone.
6  A.  Yes.
7  Q.  And there was no concern on your part that
8  this individual might be walking with a handgun
9  in the direction that Mr. Gurule said he was traveling?
10 A.  I had that concern, yes.
11 Q.  But you didn't attempt to take Mr. Gurule and
12 try to go find and locate the individual he said had a
13 gun and pulled it out on him?
14 A.  No.
15 Q.  Okay. After you had found the .22 rifle that
16 you said was in the home, you knew that wasn't the —
17 the description of the handgun that Mr. Gurule gave you;
18 right?
19 A.  Correct.
20 Q.  So that individual is potentially out there
21 with a handgun walking towards Northern New Mexico
22 Community College; is that correct?
23 A.  Yes.
24 Q.  Did you do anything to further attempt to find
25 and locate the individual that was alleged to have had a

---

**Page 60**

1  gun, a handgun, and had threatened Mr. Gurule?
2  A.  Yes.
3  Q.  What did you do?
4  A.  While I was en route to that location, I
5  passed directly the general area of where that
6  individual would have been walking, based off of what
7  was described to me.
8  Q.  Okay.
9  A.  And I checked that area on my way to the
10 residence, or the business.
11 Q.  Okay. I'm — a little after that, because the
12 first question was Mr. Gurule told you the name of the
13 individual, the direction he was walking in, and the
14 fact that he had a handgun. At that point you didn't do
15 anything to try to locate this individual?
16 A.  Not to my knowledge.
17 Q.  Did you ask Mr. Gurule for a description of
18 the individual that pulled the handgun out on him?
19 A.  I believe so.
20 Q.  And what description did you get?
21 A.  I can't specifically recall.
22 Q.  Did you document the description of the
23 individual in your incident report?
24 A.  I don't believe so.
25 Q.  Wouldn't that be standard procedure in the

---

**Page 61**

1  investigation of an assault with a weapon, to document
2  the — a description of the individual that allegedly
3  had the weapon and committed the assault?
4  A.  Yes.
5  Q.  But why didn't you do it in this instance?
6  A.  I believe in this instance I didn't document
7  that part because of how broad a situation this
8  developed into. And I don't know exactly why I did not.
9  Q.  Okay. So did — is it fair to say from what
10 you described that your attention turned away from Mr.
11 — the suspect, and you began investigating the incident
12 with the individuals at the scene?
13 A.  Yes.
14 Q.  Did you put a description of the individual
15 suspect over the radio to dispatch?
16 A.  I can't specifically recall if I did that or
17 if they obtained that information from the 911 caller.
18 Q.  If who obtained the information?
19 A.  If dispatch obtained that information and then
20 relayed it to me on my — I know that on my way to the
21 scene they described the individual, I believe. That's
22 how I was able to check the area and determine nobody
23 was there.
24 Q.  Okay. But when you talked to Mr. Gurule, you
25 got a description of him?

---

Antonio Gallegos, et al. v.
City of Espanola, et al.

Jeremy Apodaca
June 19, 2013

**Page 66**

1  A.  I do recall slightly that.

2  Q.  Okay.  And that testimony that I just read to

3  you, if that were true, in terms of your testimony, is

4  inconsistent with what you just told us today about the

5  danger that Kolby was faced while she was with her

6  mother?

7  A.  I don't believe it's inconsistent.

8  Q.  Okay.  And how is it not inconsistent?

9  A.  Like I stated, initially I believe that she

10  was in danger upon my arrival, when I did observe her

11  walking around that area right there.

12      But once I was out and speaking with her, I

13  believe that that danger was -- had subsided slightly

14  because I was there intervening now.

15  Q.  Okay.  How long did you observe Kolby when you

16  arrived?

17  A.  Approximately a couple minutes, I can't say

18  specifically.

19  Q.  A couple of minutes?

20  A.  Less than that.

21  Q.  Okay.

22      MR. BASHAM:  Can I just go on the record here

23  and say perhaps from now on instead of referring to the

24  child by her name, refer to the two-year old, in the

25  event that some of this may be used at trial?

**Page 67**

1      MR. THOMPKINS:  If we go to trial I'm going to

2  refer to the child by her name.  There is nothing to

3  prevent me from referring to her by her name.  He

4  referred to the child by her name in his report.

5      So why do we have to call her a two-year old

6  child?

7      MR. BASHAM:  Then why can't you put it in a

8  complaint?  Because they don't want the child's --

9  that's -- come on, Nate, we went through this with the

10  judge.

11      MR. THOMPKINS:  We didn't go through a

12  deposition saying I couldn't mention the name.  Why did

13  he put it in the complaint?

14      MR. BASHAM:  Never mind.  I'm on the record.

15  BY MR. THOMPKINS:

16  Q.  So you don't know how long you were there at

17  the scene?

18  A.  Not --

19      MR. BASHAM:  Objection, asked and answered.

20  A.  Not specifically.

21  BY MR. THOMPKINS:

22  Q.  And so for the time period you were there,

23  whatever time that was, you didn't indicate when you

24  answered this question that the child was in any danger.

25  A.  I can't specifically say how long she was in

**Page 68**

1  that danger for.

2  Q.  Well, you were talking -- during your

3  investigation you talked to other people besides Ms.

4  Pettine, didn't you?

5  A.  Yes.

6  Q.  And where was the child and where was Ms.

7  Pettine when you were talking to Alfonzo Gurule?

8  A.  She was walking around the area holding the

9  child.

10  Q.  Holding the child in her arms?

11  A.  She would hold her, place her down.

12  Q.  And in that period of time your testimony was

13  she was in no danger?

14      MR. BASHAM:  Objection.  Mischaracterizes his

15  testimony.

16  BY MR. THOMPKINS:

17  Q.  Isn't it your testimony during the

18  investigation I would say that Kolby wasn't exposed to

19  any danger while we were there?

20  A.  I believe that's correct.

21  Q.  Okay.  So while you were there, and Ms.

22  Pettine is holding the child and putting her down, the

23  child wasn't in any danger.

24  A.  I don't believe so.

25  Q.  When you -- when Mr. Gallegos was -- did you

**Page 69**

1  instruct Mr. Gallegos to stand by the back of your

2  patrol car?

3  A.  Yes, I believe I did.

4  Q.  And at some point did Mr. Gallegos leave that

5  point and attempt to return to his house?

6  A.  Yes.

7  Q.  And what did you and Officer Vigil do when he

8  attempted to re-enter his home?

9  A.  We attempted to stop him from re-entering his

10  home.

11  Q.  Did you describe in your report that you ran

12  after him?

13  A.  Yes, I believe so.

14  Q.  And that you yelled at him to stop?

15  A.  I believe so, yes.

16  Q.  Okay.  And at that point you established your

17  authority as a police officer to get Mr. Gallegos to

18  comply.

19  A.  Yes.

20  Q.  And Mr. Gallegos then stopped.  He didn't

21  enter the house, did he?

22  A.  No.

23  Q.  And he was not free to leave at that point,

24  was he?

25  A.  No.

Antonio Gallegos, et al. v.
City of Espanola, et al.

Jeremy Apodaca
June 19, 2013

---

**Page 70**

1   Q.   And wasn't he therefore under arrest?

2   A.   Technically, yes.

3   Q.   Okay. At that point, when you and Officer

4   Vigil prevented him from entering his house, what crime

5   did you suspect he had committed?

6   A.   At the point when we stopped him what crime

7   had he committed, you mean?

8   Q.   You yelled stop, you ran after him, and you

9   said he stopped. And now at that point he is not free

10  to leave and he is under arrest. What crime did you

11  suspect he had committed?

12  A.   The resisting, evading or obstructing a police

13  officer.

14  Q.   By walking from the car to his house he was

15  resisting, obstructing and evading a police officer?

16       MR. BASHAM: Objection. Asked and answered.

17  A.   Yes, I believe so.

18  BY MR. THOMPKINS:

19  Q.   And that's the crime that you arrested him for

20  at that point when you arrested him, for obstructing,

21  evading and resisting?

22  A.   Yes.

23  Q.   How did he evade?

24  A.   By -- during the course of my investigation I

25  instructed him to stand there by my police car. Being

---

**Page 71**

1   that there was weapons involved and by his statement

2   that the only weapons there, were in his house. So for

3   officer safety sake, I instructed him to stand by my

4   police car where I was able to observe him and keep an

5   eye there, that he didn't have access to any weapons.

6       And by him leaving that point and attempting

7   to re-enter the home where he just told us that the only

8   weapons were inside his home, he was therefore

9   committing the resisting, obstructing and evading a

10  police officer.

11  Q.   What facts did you have about the weapon that

12  was in the home at the time that you've told him to

13  stop?

14  A.   Only the presence that he had told me of there

15  being weapons in the home.

16  Q.   What facts did you have that would indicate

17  where the weapon was located at the time that you

18  prevented him from entering his home?

19       MR. BASHAM: Objection, asked and answered.

20  A.   I didn't have any facts as to where it was

21  located.

22  BY MR. THOMPKINS:

23  Q.   What facts did you have that would indicate

24  what type of weapon that it was that was in the home at

25  the time that you prevented him from entering his home?

---

**Page 72**

1   A.   The fact that he referred to it as a -- the

2   gun or guns.

3   Q.   Okay. At no point did he refer to it as the

4   gun that Mr. Gurule told you about, did he?

5   A.   No, not to my knowledge.

6   Q.   And at no point did Mr. Gurule refer to the

7   gun that Mr. Gallegos, Antonio Gallegos told you about,

8   as being the gun that was pointed at him, did he?

9   A.   I'm sorry?

10  Q.   Mr. Gallegos -- excuse me, Mr. Gurule, did he

11  ever tell you that the gun that Antonio Gallegos

12  referred to was the gun that was pointed at him?

13  A.   No, I don't believe so.

14  Q.   Okay. Do you recall being interviewed by

15  Chief Martinez, Chief Joe Martinez when a complaint was

16  filed about this incident?

17  A.   Yes.

18  Q.   And do you recall -- did you ever get a copy

19  of and/or see his supplement to your report of that

20  incident, of that investigation?

21  A.   Yes, I believe so.

22  Q.   And do you recall what he said about where the

23  weapon was located when he documented it in his

24  supplemental report?

25  A.   I can't recall specifically.

---

**Page 73**

1   Q.   I'm going to place before you what's been

2   marked as Exhibit 5 to Mr. Vigil's deposition, and

3   direct your attention to, if we -- it's easier to go up

4   from the bottom, one, two, three, third paragraph from

5   the bottom.

6       I'm sorry, second paragraph from the bottom,

7   beginning with, I contacted the officers involved and

8   had them give me their side of the story. See report by

9   Jeremy Apodaca for details.

10      And he says, "officer," and I quote, "Officer

11  Robert Vigil stated that a weapon was believed to be

12  somewhere on the premises of the vehicle. So they could

13  not allow anyone out of their sight."

14      Do you have any reason to believe that the

15  chief did not record what Robert Vigil told him

16  accurately in his supplemental report?

17  A.   I believe that's accurate.

18  Q.   Okay.

19      MR. BASHAM: You know, since your expert is

20  taking a break, maybe we can take a five-minute break.

21  We have been going for almost two hours.

22      MR. THOMPKINS: Sure. Let's take a -- how

23  much time do you need?

24      MR. BASHAM: Five.

25      MR. THOMPKINS: Five minutes?

---

Antonio Gallegos, et al. v.
City of Espanola, et al.

Jeremy Apodaca
June 19, 2013

**Page 74**

1    MR. BASHAM: Yes.
2    (Break taken.)
3    BY MR. THOMPKINS:
4    Q.  When Mr. Gurule made a description of the
5    individual that is alleged to have pointed the gun at
6    him, his father didn't fit that description, did he?
7    A.  No.
8    Q.  When you — you made a decision to — strike
9    that.
10   Who made the decision to arrest Kristian
11   Pettine?
12   A.  I believe I did.
13   Q.  You didn't charge her with neglect or abuse of
14   the minor child in this case, did you?
15   A.  No.
16   Q.  Did you have any facts that would support
17   that?
18   A.  I believe yes.
19   Q.  Why didn't you make the charge?
20   A.  I honestly don't recall at this point in time
21   why I did not.
22   Q.  What did you charge Ms. Pettine with?
23   A.  I believe I charged her with resisting,
24   evading or obstructing an officer.
25   Q.  And before you arrested her did you obtain a

**Page 75**

1    warrant to arrest her?
2    A.  No, I did not.
3    Q.  Can you tell us why you did not?
4    A.  Because she was resisting, evading or eluding
5    me by — at this point in time when she stopped, I was
6    trying to obtain information for the sake of the child
7    to place the child with either the child's father or
8    family member.
9    And she wouldn't give me any information as
10   far as anybody that would possibly be able to take the
11   child.
12   And then at the same time that all this was
13   happening with Mr. Gallegos, she was almost provoking
14   him in a sense, to — which was causing him to react in
15   a negative way and be more combative.
16   So she was therefore resisting, because we
17   kept telling her stay back, just stay out, stay back for
18   right now, and stuff to that effect.  And she just kept
19   on — I would say provoking him.
20   Q.  Okay.  What did she say that provoked him?
21   A.  I can't specifically recall.
22   Q.  Did you write it in your report?
23   A.  No, I did not.
24   Q.  Okay.  Did she lose her right to free speech
25   because you were arresting her husband?

**Page 76**

1    A.  No.
2    Q.  Which — what is your training — what did
3    your training teach you with respect to what you need in
4    order to make a warrantless arrest?
5    A.  Probable cause.
6    Q.  Anything else?
7    A.  Basically the facts that you can see while you
8    are conducting your investigations.
9    Q.  Okay.  Let me make sure I understand.  What is
10   your definition of probable cause?  Or what is your
11   understanding the definition of probable cause is?
12   A.  Probable cause is the reasonable belief
13   basically that a crime occurred, based off of facts that
14   you obtain or come by throughout the course of your
15   investigation, which are then used to — well, which a
16   reasonable person would believe a crime occurred.  And
17   it's used to effect an arrest.
18   Q.  Okay.  So, in order for an officer to make a
19   warrantless arrest, he only needs probable cause and
20   facts that support the probable cause?
21   A.  Basically, yes.
22   Q.  And you learned that from your training at the
23   law enforcement academy?
24   A.  Yes.
25   Q.  And did you learn — or did you have any

**Page 77**

1    training on warrantless arrests while you were employed
2    at the Española Police Department?
3    A.  I can't specifically recall at this time.
4    Q.  When you did your field training, did your
5    field trainer go over with you what is required to make
6    a warrantless arrest?
7    A.  Yes.
8    Q.  And did what he trained you on include what
9    you just described as probable cause?
10   A.  Yes, I believe so.
11   Q.  And the facts that support the probable cause?
12   A.  Yes.
13   Q.  And he didn't tell you that you needed
14   anything else?
15   A.  In regards to evidence or part of the facts?
16   Q.  Anything.
17   MR. BASHAM: Objection, calls for hearsay.
18   A.  I can't specifically recall at this time.
19   BY MR. THOMPKINS:
20   Q.  Did he — when you were trained at the
21   academy, did they make a distinction between the type
22   and level of crime that was required for a warrantless
23   arrest?
24   A.  I don't specifically recall.
25   Q.  When you were in your field training at the

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ANTONIO GALLEGOS, KRISTIAN PETTINE,
ANDRE GALLEGOS, and K.L.P.L., a
minor child,

       Plaintiffs,

vs.                       No. 1:12-CV-224-LH/KBM

CITY OF ESPAÑOLA, a municipal corporation,
JOE MARTINEZ, individually and in his official capacity;
JEREMY APODACA, individually and in his official
capacity; ROBERT VIGIL, individually and in his official
capacity; CITY OF ESPAÑOLA OFFICERS and SUPERVISORS JOHN
DOES 1 through, individually and in their official
capacities,

       Defendants.

DEPOSITION OF ANTONIO GALLEGOS
Friday, June 21, 2013
9:03 a.m.
Cumbre Court Reporting, Inc.
2019 Galisteo Street
Santa Fe, New Mexico 87505

# CERTIFIED COPY

PURSUANT TO THE NEW MEXICO RULES OF CIVIL
PROCEDURE, this Deposition was:

TAKEN BY:   MARK A. BASHAM
             ATTORNEY FOR THE DEFENDANTS


REPORTED BY:   ALLISON ASH-HOYMAN
               NEW MEXICO CCR #18
               CUMBRE COURT REPORTING, INC.
               2019 Galisteo, Suite A-1
               Santa Fe, New Mexico 87505

**EXHIBIT**

2

Antonio Gallegos, et al. v.
City of Espanola, et al.

Antonio Gallegos
June 21, 2013

---

**Page 10**

1 didn't -- we just didn't get along.
2 Q. Okay. And who were you married to the second
3 time?
4 A. Veronica Martinez.
5 Q. And how long were you married?
6 A. Just right over a year, I believe.
7 Q. And who filed for divorce?
8 A. I did.
9 Q. And what were the grounds?
10 A. The same thing.
11 Q. Which is the mother of Andre?
12 A. Alice.
13 Q. Okay. And who is the mother of Estevan?
14 A. Alice.
15 Q. What were the custody arrangements?
16 A. We shared custody. I guess we had 50/50
17 custody.
18 Q. And do Estevan and Andre live with you now?
19 A. No.
20 Q. When was the last time they lived with you?
21 Let's take it one by one.
22    When is the last time Estevan lived with you?
23 A. The boys haven't really actually lived with me
24 since they were -- since they were kids. Since they
25 were small. Since they were, you know, five, six years

**Page 11**

1 old, whatever.
2 Q. When you got divorced?
3 A. Right.
4 Q. So they didn't live you, but you claim you had
5 50/50 custody?
6 A. We did have 50/50 custody. I would see them
7 on the weekends and we would share custody. I would
8 have them, you know, several times a month, other than
9 the weekends.
10 Q. How old is Estevan?
11 A. Estevan just turned 23.
12 Q. And how old is Andre?
13 A. He is 20.
14 Q. When did you marry, is it Kristian or --
15    MR. THOMPKINS: Kristian.
16 BY MR. BASHAM:
17 Q. Kristian?
18 A. Got married May 31st, 2010.
19 Q. And how long had you dated prior to that?
20 A. I've known Kristian my whole life.
21 Q. Where did you meet her?
22 A. In Las Vegas, New Mexico.
23 Q. Okay. But my question was how long did you
24 date her before you married her?
25 A. I would say -- I'd say about six months.

**Page 12**

1 Q. Okay. But you had known her prior to that?
2 A. Yeah.
3 Q. Had you ever dated her prior to that?
4 A. Yes.
5 Q. Okay. I want to take you back to July 31st,
6 2010.
7    Where did you wake up that morning?
8 A. July 31st, the day of the incident?
9 Q. Yes.
10 A. At our home in Albuquerque, New Mexico.
11 Q. Okay. And about what time do you think you
12 woke up?
13 A. I don't -- I don't recall.
14 Q. Okay. Well, tell me everything you did until
15 the time that you got to Espanola.
16 A. I woke up, I took a shower, made some
17 breakfast. Oh, yeah. No, I didn't take a shower. I
18 worked on the yard outside, then I had some breakfast
19 and then went to work.
20 Q. Okay. Was Kristian with you?
21 A. Yes.
22 Q. Okay. And was the minor child with you as
23 well?
24 A. Yes.
25 Q. Okay. Was anyone else with you?

**Page 13**

1 A. No.
2 Q. Now when you say you "went to work," what does
3 that mean?
4 A. I went to -- I went to Espanola, to my mobile
5 home dealership.
6    MR. THOMPKINS: Excuse me. You have to turn
7 that off. Is it off?
8    THE WITNESS: Yes.
9 BY MR. BASHAM:
10 Q. What time did you take off?
11 A. I don't recall the time.
12 Q. Okay. Was it before noon?
13 A. Before noon, yes, of course. In the morning.
14 Q. Well, what time does your business open?
15 A. Usually we try to open our business, on a
16 Saturday, any time from 10:00 to 12:00. We are kind of
17 flexible on Saturdays.
18 Q. Okay. And so who was with you?
19 A. Kristian and our daughter Kolby.
20 Q. Okay. Do me a favor and just let's refer to
21 her as the minor child. Okay?
22 A. Sure.
23 Q. Thanks.
24    Did they have breakfast with you?
25 A. Yes.

---

Case 1:12-cv-00224-LH-KBM   Document 137-4   Filed 08/11/14   Page 5 of 5

Antonio Gallegos, et al. v.
City of Espanola, et al.

Antonio Gallegos
June 21, 2013

---

**Page 18**

1  MR. THOMPKINS: Objection as to form of the
2  question.
3  A. I don't understand.
4  BY MR. BASHAM:
5  Q. So you agree that the officers were there as a
6  result of a — were there to investigate a 911 call
7  involving a gun; correct?
8  MR. THOMPKINS: Objection as to the form of
9  the question.
10  A. I don't understand the question.
11  BY MR. BASHAM:
12  Q. So they came to your — do you agree that the
13  officers came to your place of business because they
14  were responding to a 911 call involving a gun?
15  MR. THOMPKINS: Objection as to form of the
16  question.
17  A. I don't understand.
18  BY MR. BASHAM:
19  Q. You tell me why were the officers there.
20  A. Why did they say they were there?
21  Q. Sure.
22  A. They said that they were there because they
23  got a call that somebody had a gun.
24  Q. And would you agree that they were
25  investigating that call?

---

**Page 19**

1  MR. THOMPKINS: Objection as to form of the
2  question.
3  A. Say it again.
4  BY MR. BASHAM:
5  Q. Do you agree that they were there
6  investigating that 911 call?
7  MR. THOMPKINS: Same objection.
8  You can answer it.
9  THE WITNESS: I can answer?
10  MR. THOMPKINS: If you understand what he is
11  asking you, yes.
12  A. They said that they were there because they
13  got a call somebody had a gun.
14  BY MR. BASHAM:
15  Q. And I'm asking you, would you agree that they
16  were investigating that call?
17  MR. THOMPKINS: Objection as to the form of
18  the question.
19  A. That's what they told me.
20  BY MR. BASHAM:
21  Q. I'm asking you.
22  A. I don't know. I don't know what they were
23  there for.
24  Q. Okay. You said you saw them in the hallway,
25  the police unit, and you were in the hall in your

---

**Page 20**

1  business; correct?
2  A. At what time?
3  Q. When the officer first showed up.
4  A. I was walking through my office when the
5  officer first walked up. First drove up.
6  Q. Okay. Then what did you do?
7  A. I waited, looking out the window, because we
8  get police officers, we get firemen, we get different
9  customers come in in their different vehicles, and I was
10  waiting for him to get down. But he never got down.
11  Q. What do you mean by "got down"?
12  A. Got off his vehicle.
13  Q. Okay.
14  A. So then I went outside to ask him if I could
15  help him. I thought he was a customer.
16  Q. Okay. So when you approached him he was still
17  in the vehicle?
18  A. Yes.
19  Q. This is Officer Apodaca?
20  A. No. Vigil. Officer Vigil.
21  Q. Okay. At that point in time how many cop cars
22  were there?
23  A. At the point that I walked out it was only
24  Officer Vigil's car.
25  Q. So you are saying Officer Vigil was the first

---

**Page 21**

1  one on the scene?
2  MR. THOMPKINS: Objection as to form of the
3  question.
4  A. He is the one that I went to go talk to.
5  BY MR. BASHAM:
6  Q. Okay. Did you ever talk to —
7  A. That is the vehicle that I saw pull up right
8  in front of the office.
9  Q. Okay. Was there another cop car there at that
10  point in time?
11  A. I don't recall. I was just paying attention
12  to Officer Vigil.
13  Q. Okay. Where was Kristian at this point in
14  time?
15  A. She was in the office.
16  Q. Okay. What did you tell Officer Vigil?
17  A. I asked him if I could help him.
18  Q. And you are saying he was still in his vehicle
19  at that point in time?
20  A. Either in his vehicle or just got out of his
21  vehicle at that point.
22  Q. Okay. And so you asked him if you could help
23  him. What was his response?
24  A. He told me that he was there on a 911 call.
25  He told me that somebody called in, that somebody had

---

Antonio Gallegos, et al. v.
City of Espanola, et al.

Antonio Gallegos
June 21, 2013

**Page 22**

1  pulled a gun on somebody else.
2      Q. Okay. Go ahead.
3      A. And I didn't know anything he was talking
4  about.
5      Q. Okay. And was that the end of your
6  conversation?
7      A. No.
8      Q. Okay. What else was said?
9      A. I told him I didn't -- I didn't know that
10  anyone had called in that somebody pulled a gun, I
11  didn't know anything about it.
12      Q. Okay. On Exhibit A would you go ahead and
13  mark where this conversation took place?
14      A. I would say right in here (indicating).
15      Q. Okay. Put down a V for Vigil.
16      A. I'm --
17      Q. Pardon me?
18      A. I'm not sure which side of the car we were on
19  when we were talking, somewhere around the car here.
20      Q. Okay. Well, put down a V for Vigil.
21          MR. THOMPKINS: Objection as to marking a V
22  for Vigil. He just indicated he didn't know where it
23  was located, so that misrepresents his testimony.
24  BY MR. BASHAM:
25      Q. Where were you located, put down AG for where

**Page 23**

1  you were located.
2      A. I was located right around the police car
3  somewhere.
4      Q. Okay, go ahead and put down AG.
5          MR. THOMPKINS: Again I raise the same
6  objection as to one point that he testified it was an
7  area, not a specific point.
8  BY MR. BASHAM:
9      Q. So that's the area you were in, correct, where
10  you just marked?
11      A. Right. Right in front of the building
12  somewhere there.
13      Q. Okay. Did you have any other conversation
14  with him?
15      A. Yes.
16      Q. Tell us about it.
17      A. The conversation I had with him? I -- I told
18  him that I didn't know of any phone call or any gun or
19  anything that he was talking about.
20      Q. Okay. Was there another officer there as well
21  that you remember?
22      A. Uhm, I believe Officer Apodaca was there.
23      Q. Can you mark down where you think Officer
24  Apodaca was?
25      A. He was somewhere in the front, I'm not sure.

**Page 24**

1      Q. And where was --
2      A. In the front of the office, I'm not sure where
3  he was parked.
4      Q. Okay. What about Kristian, where was she?
5      A. She was in the office.
6      Q. At this point in time she was still in the
7  office?
8      A. Yeah.
9      Q. Okay. And then what happened?
10      A. And then -- and then I asked Alfonzo Gurule if
11  he knew anything that the police were talking about.
12      Q. Where was Alfonzo at this point in time?
13      A. He was in the front, somewhere by the truck,
14  somewhere over here.
15      Q. Go ahead and mark that, put down a G for
16  Gurule.
17          MR. THOMPKINS: Again, same objection, he just
18  indicated a general area.
19  BY MR. BASHAM:
20      Q. Go ahead and do it.
21          MR. THOMPKINS: If you know a specific area,
22  then you can mark it.
23  BY MR. BASHAM:
24      Q. Even a general area, mark down the general
25  area.

**Page 25**

1      A. (Witness complying.)
2      Q. Put a G.
3      A. (Witness complying.)
4      Q. Let me ask you this: Do you have a clear
5  recollection of the events that happened that day?
6      A. Yes.
7      Q. Okay. But you can't tell me where Alfonzo was
8  at this point in time?
9      A. No.
10      Q. Okay. So you have marked yourself in front of
11  the -- of the police unit, and as far as Alfonzo, you've
12  marked it on the right-hand side of the red -- at the
13  left-hand side of the red pickup truck.
14          MR. THOMPKINS: Objection as to form, and
15  objection as to it mischaracterizes his testimony as to
16  where he was.
17  BY MR. BASHAM:
18      Q. So how were you able to talk to him?
19      A. He was close enough to talk to him.
20      Q. Okay. So we have AG over here, and a G way
21  over there. Were you yelling at him?
22      A. No. No, that's -- that's -- the whole front
23  of my office is probably only 60 feet long. I could be
24  -- I could be on this side and be talking to you on this
25  side (indicating).

Antonio Gallegos, et al. v.
City of Espanola, et al.

Antonio Gallegos
June 21, 2013

**Page 26**

1  Q. Without raising your voice?
2  A. Yeah.
3  Q. Okay. So tell us about your conversation with
4  Alfonzo.
5  A. I asked him if he knew anything about what the
6  police were asking.
7  Q. And what was his response?
8  A. I asked -- he said that him and my older son
9  had some words. And I said, do you know anything about
10 a gun? Did you see a gun? And he said no, I don't
11 know.
12 Q. That's what Alfonzo said?
13 A. Yes.
14 Q. Okay. Then what happened?
15 A. And then I talked to Officer Vigil and told
16 him well, obviously there is not anything going on here.
17 Somebody made a call saying there was a gun and now he
18 is saying no, and he doesn't know.
19 Q. Now you would agree at this point in time you
20 told Officer Vigil that the only guns here are the ones
21 in the house; correct?
22     MR. THOMPKINS: Objection as to the form of
23 the question.
24 A. No.
25 BY MR. BASHAM:

**Page 27**

1  Q. What did you say about the guns?
2     MR. THOMPKINS: Objection as to form.
3  A. I didn't.
4     MR. THOMPKINS: Hold on. Objection as to
5  form of the question.
6     Go ahead.
7     THE WITNESS: Repeat the question for me.
8  BY MR. BASHAM:
9  Q. What did you say about the guns?
10    MR. THOMPKINS: Same objection.
11 A. What guns?
12 BY MR. BASHAM:
13 Q. Did you have guns in the house/business,
14 whatever it is?
15 A. Was there a gun in the house?
16 Q. Or guns.
17 A. There was a gun in the house, I believe.
18 Q. Okay. What type of gun was it?
19 A. A .22 rifle.
20 Q. How many guns do you possess? Firearms that
21 is. So that includes rifles.
22 A. I don't know. A handful.
23 Q. Okay. Can you tell us what they are?
24 A. Uhm, what do I own. I have a .270 rifle; I
25 have 7 millimeter rifle; I have -- I have a 12 gauge

**Page 28**

1  shotgun, a .22 rifle. I believe that's it.
2  Q. So you don't own any handguns?
3  A. Handguns? I have a -- I have a .500 Smith &
4  Wesson Magnum.
5  Q. Okay. Is that it?
6  A. I believe so.
7  Q. But you don't know for sure?
8  A. I've given some -- I've given some of my
9  rifles and guns to my sons.
10 Q. Okay. At the time you were talking to Alfonzo
11 Gurule, where was Kristian?
12 A. Kristian was in the office.
13 Q. Okay. Well, in your complaint it says that
14 Officer Apodaca became aggressive and focusing his
15 attention on Kristian Pettine.
16    Can you define what you mean by "aggressive"?
17 A. Can you repeat the question?
18 Q. In the complaint that you have filed, it
19 alleges that Officer Apodaca became aggressive and
20 focusing his attention on Kristian, and I asked you can
21 you describe what you mean by "aggressive"?
22    MR. THOMPKINS: I'm going to object to the
23 form of the question as the complaint is filed by more
24 than Mr. Gurule -- I'm sorry, Mr. Gallegos. So I'm
25 objecting to the characterization in the question that

**Page 29**

1  he is the only one that filed the complaint and he is
2  the only one that has information.
3  BY MR. BASHAM:
4  Q. Go ahead and answer.
5  A. I don't understand your question.
6  Q. Can you describe what you mean by aggressive?
7  A. I still don't understand what -- I don't
8  understand what you are talking about.
9  Q. In your complaint you allege that Officer
10 Apodaca became aggressive and focusing his attention on
11 Kristian.
12    MR. THOMPKINS: Objection as to the form of
13 the question.
14 BY MR. BASHAM:
15 Q. Can you describe what you mean by
16 "aggressive"?
17    MR. THOMPKINS: Same objection.
18 A. I don't understand the question.
19 BY MR. BASHAM:
20 Q. What part don't you understand?
21 A. The whole thing. The whole thing I don't
22 understand.
23 Q. Well, can you explain what you mean by
24 "focusing his attention on Kristian"?
25    MR. THOMPKINS: Same objection as to the form

Antonio Gallegos, et al. v.
City of Espanola, et al.

Antonio Gallegos
June 21, 2013

---

**Page 34**

1  that the call wasn't correct because the guy that made
2  the call now was saying he doesn't know if he saw a gun.
3  So there is nothing here, there is no reason for you to
4  stay here. He was the only one outside. There is
5  nothing here.
6      I said, I'm here to work, I have to take care
7  of my business, and I would appreciate if you guys just
8  left.
9      Q. And what did he say?
10     A. That's when he got combative. He raised his
11  voice to me, kind of got in my face a little bit and
12  told me no, we are not -- we are not going anywhere.
13     Q. Okay.
14     A. Kind of yelled at me.
15     Q. And then what happened?
16     A. And then I said well, there is nothing here.
17  I don't -- I didn't see nothing, nobody here saw
18  anything, the only one that saw anything was outside at
19  the time was Alfonzo Gurule, he says he doesn't know
20  what he saw.
21     Q. Where was Andre at this point in time?
22     A. In the office.
23     Q. Okay. And then what happened next?
24     A. And then Officer Vigil and Officer Apodaca
25  started talking to each other.

---

**Page 35**

1      Q. Okay. Did you overhear what they were saying?
2      A. No.
3      Q. Okay. I thought earlier you testified that
4  you could hear someone or talk to someone from one side
5  of the building to the other; correct?
6      A. Well, they were talking kind of low to each
7  other.
8      Q. Okay. Were you trying to listen to what they
9  were saying?
10     A. I was.
11     Q. But you didn't hear anything?
12     A. I didn't.
13     Q. Did you hear bits and pieces?
14     A. No.
15     Q. Okay. What did you do next?
16     A. Next -- what happened next.
17      They were talking, and I started to walk
18  towards my office. I was going to go back to work.
19     Q. Did you tell them anything, the officers that
20  is, other than that you that you were going to go back to work?
21     A. I told them I don't know anything, I didn't
22  see anything, I'm going back to work.
23     Q. Did you tell them, you know, did you tell them
24  to get out of here, that you know Judge Naranjo?
25     A. No.

---

**Page 36**

1      Q. You never said that?
2      A. No.
3      Q. So then what happened next?
4      A. So then I started up the stairs to my office.
5  And Officer Vigil ran up, he ran up behind me, said
6  stop, stop, you can't -- you can't -- he told me to
7  stop, and I was already walking up my stairs. So I
8  stopped at the top of the stairs and he grabbed my arm
9  and he cuffed my arm.
10      And then as he was going to get this other arm
11  he grabbed my head and started to force my head into the
12  wall, towards the wall. And then Officer Apodaca ran up
13  at the same time and tased me in the neck.
14     Q. Okay. So is it your testimony that at no
15  point in time did you push Officer Vigil?
16     A. No, I didn't.
17     Q. Okay. So you deny pushing Officer Vigil?
18     A. I did not.
19      MR. THOMPKINS: Objection. Asked and
20  answered.
21      Give me a moment to raise an objection before
22  you answer the question.
23      THE WITNESS: Okay.
24  BY MR. BASHAM:
25     Q. Okay. How many times were you tased?

---

**Page 37**

1      MR. THOMPKINS: You can answer.
2      A. Three.
3  BY MR. BASHAM:
4      Q. Okay. Did you take photos of the injury?
5      A. Yes.
6      MR. BASHAM: Nate, those have not been
7  provided to us.
8      MR. THOMPKINS: I'm sorry?
9      MR. BASHAM: Those photos have not been
10  provided to us.
11      MR. THOMPKINS: Yes, they have. They are in
12  the discovery. You even listed them in there.
13      MR. BASHAM: Photos of his injuries.
14      MR. THOMPKINS: Yes.
15      MR. BASHAM: I'll confirm that. I looked for
16  them yesterday.
17      Q. So then what happened next?
18      A. So then me and Officer Vigil, we kind of -- we
19  kind of fell towards the front steps, and as we did that
20  then Officer Apodaca tased me here on the side.
21      Q. Okay. Once in the neck and once on the
22  left-hand side?
23      A. Yes.
24      Q. Okay. And then what happened?
25      A. And then I fell to the -- I fell to the cement

---

Antonio Gallegos, et al. v.
City of Espanola, et al.

Antonio Gallegos
June 21, 2013

**Page 38**

1  slab on the bottom, and as soon as I fell I gave Officer
2  Vigil my left hand so he could cuff me, because I didn't
3  want them to rough me up like he was trying to do on the
4  wall.
5      Q.  And at this point in time where was Kristian?
6      A.  Kristian and Andre were at the glass door
7  since I got up to the top of the steps looking out the
8  glass door.  Looking at them tasing me.
9      Q.  Okay.  So the entire time that you had this
10  conversation with the officers, up until the take-down,
11  they were in the office?
12      A.  Actually, I want to go back to the -- to the
13  question that you asked me what happened when I fell
14  down on the slab.
15      I gave Officer Vigil my arm and he immediately
16  cuffed me, and then Jeremy Apodaca yelled out should I
17  hit him again?  And he tased me right in the middle of
18  the back.
19      Q.  Upper or lower back?
20      A.  Right in the middle.
21      Q.  Okay.  Again, going back to my other question.
22  So it's your testimony that during this whole time you
23  are having this conversation with Officer Vigil and
24  Alfonzo, Kristian and Andre were in the office; correct?
25      MR. THOMPKINS: Objection as to the form of

**Page 39**

1  the question.
2      A.  Can you ask that question again.
3      MR. BASHAM: Read it back to him, please.
4      (Record read as requested.)
5      A.  Yes.
6  BY MR. BASHAM:
7      Q.  Okay.  Then what happened after you were taken
8  down and cuffed?
9      A.  Then I was put in the police car.
10      Q.  Okay.  And did you observe anything happening
11  from the police car?
12      A.  All I could see was at one point Kristian came
13  out holding the baby, her baby Kolby -- what did you
14  want me to call her?
15      Q.  The minor child.
16      A.  Minor child.
17      Q.  Came out of where?
18      A.  Came out of the office.
19      Q.  Okay.  And what else did you see?
20      A.  I saw her talking to Officer Apodaca.
21      Q.  Okay.  And who else did you see?
22      A.  My attention was mainly on my wife.
23      Q.  Okay.  And so you saw them talking?
24      A.  Yes.
25      Q.  You couldn't hear what they were saying?

**Page 40**

1      A.  No.
2      Q.  Okay.  Then what happened?
3      A.  And then it appeared that Officer Apodaca
4  wanted to take the minor child out of my wife's arms.
5      Q.  Okay.  And then what happened?
6      A.  And it appeared that she didn't want to give
7  up her minor child.
8      Q.  Okay.  Where is Andre at this point in time?
9      A.  I guess -- I had my back to -- to the office
10  when they arrested me so I never saw Andre.
11      Q.  Okay.  So they put you in the cop car;
12  correct?
13      A.  Right.
14      Q.  In the back seat?
15      A.  Yes.
16      Q.  Wouldn't that be facing the business?
17      A.  I couldn't see -- I couldn't really see the
18  front of the business.  I could see off to the left.
19      MR. BASHAM: Okay.  Let's go ahead and mark
20  this photograph as Exhibit B to Antonio's deposition.
21      (Marked Deposition Exhibit B.)
22  BY MR. BASHAM:
23      Q.  Whose cop car were you in?
24      A.  I was in Officer Vigil's.
25      Q.  Okay.  And so your testimony is he was the

**Page 41**

1  first one there; right?
2      A.  Yes.
3      Q.  In that Exhibit B, would that be his car that
4  is off to the right, lower right?
5      A.  I believe so.
6      Q.  Okay.  So, did you see -- did you see anything
7  else off to your left?
8      A.  I saw when -- I saw when the ambulance pulled
9  up off to my left.
10      Q.  Okay.  Were you offered treatment at that
11  point in time for the stuns?
12      A.  Uhm, treatment?
13      Q.  Yeah.  By the ambulance personnel.
14      A.  They told me that they wanted the ambulance
15  people to look at me.
16      Q.  And what did you respond?
17      A.  I said no, I'm okay.
18      Q.  Okay.  When is the next time you saw Andre?
19      A.  When he showed up to the -- to the jail.
20      Q.  Okay.  And what happened there?
21      A.  I asked the policeman that brought him in what
22  he was doing there.  And he wouldn't answer me.  And I
23  kept asking him.  And finally he told me well, he is too
24  young to stay at home alone.  And I told him first of
25  all, that's not his home.  Second of all, he has his



EXHIBIT

3

**Incident Narrative**
**10-07-476**

On Saturday, July 31st 2010 I was dispatched to 1201A North Paseo De Onate in reference to an Assault. While en-route, dispatch told me that the victim who called 911 had run across the road to the Chevron gas station and was hiding from the suspect only identified as "Estevan" who had walked toward the Northern New Mexico Community College. I traveled to the location from the area of Spruce Street and passed the College but was UN able to locate anyone.

I proceeded to the residence and immediately saw a male, female and a female toddler who was wearing nothing but a very obviously soiled and thick, heavy diaper in 80 degree plus weather, sitting on the front steps of the home which is also the office of American Spirit Mobile Homes. I asked the male and female what happened, and they both told me nothing and started to giggle. I asked the two if they had called 911 or heard anything about a gun, and they continued to giggle and the male later identified as Mr. Steven Marquez pointed behind me and said here he comes now, at which point another male stepped out of the home seeming very upset and a third male was crossing Paseo De Onate and also seemed very upset. I asked the male who was crossing the road what was going on? And he told me a male had pulled a gun on him and told him "you fagots don't belong here". The male who was the reporting person, identified himself as Mr. Alfonso Gurule. Mr. Gurule told me he was in Espanola with his friends, one of whom was visiting her husband who was the home owner of the residence, and father of the suspect.

While I was speaking to Mr. Gurule the female who was identified as Mrs. Kristian Pettine walked up and said there was no problem. I asked Mrs. Pettine who was the child's parents? And she told me the child was her daughter. While speaking to Mrs. Pettine I detected the odor of an intoxicating beverage on her person and also saw several bottles of beer on the front step, inside the house, and broken in the front yard. I asked Mrs. Pettine how much alcohol she had to drink, and she told me "just a couple". Mrs. Pettine was having a difficult time standing still and not swaying, and was also slurring her words and yelling during normal conversation periods. Mr. Gurule continued to tell me what had happened and that he "just wanted to make a report because it was not cool". I asked Mrs. Pettine where her daughter's father was and she told me he was somewhere in Albuquerque, and very abussive. I asked Mrs. Pettine if there was anyone else in the home in an attempt to find someone suitable to take care of the baby identified as Kolby Pettine and two years of age, at which point two other males walked out of the home. I then spoke to the two males later identified as Mr. Antonio Gallegos, and Mr. Andre Gallegos.

Mr. Gallegos was highly intoxicated as were the rest of the adults at the location and Andre was not, however Andre is seventeen years of age and the step brother to Kolby. Mr. Gallegos is Mrs. Pettine's current husband. I had dispatch contact the on call person for Children Youth and Families Department due to the fact that all the adults were highly intoxicated and the only sober individual beside Kolby was Andre, a child himself. While I was waiting for CYFD to call me, Mr. Gallegos started stumbling around asking myself, Mrs. Pettine, and Mr. Gurule what was going on and was told by Mr. Gurule that Estevan had pulled a gun on him. After speaking to everyone I found out Estevan is Mr. Gallegos's other son. Mr. Gallegos became very passive aggressive towards Mr. Gurule and tried grabbing him and telling him to shut his "fucken mouth and quit lying." Mr. Gurule told him "I'm not lying. He did and it's not ok." I separated Mr. Gallegos and Mr. Gurule and requested for another Officer to my location.

Kamille, the on call CYFD case worker called me and I informed her of the situation and Officer Robert Vigil arrived and assisted me. While I was waiting for CYFD to call me back with a determination to take Kolby into State custody or not, Mr. Gallegos started to walk around yelling that the only guns he had were in his house, and he is a business man in this town, and pays taxes and also threatening Officer Vigil and myself that he was going to sew us, and call Judge Naranjo and also stated that we needed to leave now because we were on his property. Andre walked back into the home, and after repeatedly telling Mr. Gallegos to stand by the rear of my Police car Mr. Gallegos made a hand gesture and said I'm done here and turned around walking into his home. Officer Vigil and my-self yelled loudly several times for Mr. Gallegos to stop and had to run after Mr. Gallegos who then turned around in the entryway of his home and pushed Officer Vigil in an

### Incident Narrative
### 10-07-476

aggressive manner when Officer Vigil Stopped Mr. Gallegos from entering the house. Officer Vigil used hand control techniques in an attempt to stop and place Mr. Gallegos in hand cuffs, at which time Mr. Gallegos started combatively resisting and I applied a drive stun to the left shoulder of Mr. Gallegos and he was placed into hand cuffs. Mrs. Pettine continued to move around the area instigating arguments and not give accurate or proper information and completely withheld information about herself and Kolby.

I arrested Mr. Gallegos for Battery on a Police Officer and Resisting, Evading, or Obstructing an Officer. I arrested Mrs. Pettine for Resisting, Evading, or Obstructing an Officer and I took into custody for detoxification Mr. Jason Garcia, Mr. Steven Marquez, and Mr. Alfonzo Gurule. I asked dispatch to have the Juvenile Probation Office contact me and I advised them of the information and shortly thereafter authorized for Andre to be taken to the Youth Shelter for protective custody.

I had dispatch send an ambulance to my location to have Kolby transported to the Espanola Hospital for a medical evaluation where Kamille from CYFD took custody of Kolby for a forty eight hour hold, due to the fact that Mrs. Pettine would not provide any contact information for Kolby's biological father, and was in no condition to properly care for Kolby. Through further investigation I found Kolby's father identified as Mr. Antonio Londono-Reales, does share custody.

Officer Vigil obtained verbal consent from Mrs. Pettine to search her silver in color Jeep SUV which had a very apparent smell of alcohol, and found a small brown in color dog inside, and I located a very large clear bottle of clear alcohol, and limes. I also found several bullets and a loaded 9mm hand gun magazine on top of the center console, the car seat was not properly buckled in and very loose and filthy, I also found dog urine in the center console next to a bag containing one diaper, and vomit on the right middle rear floor board area by Kolby's car seat. Officer Vigil requested for Animal Control to pick up the dog and the keys to the jeep were secured inside the ignition.

Sgt. Jeff Martinez and I walked through the home to make sure all doors and windows were secured and locked and while doing so I saw a rifle appearing to be a .22 caliber leaning against the wall next to the bed in the master bedroom, which could have been easily accessible to Kolby. I also saw beer bottles throughout the home and broken glass which could have been very hazardous to Kolby due to the fact that she was not wearing any shoes or clothes. Sgt. Martinez, Officer Vigil, and Myself all transported the adults and Andre to EDC, where they were booked accordingly. This report will be forwarded to CYFD. There is no further information at this time, and if any further information becomes available this officer will submit a supplemental report.

Officer Jeremy Apodaca #14

1

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW MEXICO
2

3
    ANTONIO GALLEGOS, KRISTIAN PETTINE,
4   ANDRE GALLEGOS, and K.L.P.L., a
    minor child,
5
                 Plaintiffs,
6
    vs.                              No. 1:12-CV-224-LH/KBM
7

8   CITY OF ESPAÑOLA, a municipal corporation,
    JOE MARTINEZ, individually and in his official capacity;
9   JEREMY APODACA, individually and in his official
    capacity; ROBERT VIGIL, individually and in his official
10  capacity; CITY OF ESPAÑOLA OFFICERS and SUPERVISORS JOHN
    DOES 1 through 10, individually and in their official
11  capacities,

12
                 Defendants.
13

14              DEPOSITION OF ROBERT VIGIL

15              Monday, June 17, 2013
                     9:25 A.M.
16           Cumbre Court Reporting, Inc.
                 2019 Galisteo Street
17           Santa Fe, New Mexico 87505

18           **CERTIFIED COPY**

19       PURSUANT TO THE NEW MEXICO RULES OF CIVIL
    PROCEDURE, this Deposition was:
20
    TAKEN BY:  NATHANIEL V. THOMPKINS
21             ATTORNEY FOR THE PLAINTIFFS

22
    REPORTED BY:  ALLISON ASH-HOYMAN
23               NEW MEXICO CCR #18
                 CUMBRE COURT REPORTING, INC.
24               2019 Galisteo, Suite A-1
                 Santa Fe, New Mexico 87505
25

              Allison Ash-Hoyman, CCR 18

EXHIBIT

4

Antonio Gallegos, et al. v.
City of Espanola, et al.

Robert Vigil
June 17, 2013

---

**Page 74**

1  p.m.
2  Q. 8:00 to 6:00?
3  A. No, sir, 6:00 to 6:00.
4  Q. I'm sorry, 6:00 to 6:00. Okay.
5  A. And then you've got A shift graves, 6:00 to
6  6:00, 6:00 p.m. to 6:00 a.m., 12-hour shifts.
7       And the same on the opposite end, B days, B
8  graves. Make sense?
9  Q. For officers.
10 A. Then you have a B shift days, and a B shift
11 graves, also.
12 Q. B shift days?
13 A. You have A shift days, A shift graves. B
14 shift days, B shift graves. When A shift is off, B
15 shift is working.
16 Q. All right. And so do the shifts work every
17 other day, or how does it work?
18 A. I'm going to confuse you more.
19      We work two on, two off, three on, two off,
20 two on, three off. So, for instance, if we work
21 Tuesday, Wednesday --
22 Q. Okay.
23 A. If we work Tuesday, Wednesday, then we are off
24 Thursday, Friday. Then we work Saturday, Sunday,
25 Monday.

**Page 75**

1  Q. Okay.
2  A. Then we are off Tuesday, Wednesday, work
3  Thursday, Friday, and off Saturday, Sunday, Monday.
4  Q. So for the A shift, when they are off, that
5  means B shift is working?
6  A. Yes, sir.
7  Q. And so when B shift is off, the A shift is
8  working?
9  A. Yes, sir.
10 Q. That way you have four shifts, mornings, days,
11 evenings?
12 A. Everything is covered. The guys on A shift
13 all work together. The guys on B shift all work
14 together. Make sense?
15 Q. I'm not sure if I understand that, but all the
16 guys on A shift days, a shift work together?
17 A. Yes, they have the same days on, same days
18 off.
19 Q. Then the graveyard shift A, same days on, same
20 days off?
21 A. Yes.
22 Q. Then you go to your B shift?
23 A. Yes.
24 Q. Got it. Does the police department have any
25 civilian employees?

**Page 76**

1  A. It does.
2  Q. And how many?
3  A. Approximately five.
4  Q. And what capacity do they serve in? Are they
5  administration?
6  A. They are all administration, yes.
7  Q. That's in the office, in the front office,
8  or --
9  A. Yes.
10 Q. Okay.
11 A. You have four different office and one that
12 works in the back, detectives' secretary.
13 Q. Are there any detectives that work for the
14 Española Police Department?
15 A. Yes.
16 Q. And how many?
17 A. Two.
18 Q. Who are they?
19 A. George Martinez.
20 Q. Philip Martinez?
21 A. George.
22 Q. I'm sorry, George.
23      And who else?
24 A. Solomon Romero.
25 Q. Solomon Romero who was formerly with the Santa

**Page 77**

1  Fe Sheriff's Department?
2  A. Yes, sir.
3  Q. Since you have been employed with the Española
4  Police Department, how -- when do you get -- or do you
5  get performance evaluations?
6  A. I think I've gotten one. And that was back
7  when I first started.
8  Q. So you had one how long after you started?
9  A. I don't recall. I don't remember.
10 Q. Months, year?
11 A. Months. I'll say nine, ten months.
12 Q. And since you've been there from 2008 till
13 today, you've had one performance evaluation?
14 A. Yes, sir.
15 Q. When you became employed did they give you a
16 copy of the policies and procedures for the Española
17 Police Department?
18 A. They did.
19 Q. And are performance evaluations part of the
20 policies and procedures in the Española Police
21 Department?
22 A. I don't recall seeing them in there.
23 Q. Okay. And is that the -- your understanding
24 of the policy that is followed in the Española Police
25 Department for evaluations, is that you get one and not

---

Antonio Gallegos, et al. v.
City of Espanola, et al.

Robert Vigil
June 17, 2013

---

**Page 102**

1   Q. Okay. And who was present when you arrived
2   with Officer Apodaca?
3   A. I believe Ms. Kristian Pettine was there,
4   Antonio Gallegos was there, and a little child, I want
5   to say two years old or younger.
6   Q. Okay. Anybody else?
7   A. There were other individuals in the home but I
8   don't recall their names.
9   Q. Okay. Now, when you say "there were other
10  individuals in the home," Kristian, Antonio and the baby
11  were outside?
12  A. Yes.
13  Q. In relation to the home, where outside were
14  they?
15  A. Antonio Gallegos was -- Officer Apodaca's car
16  was parked in front of the front door of the home, not
17  all the way to the door, but was parked a little ways
18  back. Antonio Gallegos was on the right side of the
19  vehicle, I believe by the rear, the rear tire. If I'm
20  correct.
21  Q. Okay. And where was Kristian Pettine, do you
22  recall?
23  A. I don't recall.
24  Q. And how about the baby?
25  A. The baby was walking around, I remember. She

---

**Page 103**

1   was walking around in an obviously soiled diaper without
2   a shirt, without any shoes, without any pants on,
3   walking around on hot gravel.
4   Q. Okay. At the moment that you observe Antonio
5   Gallegos by the back of the car, Ms. Pettine somewhere
6   outside the house, and the baby walking around, did you
7   have reason to believe that any of them had committed a
8   crime or was involved in committing a crime?
9      MR. BASHAM: Objection as to form.
10  A. When I arrived and I spoke to Officer Apodaca,
11  I wasn't exactly sure who had the weapon.
12  BY MR. THOMPKINS:
13  Q. Okay.
14  A. So I didn't know at that time if somebody had
15  committed a crime or not.
16  Q. Okay. So you didn't have any facts or
17  information that indicated that Antonio Gallegos had a
18  weapon?
19  A. Well, I -- there was weapons in the home, from
20  what I was told from Officer Apodaca or -- I'm sorry,
21  there was a weapon somewhere, we weren't sure where it
22  was at. We didn't know who pointed the weapon at the
23  individual.
24  Q. Well, did you talk to the complainant?
25     Where was the complainant, by the way, when

---

**Page 104**

1   you arrived?
2   A. I'm thinking he was outside. If I'm -- it's
3   been so long. I want to say he was sitting on the rear
4   of a pickup truck, on the tailgate, but I'm not exactly
5   sure.
6   Q. Okay. And did you have any information that
7   he said Antonio Gallegos was the one who pointed the gun
8   at him?
9   A. No.
10  Q. Did he have -- or did you get any information
11  from him that Christine Pettine -- Christine -- Kristian
12  Pettine was the one who pointed the gun at him?
13  A. No.
14  Q. Did Officer Apodaca give you any information
15  that indicated that Antonio Gallegos was the person who
16  pointed the gun?
17  A. No.
18  Q. And did Officer Apodaca give you any
19  information that indicated that Kristian Pettine was the
20  one who pointed the gun?
21  A. No.
22  Q. And you didn't suspect the baby of pointing
23  the gun?
24  A. Obviously not.
25  Q. So as you are assisting Officer Apodaca, whose

---

**Page 105**

1   questioning -- what questioning is being conducted of
2   either Mr. Gallegos or Ms. Pettine?
3      MR. BASHAM: Objection to form.
4   A. One thing that Officer Apodaca was trying to
5   find was the weapon, where the weapon was. We weren't
6   sure where the weapon was. And he was trying to sort
7   out exactly who pointed the weapon, or pointed the
8   weapon at the victim.
9   BY MR. THOMPKINS:
10  Q. Let me -- I may have confused you. I don't
11  want to think or tell us what you think Officer
12  Apodaca was thinking or trying to do.
13     I want to know if you know what questions
14  either he was asking of Antonio Gallegos, or anybody
15  while you were assisting him.
16     Do you know or recall?
17  A. Some of the questions -- I don't know verbatim
18  what the questions were, but some of the questions
19  referred to where the weapon is at.
20  Q. Okay. And did any of the people that he was
21  questioning tell him where -- and the weapon that you
22  are referring to, is that the one that was pointed at
23  the complainant?
24  A. At the time that's the only weapon I knew
25  should have been around.

---

Antonio Gallegos, et al. v.
City of Espanola, et al.

Robert Vigil
June 17, 2013

---

**Page 106**

1    Q.  Okay. And did Officer Apodaca, or did you
2 hear any of the people that were being questioned
3 indicate to you where the weapon was that had been
4 pointed at the complainant?
5    A.  No. What they did, I believe it was Ms.
6 Pettine that did confirm there was a weapon but didn't
7 know where it was at.
8    Q.  Okay. Did -- would that -- as a police
9 officer, if Ms. Pettine had confirmed, like you said,
10 there was a weapon someplace, would that be information
11 that should make it into a report someplace?
12    A.  What do you mean by "report someplace"? If a
13 report should be taken on this incident?
14    Q.  Well, isn't there a report taken on this
15 incident?
16    A.  Yes.
17    Q.  Okay. In that report did you read anywhere
18 that Kristian Pettine said there was a weapon someplace?
19    A.  No, I did not.
20    Q.  Okay. If she had indicated -- because you
21 were concerned about a weapon, if she had indicated
22 there was a weapon someplace, would that piece of
23 information be something that is important enough to be
24 listed in the incident report?
25    A.  Yes. And I'm not -- there is Antonio Gallegos

**Page 107**

1 going off threatening to tell Judge Naranjo what was
2 going on. He did admit to there being firearms in the
3 home. He did threaten myself and Officer Apodaca with a
4 civil suit, or with a lawsuit is what he said.
5    Q.  Does that have any reference to the gun that
6 was alleged to have been pointed at the complainant?
7    A.  Yes.
8    Q.  What gun?
9    A.  He admitted to there being guns in the home.
10 We didn't know if those were the guns.
11    Q.  Did he admit to pointing a gun at the
12 complainant?
13    A.  No, but there were guns. We didn't know which
14 gun it was. He admitted to there being guns in the
15 home. We didn't know where the gun was, so we didn't
16 know if the guns in the home were the actual guns
17 pointed at the complainant.
18    Q.  Okay. Did you have any information that
19 indicated to you that the gun in the house was the one
20 that was pointed at the complainant?
21    A.  No.
22    Q.  Did you have any information that Antonio
23 Gallegos had taken a gun out of the house and pointed it
24 at the complainant?
25    A.  No.

**Page 108**

1    Q.  At the time that you -- did you ask any
2 questions of either Antonio Gallegos --
3    A.  I did ask Antonio Gallegos questions, I just
4 don't recall what the questions were.
5    Q.  Did you ask him if he pointed a gun at the
6 complainant?
7    A.  I don't recall.
8    Q.  Did you ask him if he was involved -- did you
9 ask him if he knew who allegedly pointed a gun at the
10 complainant?
11    A.  I don't recall if I asked him that.
12    Q.  Did you ask the complainant any questions
13 about who pointed the gun at him?
14    A.  I remember speaking to the complainant, but I
15 don't know exactly what questions I asked him, either.
16    Q.  Do you recall if Officer Apodaca told you that
17 the complainant identified who pointed the gun at him?
18    A.  He did.
19    Q.  And who was it?
20    A.  I want to -- I'm not sure I remember the name,
21 but I think it was Estevan, if I'm correct.
22    Q.  And he didn't say Antonio Gallegos?
23    A.  No.
24    Q.  He didn't say Kristian Pettine?
25    A.  No.

**Page 109**

1    Q.  He didn't say anybody that was in the house?
2    A.  No.
3    Q.  Okay. At some point Mr. Gallegos -- well, how
4 many questions do you recall hearing Officer Apodaca ask
5 either Antonio Gallegos or Kristian Pettine about the
6 individual or the gun that was allegedly used on the
7 complainant or pointed at the complainant?
8       MR. BASHAM: Objection as to form.
9       Go ahead.
10    A.  I don't recall.
11 BY MR. THOMPKINS:
12    Q.  And do you know if you asked any questions of
13 the complainant about the events that happened and led
14 to him calling?
15    A.  I'm sure I did. I talked to the complainant
16 but I don't remember what the questions are.
17    Q.  Okay. And how long were you observing Officer
18 Apodaca and the individuals that were outside the home
19 before anything else happened?
20    A.  I don't know. ..
21    Q.  How long -- you said you were there for an
22 hour before Sergeant Martinez --
23    A.  Approximately an hour, I'm not sure on the
24 time.
25    Q.  Okay, approximately an hour.

---

Antonio Gallegos, et al. v.
City of Espanola, et al.

Robert Vigil
June 17, 2013

---

**Page 110**

1       In that approximate time before Sergeant
2 Martinez arrived, what happened besides asking
3 questions?
4     A.   Well, Officer Apodaca was -- Officer Apodaca
5 and myself were speaking with Mr. Antonio Gallegos. Mr.
6 Antonio Gallegos at one point threw his arms up and said
7 I'm done, and started walking back into the home, or the
8 office.
9     Q.   Okay. Let me ask you, at that point when you
10 say he said "I'm done" and started walking back into the
11 house, did you suspect him of committing a crime, having
12 committed a crime, or about to commit a crime?
13     A.   With the child in the condition it was, it was
14 a possibility that a child neglect could have been in
15 place, but at that point, no.
16     Q.   You said "a possibility." So did you
17 have facts that indicated that he was the parent of that
18 child and responsible for any neglect that might have
19 happened to that child?
20     A.   No. At that point no, I did not have facts.
21     Q.   Okay. And you didn't have -- you didn't
22 advise him that he was under arrest for possible neglect
23 of the child?
24     A.   No.
25     Q.   When he said "I'm done," he started walking

---

**Page 111**

1 towards the house, or to the house, what did you do?
2     A.   I raised my voice and instructed him several
3 times to stop, that he could not go back in the house.
4     Q.   Okay. At that point when you -- you say you
5 raised your voice, are you aware in the incident report
6 it says that you and Officer Apodaca yelled?
7     A.   I don't know if it said yell or not, but yeah,
8 we advised him not to go back in the house.
9     Q.   So as Officer Apodaca wrote in his incident
10 narrative that you and he yelled, would he be incorrect?
11     A.   No.
12     Q.   Okay. And when you yelled at Mr. Gallegos
13 that he could not enter back into his house, he did not
14 go into the house, did he?
15     A.   He continued to walk towards the house.
16     Q.   But he didn't go back into the house?
17     A.   No.
18     Q.   And at some point he turned around?
19     A.   No.
20     Q.   If Officer Apodaca wrote in his incident
21 narrative that Mr. Gallegos did not enter the house and
22 turned around, would his incident report be incorrect?
23     A.   I'm not going to say it would be incorrect,
24 but I don't recall him turning around.
25     Q.   Okay. But from what you recall, if he wrote

---

**Page 112**

1 that, it wouldn't be correct to what your recollection
2 is?
3     A.   I don't recall him turning around, so
4 obviously with my recollection, then, that would be
5 incorrect.
6     Q.   Okay. And when you arrived you were in your
7 full uniform?
8     A.   Yes, sir.
9     Q.   You had your badge --
10     A.   Yes, sir.
11     Q.   -- which is -- it's a show of your authority
12 as a police officer?
13     A.   It's a show of being a police officer, yes.
14     Q.   Okay. And you told and advised Mr. Gallegos
15 that he was not free to walk back into his home.
16     A.   I did not say you are not free to walk back
17 into your home. I said stop, you cannot go back into
18 your home.
19     Q.   "Stop, you cannot go back into your home."
20     A.   (Nodding head.)
21     Q.   Do you believe that Mr. Gallegos, when you
22 yelled that, or you raised your voice and stated that,
23 believed he was not free to leave?
24     A.   No.
25     Q.   Okay. When you raised your voice, did you run

---

**Page 113**

1 towards Mr. Gallegos?
2     A.   I don't know if I ran, but I walked -- I don't
3 know if I ran or walked at a fast pace, but I did walk
4 towards him, yes, or moved towards him.
5     Q.   If Officer Apodaca wrote in his report that
6 you and he ran after Mr. Gallegos, would that
7 description be inaccurate in his report?
8     A.   No, no.
9     Q.   Was Mr. Gallegos free to leave and walk away
10 from the front of his house when he -- if he wanted to?
11     A.   Yes, but not to go back into the house.
12     Q.   What was the state of the people that were --
13 the condition of the people that you observed outside of
14 the house?
15     A.   From my knowledge and experience and training,
16 I would believe the individuals outside of the house
17 were all intoxicated.
18     Q.   And what leads you to believe, based on your
19 experience, that they were intoxicated?
20     A.   The strong smell of alcoholic beverage.
21     Q.   Okay.
22     A.   They weren't talking exactly like you and I
23 are talking now, they had slurred speech or slightly
24 slurred speech, bloodshot watery eyes.
25     Q.   Is that for everyone? Antonio Gallegos,

---

Antonio Gallegos, et al. v.
City of Espanola, et al.

Robert Vigil
June 17, 2013

---

**Page 114**

1  Kristian Pettine and the complainant? And his name is
2  Alfonzo Gurule.
3       MR. BASHAM: Objection as to form.
4  BY MR. THOMPKINS:
5       Q. Let's take it one at a time so we remove the
6  objection.
7       Is that what you observed, what you just
8  stated, in your training and experience did you observe
9  that about Antonio Gallegos?
10      A. Yes.
11      Q. Okay. Did you observe that also about
12  Kristian Pettine?
13      A. Yes.
14      Q. And did you observe that about Alfonzo Gurule?
15      A. Who is the complainant; correct? Yes.
16      Q. And where -- did any of them have any problems
17  being able to stand up and not sway?
18      A. I do believe that they were swaying. I do
19  believe that Ms. Kristian Pettine was swaying somewhat
20  when we talked to her. I do believe that Mr. Antonio
21  Gallegos was swaying when we talked to him.
22      I don't recall if I spoke to the complainant
23  while he was standing or just sitting.
24      Q. But you did observe the odor of alcohol,
25  bloodshot eyes, slurred speech?

---

**Page 115**

1       A. Yes.
2       Q. When you yelled, or raised your voice to Mr.
3  Gallegos to tell him he is not free to go into his
4  house, what did you do after that?
5       A. Mr. Gallegos continued to walk. Then I got in
6  front of Mr. Gallegos and I stopped him, I told him you
7  can't go back in.
8       Q. Okay. So you ran and got in front of Mr.
9  Gallegos before he could enter the house?
10      A. Yes.
11      Q. And told him he had to stop?
12      A. Yes.
13      Q. Okay. Did you at that point suspect Mr.
14  Gallegos of having committed or being about to commit a
15  crime?
16      A. I can't speculate if he was about to commit a
17  crime, but at the time I could not say he had already
18  committed a crime.
19      Q. You can't say he had. What crime did you
20  think he might have committed?
21      A. Let me rephrase myself.
22      I can't say he had already committed a crime.
23      Q. Okay.
24      A. Okay? But I can't speculate and say that he
25  was about to commit a crime.

---

**Page 116**

1       Q. Did you think he was about to commit a crime?
2       A. I don't know what he was thinking.
3       Q. Did you have any facts that would indicate
4  that he was about to commit a crime?
5       A. Nothing that led me to believe that he was
6  going to actually do something and commit a crime. But
7  the nature of the call, and being that there was weapons
8  in the home, which he himself stated, for the safety of
9  the officers involved we did not want him to enter back
10  into the home.
11      Q. And the call that was made was not about
12  Antonio Gallegos, was it?
13      A. It was -- no, not necessarily.
14      Q. In terms of Mr. Gallegos, when you ran in
15  front of him you restricted his movement?
16      A. By standing in front of him, yes.
17      Q. And when you ran in front of him and
18  restricted his movement, he couldn't go into the house?
19      A. No.
20      Q. Okay. And did Officer Apodaca also, when you
21  went to restrict Mr. Gallegos's movements, also follow
22  you towards Mr. Gallegos?
23      A. Yes.
24      Q. And did he assist you and also restrict Mr.
25  Gallegos's movement?

---

**Page 117**

1       A. After -- after Mr. Gallegos pushed me, and I
2  attempted to use hand techniques to control Mr.
3  Gallegos, yes, he did.
4       Q. What hand techniques did you use?
5       A. I was going to attempt to place Mr. Gallegos
6  in an arm bar, which we were trained in the academy, and
7  take him down to handcuff Mr. Gallegos. And Mr.
8  Gallegos began to struggle with us, fight with us, and
9  Officer Apodaca then dry stunned him.
10      Q. When you stopped or restricted Mr. Gallegos's
11  movements, that's when you attempted to use the hand
12  technique that you just described?
13      A. Say that again.
14      Q. You indicated that you went after Mr. Gallegos
15  and Officer Apodaca also followed?
16      A. Uh-huh.
17      Q. That you were able to get in front of Mr.
18  Gallegos?
19      A. Yes.
20      Q. And then to get Mr. Gallegos to comply you
21  attempted to use a hand technique?
22      A. Only after Mr. Gallegos battered me and pushed
23  me.
24      Q. Okay. How did he batter you?
25      A. Pushed me.

---

Cumbre Court Reporting, Inc.
505-984-2244