**EXHIBIT 1**

1

1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW MEXICO
2

3
    ANTONIO GALLEGOS, KRISTIAN PETTINE,
4   ANDRE GALLEGOS, and K.L.P.L., a
    minor child,
5
                    Plaintiffs,
6
    vs.                              No. 1:12-CV-224-LH/KBM
7

8   CITY OF ESPAÑOLA, a municipal corporation,
    JOE MARTINEZ, individually and in his official capacity;
9   JEREMY APODACA, individually and in his official
    capacity; ROBERT VIGIL, individually and in his official
10  capacity; CITY OF ESPAÑOLA OFFICERS and SUPERVISORS JOHN
    DOES 1 through, individually and in their official
11  capacities,

12
                    Defendants.
13
                    DEPOSITION OF ANTONIO GALLEGOS
14                      Friday, June 21, 2013
                           9:03 a.m.
15                  Cumbre Court Reporting, Inc.
                      2019 Galisteo Street
16                   Santa Fe, New Mexico 87505

17

18         PURSUANT TO THE NEW MEXICO RULES OF CIVIL
    PROCEDURE, this Deposition was:
19
    TAKEN BY:   MARK A. BASHAM
20              ATTORNEY FOR THE DEFENDANTS

21
    REPORTED BY:   ALLISON ASH-HOYMAN
22                 NEW MEXICO CCR #18
                   CUMBRE COURT REPORTING, INC.
23                 2019 Galisteo, Suite A-1
                   Santa Fe, New Mexico 87505
24

25

Antonio Gallegos, et al. v.
City of Espanola, et al.

---

**Page 26**

1  Q. **Without raising your voice?**
2  A. Yeah.
3  Q. **Okay. So tell us about your conversation with**
4  **Alfonzo.**
5  A. I asked him if he knew anything about what the
6  police were asking.
7  Q. **And what was his response?**
8  A. I asked -- he said that him and my older son
9  had some words. And I said, do you know anything about
10  a gun? Did you see a gun? And he said no, I don't
11  know.
12  Q. **That's what Alfonzo said?**
13  A. Yes.
14  Q. **Okay. Then what happened?**
15  A. And then I talked to Officer Vigil and told
16  him well, obviously there is not anything going on here.
17  Somebody made a call saying there was a gun and now he
18  is saying no, and he doesn't know.
19  Q. **Now you would agree at this point in time you**
20  **told Officer Vigil that the only guns here are the ones**
21  **in the house; correct?**
22  MR. THOMPKINS: Objection as to the form of
23  the question.
24  A. No.
25  BY MR. BASHAM:

---

**Page 27**

1  Q. **What did you say about the guns?**
2  MR. THOMPKINS: Objection as to form.
3  A. I didn't.
4  MR. THOMPKINS: Hold on. Objection as to the
5  form of the question.
6  Go ahead.
7  THE WITNESS: Repeat the question for me.
8  BY MR. BASHAM:
9  Q. **What did you say about the guns?**
10  MR. THOMPKINS: Same objection.
11  A. What guns?
12  BY MR. BASHAM:
13  Q. **Did you have guns in the house/business,**
14  **whatever it is?**
15  A. Was there a gun in the house?
16  Q. **Or guns.**
17  A. There was a gun in the house, I believe.
18  Q. **Okay. What type of gun was it?**
19  A. A .22 rifle.
20  Q. **How many guns do you possess? Firearms that**
21  **is. So that includes rifles.**
22  A. I don't know. A handful.
23  Q. **Okay. Can you tell us what they are?**
24  A. Uhm, what do I own. I have a .270 rifle; I
25  have 7 millimeter rifle; I have -- I have a 12 gauge

---

**Page 28**

1  shotgun, a .22 rifle. I believe that's it.
2  Q. **So you don't own any handguns?**
3  A. Handguns? I have a -- I have a .500 Smith &
4  Wesson Magnum.
5  Q. **Okay. Is that it?**
6  A. I believe so.
7  Q. **But you don't know for sure?**
8  A. I've given some -- I've given some of my
9  rifles and guns to my sons.
10  Q. **Okay. At the time you were talking to Alfonzo**
11  **Gurule, where was Kristian?**
12  A. Kristian was in the office.
13  Q. **Okay. Well, in your complaint it says that**
14  Officer Apodaca became aggressive and focusing his
15  attention on Kristian Pettine.
16  Can you define what you mean by "aggressive"?
17  A. Can you repeat the question?
18  Q. **In the complaint that you have filed, it**
19  alleges that Officer Apodaca became aggressive and
20  focusing his attention on Kristian, and I asked you can
21  you describe what you mean by "aggressive"?
22  MR. THOMPKINS: I'm going to object to the
23  form of the question as the complaint is filed by more
24  than Mr. Gurule -- I'm sorry, Mr. Gallegos. So I'm
25  objecting to the characterization in the question that

---

**Page 29**

1  he is the only one that filed the complaint and he is
2  the only one that has information.
3  BY MR. BASHAM:
4  Q. **Go ahead and answer.**
5  A. I don't understand your question.
6  Q. **Can you describe what you mean by aggressive?**
7  A. I still don't understand what -- I don't
8  understand what you are talking about.
9  Q. **In your complaint you allege that Officer**
10  Apodaca became aggressive and focusing his attention on
11  Kristian.
12  MR. THOMPKINS: Objection as to the form of
13  the question.
14  BY MR. BASHAM:
15  Q. **Can you describe what you mean by**
16  "aggressive"?
17  MR. THOMPKINS: Same objection.
18  A. I don't understand the question.
19  BY MR. BASHAM:
20  Q. **What part don't you understand?**
21  A. The whole thing. The whole thing I don't
22  understand.
23  Q. **Well, can you explain what you mean by**
24  "focusing his attention on Kristian"?
25  MR. THOMPKINS: Same objection as to the form

---

Antonio Gallegos, et al. v.
City of Espanola, et al.

Antonio Gallegos
June 21, 2013

**Page 34**

1  that the call wasn't correct because the guy that made
2  the call now was saying he doesn't know if he saw a gun.
3  So there is nothing here, there is no reason for you to
4  stay here. He was the only one outside. There is
5  nothing here.
6      I said, I'm here to work, I have to take care
7  of my business, and I would appreciate if you guys just
8  left.
9    Q.  And what did he say?
10   A.  That's when he got combative. He raised his
11  voice to me, kind of got in my face a little bit and
12  told me no, we are not -- we are not going anywhere.
13   Q.  Okay.
14   A.  Kind of yelled at me.
15   Q.  And then what happened?
16   A.  And then I said well, there is nothing here.
17  I don't -- I didn't see nothing, nobody here saw
18  anything, the only one that saw anything was outside at
19  the time was Alfonzo Gurule, he says he doesn't know
20  what he saw.
21   Q.  Where was Andre at this point in time?
22   A.  In the office.
23   Q.  Okay. And then what happened next?
24   A.  And then Officer Vigil and Officer Apodaca
25  started talking to each other.

**Page 35**

1    Q.  Okay. Did you overhear what they were saying?
2    A.  No.
3    Q.  Okay. I thought earlier you testified that
4  you could hear someone or talk to someone from one side
5  of the building to the other; correct?
6    A.  Well, they were talking kind of low to each
7  other.
8    Q.  Okay. Were you trying to listen to what they
9  were saying?
10   A.  I was.
11   Q.  But you didn't hear anything?
12   A.  I didn't.
13   Q.  Did you hear bits and pieces?
14   A.  No.
15   Q.  Okay. What did you do next?
16   A.  Next -- what happened next.
17      They were talking, and I started to walk
18  towards my office. I was going to go back to work.
19   Q.  Did you tell them anything, the officers that
20  is, other than that you were going to go back to work?
21   A.  I told them I don't know anything, I didn't
22  see anything, I'm going back to work.
23   Q.  Did you tell them, you know, did you tell them
24  to get out of here, that you know Judge Naranjo?
25   A.  No.

**Page 36**

1    Q.  You never said that?
2    A.  No.
3    Q.  So then what happened next?
4    A.  So then I started up the stairs to my office.
5  And Officer Vigil ran up, he ran up behind me, said
6  stop, stop, you can't -- you can't -- he told me to
7  stop, and I was already walking up my stairs. So I
8  stopped at the top of the stairs and he grabbed my arm
9  and he cuffed my arm.
10      And then as he was going to get this other arm
11  he grabbed my head and started to force my head into the
12  wall, towards the wall. And then Officer Apodaca ran up
13  at the same time and tased me in the neck.
14   Q.  Okay. So is it your testimony that at no
15  point in time did you push Officer Vigil?
16   A.  No, I didn't.
17   Q.  Okay. So you deny pushing Officer Vigil?
18   A.  I did not.
19      MR. THOMPKINS: Objection. Asked and
20  answered.
21      Give me a moment to raise an objection before
22  you answer the question.
23      THE WITNESS: Okay.
24  BY MR. BASHAM:
25   Q.  Okay. How many times were you tased?

**Page 37**

1      MR. THOMPKINS: You can answer.
2    A.  Three.
3  BY MR. BASHAM:
4    Q.  Okay. Did you take photos of the injury?
5    A.  Yes.
6      MR. BASHAM: Nate, those have not been
7  provided to us.
8      MR. THOMPKINS: I'm sorry?
9      MR. BASHAM: Those photos have not been
10  provided to us.
11      MR. THOMPKINS: Yes, they have. They are in
12  the discovery. You even listed them in there.
13      MR. BASHAM: Photos of his injuries.
14      MR. THOMPKINS: Yes.
15      MR. BASHAM: I'll confirm that. I looked for
16  them yesterday.
17   Q.  So then what happened next?
18   A.  So then me and Officer Vigil, we kind of -- we
19  kind of fell towards the front steps, and as we did that
20  then Officer Apodaca tased me here on the side.
21   Q.  Okay. Once in the neck and once on the
22  left-hand side?
23   A.  Yes.
24   Q.  Okay. And then what happened?
25   A.  And then I fell to the -- I fell to the cement

**Page 38**

1 slab on the bottom, and as soon as I fell I gave Officer
2 Vigil my left hand so he could cuff me, because I didn't
3 want them to rough me up like he was trying to do on the
4 wall.
5 　Q. And at this point in time where was Kristian?
6 　A. Kristian and Andre were at the glass door
7 since I got up to the top of the steps looking out the
8 glass door. Looking at them tasing me.
9 　Q. Okay. So the entire time that you had this
10 conversation with the officers, up until the take-down,
11 they were in the office?
12 　A. Actually, I want to go back to the -- to the
13 question that you asked me what happened when I fell
14 down on the slab.
15 　　I gave Officer Vigil my arm and he immediately
16 cuffed me, and then Jeremy Apodaca yelled out should I
17 hit him again? And he tased me right in the middle of
18 the back.
19 　Q. Upper or lower back?
20 　A. Right in the middle.
21 　Q. Okay. Again, going back to my other question.
22 So it's your testimony that during this whole time you
23 are having this conversation with Officer Vigil and
24 Alfonzo, Kristian and Andre were in the office; correct?
25 　　MR. THOMPKINS: Objection as to the form of

**Page 39**

1 the question.
2 　A. Can you ask that question again.
3 　　MR. BASHAM: Read it back to him, please.
4 　　(Record read as requested.)
5 　A. Yes.
6 BY MR. BASHAM:
7 　Q. Okay. Then what happened after you were taken
8 down and cuffed?
9 　A. Then I was put in the police car.
10 　Q. Okay. And did you observe anything happening
11 from the police car?
12 　A. All I could see was at one point Kristian came
13 out holding the baby, her baby Kolby -- what did you
14 want me to call her?
15 　Q. The minor child.
16 　A. Minor child.
17 　Q. Came out of where?
18 　A. Came out of the office.
19 　Q. Okay. And what else did you see?
20 　A. I saw her talking to Officer Apodaca.
21 　Q. Okay. And who else did you see?
22 　A. My attention was mainly on my wife.
23 　Q. Okay. And so you saw them talking?
24 　A. Yes.
25 　Q. You couldn't hear what they were saying?

**Page 40**

1 　A. No.
2 　Q. Okay. Then what happened?
3 　A. And then it appeared that Officer Apodaca
4 wanted to take the minor child out of my wife's arms.
5 　Q. Okay. And then what happened?
6 　A. And it appeared that she didn't want to give
7 up her minor child.
8 　Q. Okay. Where is Andre at this point in time?
9 　A. I guess -- I had my back to -- to the office
10 when they arrested me so I never saw Andre.
11 　Q. Okay. So they put you in the cop car;
12 correct?
13 　A. Right.
14 　Q. In the back seat?
15 　A. Yes.
16 　Q. Wouldn't that be facing the business?
17 　A. I couldn't see -- I couldn't really see the
18 front of the business. I could see off to the left.
19 　　MR. BASHAM: Okay. Let's go ahead and mark
20 this photograph as Exhibit B to Antonio's deposition.
21 　　(Marked Deposition Exhibit B.)
22 BY MR. BASHAM:
23 　Q. Whose cop car were you in?
24 　A. I was in Officer Vigil's.
25 　Q. Okay. And so your testimony is he was the

**Page 41**

1 first one there; right?
2 　A. Yes.
3 　Q. In that Exhibit B, would that be his car that
4 is off to the right, lower right?
5 　A. I believe so.
6 　Q. Okay. So, did you see -- did you see anything
7 else off to your left?
8 　A. I saw when -- I saw when the ambulance pulled
9 up off to my left.
10 　Q. Okay. Were you offered treatment at that
11 point in time for the stuns?
12 　A. Uhm, treatment?
13 　Q. Yeah. By the ambulance personnel.
14 　A. They told me that they wanted the ambulance
15 people to look at me.
16 　Q. And what did you respond?
17 　A. I said no, I'm okay.
18 　Q. Okay. When is the next time you saw Andre?
19 　A. When he showed up to the -- to the jail.
20 　Q. Okay. And what happened there?
21 　A. I asked the policeman that brought him in what
22 he was doing there. And he wouldn't answer me. And I
23 kept asking him. And finally he told me well, he is too
24 young to stay at home alone. And I told him first of
25 all, that's not his home. Second of all, he has his

---

**Page 50**

1  Vigil. When Officer Vigil told me why he was there,
2  that supposedly somebody had pulled a gun on someone
3  else, I asked Mr. Gurule if he knew anything about that.
4  He told me that him and my son Estevan had some words,
5  and I said, was there a gun? He said no, I don't know.
6      So this, this whole statement that -- well,
7  first of all, I was not stumbling. My wife was not out
8  there at the time. And Jeremy Apodaca was not even
9  there when Alfonzo Gurule told me what had happened.
10  And I didn't becoming aggressive towards Mr. Gurule.
11  That's incorrect. Nor did I tell him --
12      Q. Tell him what?
13      A. Shut his fucking mouth and quit lying.
14      He told me -- I asked him a question, I asked
15  him if he had seen a gun, and he told me no, I don't
16  know.
17      At that point I told Officer Vigil, Jeremy
18  Apodaca wasn't even on the scene yet, I said there is
19  nothing going on here. The guy that called you clearly
20  stated that he doesn't know if there was a gun. My son,
21  I did see him before he left walking down the hallway
22  carrying his tools to go fix his truck. And he did have
23  ratchets and stuff that could have -- you know, are
24  shiny, like a pistol, could be.
25      So -- and Mr. Gurule did tell me no, I don't

---

**Page 51**

1  know. So at that point there was nothing, nothing more
2  for the police -- no reason for them to stay there.
3  And --
4      Q. What paragraph are you on?
5      A. Paragraph 5, says I was waiting for CYFD to
6  call me back, whether the determination to take Kolby
7  into state custody or not, Mr. Gallegos started walking
8  around yelling that the only guns he had were in the
9  house, and he is a businessman in town and says taxes --
10  and pays taxes, and also threatening Officer Vigil and
11  myself that he was going to sue us and call Judge
12  Naranjo. And also stated that we needed to leave now
13  because we were on his property.
14      That's totally false. At some point Officer
15  Vigil asked me if there was guns in the house, and I
16  stated -- I thought, I thought there were. But -- so I
17  said, you know, there probably are guns in the -- in the
18  house, in the office. But I never -- I never yelled
19  that the only guns were in the house. Nor am I a
20  businessman or I pay taxes or -- or I'm going to sue you
21  or call Judge Naranjo. I told him -- I told Officer
22  Vigil that clearly there was -- it was -- the call was
23  incorrect because Alfonzo Gurule said when I asked him
24  if he saw a gun, he said no, I don't know.
25      So there was nothing more there. I told him I

---

**Page 52**

1  need to go back to work. I need to go back to work. So
2  I would appreciate if you guys left this property, it's
3  private property.
4      Q. Okay. Continue.
5      A. I never saw -- I never saw Andre there when I
6  was talking to Officer Vigil. We were at the car --
7  they said that he asked for me to stand at the rear of
8  the car, and I did stand there. And I stand there for
9  quite a while, and then I told him I -- I don't --
10  didn't see anything, like I told you, I don't know
11  anything, I need to go back to work.
12      And when they told me to stop, I stopped at
13  the top of the stairs. Officer -- okay, I never pushed
14  Officer Vigil. And I stopped by myself, he didn't stop
15  me. Nor did he use hand control techniques, he just
16  grabbed my hand and cuffed it.
17      Q. And you are at the first paragraph of page 2?
18      A. Yes.
19      I never -- it says here Officer Vigil used a
20  hand control technique in an attempt to stop and place
21  Mr. Gallegos in handcuffs.
22      He didn't use a hand technique, I don't
23  believe. He just grabbed my arm, cuffed it, at which
24  time Mr. Gallegos started combatively resisting.
25      I never resisted. He cuffed my first arm, and

---

**Page 53**

1  it says here, and I applied a stun gun to the left -- to
2  the left shoulder of Mr. Gallegos, and he was placed
3  into handcuffs.
4      That statement is totally incorrect. First of
5  all, me and Officer Vigil --
6      Q. Let the record reflect he is referring to
7  Exhibit B.
8      Go ahead.
9      A. Here on Exhibit B, left, left of the front
10  door --
11      Q. Go ahead and mark that.
12      A. (Witness complying.) Right there.
13      Q. Put a little X. Okay?
14      A. We were left of the front door. Officer Vigil
15  grabbed my right arm and cuffed it. And Officer Apodaca
16  was right of the front door. This here says, I applied
17  a stun gun to the left shoulder. I was turned -- I was
18  turned with my left shoulder facing out towards the
19  parking lot.
20      Officer Apodaca was right of the front door,
21  and he applied the stun gun on the right side of my
22  neck. It was impossible for him to hit me with a stun
23  gun in the left shoulder because he was -- he was to my
24  right.
25      Q. Okay.

---

**EXHIBIT 2**

1

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW MEXICO
2


3
   ANTONIO GALLEGOS, KRISTIAN PETTINE,
4  ANDRE GALLEGOS, and K.L.P.L., a
   minor child,
5
                    Plaintiffs,
6
   vs.                              No. 1:12-CV-224-LH/KBM
7

8  CITY OF ESPAÑOLA, a municipal corporation,
   JOE MARTINEZ, individually and in his official capacity;
9  JEREMY APODACA, individually and in his official
   capacity; ROBERT VIGIL, individually and in his official
10 capacity; CITY OF ESPAÑOLA OFFICERS and SUPERVISORS JOHN
   DOES 1 through 10, individually and in their official
11 capacities,

12
                    Defendants.
13

14                DEPOSITION OF ROBERT VIGIL

15               Monday, June 17, 2013
                       9:25 A.M.
16              Cumbre Court Reporting, Inc.
                   2019 Galisteo Street
17              Santa Fe, New Mexico 87505

18

19        PURSUANT TO THE NEW MEXICO RULES OF CIVIL
   PROCEDURE, this Deposition was:
20
   TAKEN BY:   NATHANIEL V. THOMPKINS
21             ATTORNEY FOR THE PLAINTIFFS

22
   REPORTED BY:   ALLISON ASH-HOYMAN
23                 NEW MEXICO CCR #18
                   CUMBRE COURT REPORTING, INC.
24                 2019 Galisteo, Suite A-1
                   Santa Fe, New Mexico 87505
25

Antonio Gallegos, et al. v.
City of Espanola, et al.

---

Page 102

1   Q.  Okay.  And who was present when you arrived
2   with Officer Apodaca?
3   A.  I believe Ms. Kristian Pettine was there,
4   Antonio Gallegos was there, and a little child, I want
5   to say two years old or younger.
6   Q.  Okay.  Anybody else?
7   A.  There were other individuals in the home but I
8   don't recall their names.
9   Q.  Okay.  Now, when you say "there were other
10  individuals in the home," Kristian, Antonio and the baby
11  were outside?
12  A.  Yes.
13  Q.  In relation to the home, where outside were
14  they?
15  A.  Antonio Gallegos was -- Officer Apodaca's car
16  was parked in front of the front door of the home, not
17  all the way to the door, but was parked a little ways
18  back.  Antonio Gallegos was on the right side of the
19  vehicle, I believe by the rear, the rear tire.  If I'm
20  correct.
21  Q.  Okay.  And where was Kristian Pettine, do you
22  recall?
23  A.  I don't recall.
24  Q.  And how about the baby?
25  A.  The baby was walking around, I remember.  She

---

Page 103

1   was walking around in an obviously soiled diaper without
2   a shirt, without any shoes, without any pants on,
3   walking around on hot gravel.
4   Q.  Okay.  At the moment that you observe Antonio
5   Gallegos by the back of the car, Ms. Pettine somewhere
6   outside the house, and the baby walking around, did you
7   have reason to believe that any of them had committed a
8   crime or was involved in committing a crime?
9   MR. BASHAM:  Objection as to form.
10  A.  When I arrived and I spoke to Officer Apodaca,
11  I wasn't exactly sure who had the weapon.
12  BY MR. THOMPKINS:
13  Q.  Okay.
14  A.  So I didn't know at that time if somebody had
15  committed a crime or not.
16  Q.  Okay.  So you didn't have any facts or
17  information that indicated that Antonio Gallegos had a
18  weapon?
19  A.  Well, I -- there was weapons in the home, from
20  what I was told from Officer Apodaca or -- I'm sorry,
21  there was a weapon somewhere, we weren't sure where it
22  was at.  We didn't know who pointed the weapon at the
23  individual.
24  Q.  Well, did you talk to the complainant?
25  Where was the complainant, by the way, when

---

Page 104

1   you arrived?
2   A.  I'm thinking he was outside.  If I'm -- it's
3   been so long.  I want to say he was sitting on the rear
4   of a pickup truck, on the tailgate, but I'm not exactly
5   sure.
6   Q.  Okay.  And did you have any information that
7   he said Antonio Gallegos was the one who pointed the gun
8   at him?
9   A.  No.
10  Q.  Did he have -- or did you get any information
11  from him that Christine Pettine -- Christine -- Kristian
12  Pettine was the one who pointed the gun at him?
13  A.  No.
14  Q.  Did Officer Apodaca give you any information
15  that indicated that Antonio Gallegos was the person who
16  pointed the gun?
17  A.  No.
18  Q.  And did Officer Apodaca give you any
19  information that indicated that Kristian Pettine was the
20  one who pointed the gun?
21  A.  No.
22  Q.  And you didn't suspect the baby of pointing
23  the gun?
24  A.  Obviously not.
25  Q.  So as you are assisting Officer Apodaca, whose

---

Page 105

1   questioning -- what questioning is being conducted of
2   either Mr. Gallegos or Ms. Pettine?
3   MR. BASHAM:  Objection to form.
4   A.  One thing that Officer Apodaca was trying to
5   find the weapon, where the weapon was.  We weren't
6   sure where the weapon was.  And he was trying to sort
7   out exactly who pointed the weapon, or pointed the
8   weapon at the victim.
9   BY MR. THOMPKINS:
10  Q.  Let me -- I may have confused you.  I don't
11  want you to think or tell us what you think Officer
12  Apodaca was thinking or trying to do.
13  I want to know if you know what questions
14  either he was asking of Antonio Gallegos, or anybody
15  while you were assisting him.
16  Do you know or recall?
17  A.  Some of the questions -- I don't know verbatim
18  what the questions were, but some of the questions
19  referred to where the weapon is at.
20  Q.  Okay.  And did any of the people that he was
21  questioning tell him where -- and the weapon that you
22  are referring to, is that the one that was pointed at
23  the complainant?
24  A.  At the time that's the only weapon I knew
25  should have been around.

---

Antonio Gallegos, et al. v.
City of Espanola, et al.

Robert Vigil
June 17, 2013

---

**Page 106**

1    Q.  Okay. And did Officer Apodaca, or did you
2 hear any of the people that were being questioned
3 indicate to you where the weapon was that had been
4 pointed at the complainant?
5    A.  No. What they did, I believe it was Ms.
6 Pettine that did confirm there was a weapon but didn't
7 know where it was at.
8    Q.  Okay. Did -- would that -- as a police
9 officer, if Ms. Pettine had confirmed, like you said,
10 there was a weapon someplace, would that be information
11 that should make it into a report someplace?
12    A.  What do you mean by "report someplace"? If a
13 report should be taken on this incident?
14    Q.  Well, isn't there a report taken on this
15 incident?
16    A.  Yes.
17    Q.  Okay. In that report did you read anywhere
18 that Kristian Pettine said there was a weapon someplace?
19    A.  No, I did not.
20    Q.  Okay. If she had indicated -- because you
21 were concerned about a weapon, if she had indicated
22 there was a weapon someplace, would that piece of
23 information be something that is important enough to be
24 listed in the incident report?
25    A.  Yes. And I'm not -- there is Antonio Gallegos

---

**Page 107**

1 going off threatening to tell Judge Naranjo what was
2 going on. He did admit to there being firearms in the
3 home. He did threaten myself and Officer Apodaca with a
4 civil suit, or with a lawsuit is what he said.
5    Q.  Does that have any reference to the gun that
6 was alleged to have been pointed at the complainant?
7    A.  Yes.
8    Q.  What gun?
9    A.  He admitted to there being guns in the home.
10 We didn't know if those were the guns.
11    Q.  Did he admit to pointing a gun at the
12 complainant?
13    A.  No, but there were guns. We didn't know which
14 gun it was. He admitted to there being guns in the
15 home. We didn't know where the gun was at, so we didn't
16 know if the guns in the home were the actual guns
17 pointed at the complainant.
18    Q.  Okay. Did you have any information that
19 indicated to you that the gun in the house was the one
20 that was pointed at the complainant?
21    A.  No.
22    Q.  Did you have any information that Antonio
23 Gallegos had taken a gun out of the house and pointed it
24 at the complainant?
25    A.  No.

---

**Page 108**

1    Q.  At the time that you -- did you ask any
2 questions of either Antonio Gallegos --
3    A.  I did ask Antonio Gallegos questions, I just
4 don't recall what the questions were.
5    Q.  Did you ask him if he pointed a gun at the
6 complainant?
7    A.  I don't recall.
8    Q.  Did you ask him if he was involved -- did you
9 ask him if he knew who allegedly pointed a gun at the
10 complainant?
11    A.  I don't recall if I asked him that.
12    Q.  Did you ask the complainant any questions
13 about who pointed the gun at him?
14    A.  I remember speaking to the complainant, but I
15 don't know exactly what questions I asked him, either.
16    Q.  Do you recall if Officer Apodaca told you that
17 the complainant identified who pointed the gun at him?
18    A.  He did.
19    Q.  And who was it?
20    A.  I want to -- I'm not sure I remember the name,
21 but I think it was Estevan, if I'm correct.
22    Q.  And he didn't say Antonio Gallegos?
23    A.  No.
24    Q.  He didn't say Kristian Pettine?
25    A.  No.

---

**Page 109**

1    Q.  He didn't say anybody that was in the house?
2    A.  No.
3    Q.  Okay. At some point Mr. Gallegos -- well, how
4 many questions do you recall hearing Officer Apodaca ask
5 either Antonio Gallegos or Kristian Pettine about the
6 individual or the gun that was allegedly used on the
7 complainant or pointed at the complainant?
8    MR. BASHAM: Objection as to form.
9    Go ahead.
10    A.  I don't recall.
11 BY MR. THOMPKINS:
12    Q.  And do you recall if you asked any questions of
13 the complainant about the events that happened and led
14 to him calling?
15    A.  I'm sure I did. I talked to the complainant
16 but I don't remember what the questions are.
17    Q.  Okay. And how long were you observing Officer
18 Apodaca and the individuals that were outside the home
19 before anything else happened?
20    A.  I don't know.
21    Q.  How long -- you said you were there for an
22 hour before Sergeant Martinez --
23    A.  Approximately an hour, I'm not sure on the
24 time.
25    Q.  Okay, approximately an hour.

---

Antonio Gallegos, et al. v.
City of Espanola, et al.

Robert Vigil
June 17, 2013

**Page 110**

1    In that approximate time before Sergeant
2 Martinez arrived, what happened besides asking
3 questions?
4    A. Well, Officer Apodaca was -- Officer Apodaca
5 and myself were speaking with Mr. Antonio Gallegos. Mr.
6 Antonio Gallegos at one point threw his arms up and said
7 I'm done, and started walking back into the home, or the
8 office.
9    Q. Okay. Let me ask you, at that point when you
10 say he said "I'm done" and started walking back into the
11 house, did you suspect him of committing a crime, having
12 committed a crime, or about to commit a crime?
13    A. With the child in the condition it was, it was
14 a possibility that a child neglect could have been in
15 place, but at that point, no.
16    Q. Okay. You said "a possibility." So did you
17 have facts that indicated that he was the parent of that
18 child and responsible for any neglect that might have
19 happened to that child?
20    A. No. At that point no, I did not have facts.
21    Q. Okay. And you didn't have -- you didn't
22 advise him that he was under arrest for possible neglect
23 of the child?
24    A. No.
25    Q. When he said "I'm done," he started walking

**Page 111**

1 towards the house, or to the house, what did you do?
2    A. I raised my voice and instructed him several
3 times to stop, that he could not go back in the house.
4    Q. Okay. At that point when you -- you say you
5 raised your voice, are you aware in the incident report
6 it says that you and Officer Apodaca yelled?
7    A. I don't know if it said yell or not, but yeah,
8 we advised him not to go back in the house.
9    Q. So as Officer Apodaca wrote in his incident
10 narrative that you and he yelled, would he be incorrect?
11    A. No.
12    Q. Okay. And when you yelled at Mr. Gallegos
13 that he could not enter back into his house, he did not
14 go into the house, did he?
15    A. He continued to walk towards the house.
16    Q. But he didn't go back into the house?
17    A. No.
18    Q. And at some point he turned around?
19    A. No.
20    Q. If Officer Apodaca wrote in his incident
21 narrative that Mr. Gallegos did not enter the house and
22 turned around, would his incident report be incorrect?
23    A. I'm not going to say it would be incorrect,
24 but I don't recall him turning around.
25    Q. Okay. But from what you recall, if he wrote

**Page 112**

1 that, it wouldn't be correct to what your recollection
2 is?
3    A. I don't recall him turning around, so
4 obviously with my recollection, then, that would be
5 incorrect.
6    Q. Okay. And when you arrived you were in your
7 full uniform?
8    A. Yes, sir.
9    Q. You had your badge --
10    A. Yes, sir.
11    Q. -- which is -- it's a show of your authority
12 as a police officer?
13    A. It's a show of being a police officer, yes.
14    Q. Okay. And you told and advised Mr. Gallegos
15 that he was not free to walk back into his home.
16    A. I did not say you are not free to walk back
17 into your home. I said stop, you cannot go back into
18 your home.
19    Q. "Stop, you cannot go back into your home."
20    A. (Nodding head.)
21    Q. Do you believe that Mr. Gallegos, when you
22 yelled that, or you raised your voice and stated that,
23 believed he was not free to leave?
24    A. No.
25    Q. Okay. When you raised your voice, did you run

**Page 113**

1 towards Mr. Gallegos?
2    A. I don't know if I ran, but I walked -- I don't
3 know if I ran or walked at a fast pace, but I did walk
4 towards him, yes, or moved towards him.
5    Q. If Officer Apodaca wrote in his report that
6 you and he ran after Mr. Gallegos, would that
7 description be inaccurate in his report?
8    A. No, no.
9    Q. Was Mr. Gallegos free to leave and walk away
10 from the front of his house when he -- if he wanted to?
11    A. Yes, but not to go back into the house.
12    Q. What was the state of the people that were --
13 the condition of the people that you observed outside of
14 the house?
15    A. From my knowledge and experience and training,
16 I would believe the individuals outside of the house
17 were all intoxicated.
18    Q. And what leads you to believe, based on your
19 experience, that they were intoxicated?
20    A. The strong smell of alcoholic beverage.
21    Q. Okay.
22    A. They weren't talking exactly like you and I
23 are talking now, they had slurred speech or slightly
24 slurred speech, bloodshot watery eyes.
25    Q. Is that for everyone? Antonio Gallegos,

Antonio Gallegos, et al. v.
City of Espanola, et al.

Robert Vigil
June 17, 2013

---

**Page 114**

1 Kristian Pettine and the complainant? And his name is
2 Alfonzo Gurule.
3       MR. BASHAM: Objection as to form.
4 **BY MR. THOMPKINS:**
5    Q. Let's take it one at a time so we remove the
6 objection.
7       Is that what you observed, what you just
8 stated, in your training and experience did you observe
9 that about Antonio Gallegos?
10   A. Yes.
11   Q. Okay. Did you observe that also about
12 Kristian Pettine?
13   A. Yes.
14   Q. And did you observe that about Alfonzo Gurule?
15   A. Who is the complainant; correct? Yes.
16   Q. And where -- did any of them have any problems
17 being able to stand up and not sway?
18   A. I do believe that they were swaying. I do
19 believe that Ms. Kristian Pettine was swaying somewhat
20 when we talked to her. I do believe that Mr. Antonio
21 Gallegos was swaying when we talked to him.
22       I don't recall if I spoke to the complainant
23 while he was standing or just sitting.
24   Q. But you did observe the odor of alcohol,
25 bloodshot eyes, slurred speech?

**Page 115**

1    A. Yes.
2    Q. When you yelled, or raised your voice to Mr.
3 Gallegos to tell him he is not free to go into his
4 house, what did you do after that?
5    A. Mr. Gallegos continued to walk. Then I got in
6 front of Mr. Gallegos and I stopped him, I told him you
7 can't go back in.
8    Q. Okay. So you ran and got in front of Mr.
9 Gallegos before he could enter the house?
10   A. Yes.
11   Q. And told him he had to stop?
12   A. Yes.
13   Q. Okay. Did you at that point suspect Mr.
14 Gallegos of having committed or being about to commit a
15 crime?
16   A. I can't speculate if he was about to commit a
17 crime, but at the time I could not say he had already
18 committed a crime.
19   Q. You can't say he had. What crime did you
20 think he might have committed?
21   A. Let me rephrase myself.
22       I can't say he had already committed a crime.
23   Q. Okay.
24   A. Okay? But I can't speculate and say that he
25 was about to commit a crime.

**Page 116**

1    Q. Did you think he was about to commit a crime?
2    A. I don't know what he was thinking.
3    Q. Did you have any facts that would indicate
4 that he was about to commit a crime?
5    A. Nothing that led me to believe that he was
6 going to actually do something and commit a crime. But
7 the nature of the call, and being that there was weapons
8 in the home, which he himself stated, for the safety of
9 the officers involved we did not want him to enter back
10 into the home.
11   Q. And the call that was made was not about
12 Antonio Gallegos, was it?
13   A. It was -- no, not necessarily.
14   Q. In terms of Mr. Gallegos, when you ran in
15 front of him you restricted his movement?
16   A. By standing in front of him, yes.
17   Q. And when you ran in front of him and
18 restricted his movement, he couldn't go into the house?
19   A. No.
20   Q. Okay. And did Officer Apodaca also, when you
21 went to restrict Mr. Gallegos's movements, also follow
22 you towards Mr. Gallegos?
23   A. Yes.
24   Q. And did he assist you and also restrict Mr.
25 Gallegos's movement?

**Page 117**

1    A. After -- after Mr. Gallegos pushed me, and I
2 attempted to use hand techniques to control Mr.
3 Gallegos, yes, he did.
4    Q. What hand techniques did you use?
5    A. I was going to attempt to place Mr. Gallegos
6 in an arm bar, which we were trained in the academy, and
7 take him down to handcuff Mr. Gallegos. And Mr.
8 Gallegos began to struggle with us, fight with us, and
9 Officer Apodaca then dry stunned him.
10   Q. When you stopped or restricted Mr. Gallegos's
11 movements, that's when you attempted to use the hand
12 technique that you just described?
13   A. Say that again.
14   Q. You indicated that you went after Mr. Gallegos
15 and Officer Apodaca also followed?
16   A. Uh-huh.
17   Q. That you were able to get in front of Mr.
18 Gallegos?
19   A. Yes.
20   Q. And then to get Mr. Gallegos to comply you
21 attempted to use a hand technique?
22   A. Only after Mr. Gallegos battered me and pushed
23 me.
24   Q. Okay. How did he batter you?
25   A. Pushed me.

**EXHIBIT 3**

1

1           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW MEXICO
2

3

ANTONIO GALLEGOS, KRISTIAN PETTINE,
4   ANDRE GALLEGOS, and K.L.P.L., a
minor child,
5
                Plaintiffs,
6
vs.                              No. 1:12-CV-224-LH-/KBM
7

8   CITY OF ESPAÑOLA, a municipal corporation,
JOE MARTINEZ, individually and in his official capacity;
9   JEREMY APODACA, individually and in his official
capacity; ROBERT VIGIL, individually and in his official
10  capacity; CITY OF ESPAÑOLA OFFICERS and SUPERVISORS JOHN
DOES 1 through, individually and in their official
11  capacities,

12

                    Defendants.
13
                 DEPOSITION OF JEREMY APODACA
14               Wednesday, June 19, 2013
                        1:42 p.m.
15             Cumbre Court Reporting, Inc.
                 2019 Galisteo Street
16             Santa Fe, New Mexico 87505

17

18        PURSUANT TO THE NEW MEXICO RULES OF CIVIL
PROCEDURE, this Deposition was:
19
TAKEN BY:  NATHANIEL V. THOMPKINS
20             ATTORNEY FOR THE PLAINTIFFS

21

REPORTED BY:  ALLISON ASH-HOYMAN
22             NEW MEXICO CCR #18
               CUMBRE COURT REPORTING, INC.
23             2019 Galisteo, Suite A-1
               Santa Fe, New Mexico 87505
24

25

Antonio Gallegos, et al. v.
City of Espanola, et al.

Jeremy Apodaca
June 19, 2013

---

**Page 66**

1    A.  I do recall slightly that.

2    Q.  And that testimony that I just read to

3  you, if that were true, in terms of your testimony, is

4  inconsistent with what you just told us today about the

5  danger that Kolby was faced while she was with her

6  mother?

7    A.  I don't believe it's inconsistent.

8    Q.  Okay.  And how is it not inconsistent?

9    A.  Like I stated, initially I believe that she

10  was in danger upon my arrival, when I did observe her

11  walking around that area right there.

12    But once I was out and speaking with her, I

13  believe that that danger was -- had subsided slightly

14  because I was there intervening now.

15    Q.  Okay.  How long did you observe Kolby when you

16  arrived?

17    A.  Approximately a couple minutes, I can't say

18  specifically.

19    Q.  A couple of minutes?

20    A.  Less than that.

21    Q.  Okay.

22    MR. BASHAM:  Can I just go on the record here

23  and say perhaps from now on instead of referring to the

24  child by her name, refer to the two-year old, in the

25  event that some of this may be used at trial?

---

**Page 67**

1    MR. THOMPKINS:  If we go to trial I'm going to

2  refer to the child by her name.  There is nothing to

3  prevent me from referring to her by her name.  He

4  referred to the child by her name in his report.

5    So why do we have to call her a two-year old

6  child?

7    MR. BASHAM:  Then why can't you put it in a

8  complaint?  Because they don't want the child's --

9  that's -- come on, Nate, we went through this with the

10  judge.

11    MR. THOMPKINS:  We didn't go through a

12  deposition saying I couldn't mention the name.  Why did

13  he put it in the complaint?

14    MR. BASHAM:  Never mind.  I'm on the record.

15  BY MR. THOMPKINS:

16    Q.  So you don't know how long you were there at

17  the scene?

18    A.  Not --

19    MR. BASHAM:  Objection, asked and answered.

20    A.  Not specifically.

21  BY MR. THOMPKINS:

22    Q.  And so for the time period you were there,

23  whatever time that was, you didn't indicate when you

24  answered this question that the child was in any danger.

25    A.  I can't specifically say how long she was in

---

**Page 68**

1  that danger for.

2    Q.  Well, you were talking -- during your

3  investigation you talked to other people besides Ms.

4  Pettine, didn't you?

5    A.  Yes.

6    Q.  And where was the child and where was Ms.

7  Pettine when you were talking to Alfonzo Gurule?

8    A.  She was walking around the area holding the

9  child.

10    Q.  Holding the child in her arms?

11    A.  She would hold her, place her down.

12    Q.  And in that period of time your testimony was

13  she was in no danger?

14    MR. BASHAM:  Objection.  Mischaracterizes his

15  testimony.

16  BY MR. THOMPKINS:

17    Q.  Isn't it your testimony during the

18  investigation I would say that Kolby wasn't exposed to

19  any danger while we were there?

20    A.  I believe that's correct.

21    Q.  Okay.  So while you were there, and Ms.

22  Pettine is holding the child and putting her down, the

23  child wasn't in any danger.

24    A.  I don't believe so.

25    Q.  When you -- when Mr. Gallegos was -- did you

---

**Page 69**

1  instruct Mr. Gallegos to stand by the back of your

2  patrol car?

3    A.  Yes, I believe I did.

4    Q.  And at some point did Mr. Gallegos leave that

5  point and attempt to return to his house?

6    A.  Yes.

7    Q.  And what did you and Officer Vigil do when he

8  attempted to re-enter his home?

9    A.  We attempted to stop him from re-entering his

10  home.

11    Q.  Did you describe in your report that you ran

12  after him?

13    A.  Yes, I believe so.

14    Q.  And that you yelled at him to stop?

15    A.  I believe so, yes.

16    Q.  Okay.  And at that point you established your

17  authority as a police officer to get Mr. Gallegos to

18  comply.

19    A.  Yes.

20    Q.  And Mr. Gallegos then stopped.  He didn't

21  enter the house, did he?

22    A.  No.

23    Q.  And he was not free to leave at that point,

24  was he?

25    A.  No.

---

Antonio Gallegos, et al. v.
City of Espanola, et al.

Jeremy Apodaca
June 19, 2013

---

**Page 70**

1    Q.   And wasn't he therefore under arrest?
2    A.   Technically, yes.
3    Q.   Okay.  At that point, when you and Officer
4  Vigil prevented him from entering his house, what crime
5  did you suspect he had committed?
6    A.   At the point when we stopped him what crime
7  had he committed, you mean?
8    Q.   You yelled stop, you ran after him, and you
9  said he stopped.  And now at that point he is not free
10  to leave and he is under arrest.  What crime did you
11  suspect he had committed?
12    A.   The resisting, evading or obstructing a police
13  officer.
14    Q.   By walking from the car to his house he was
15  resisting, obstructing and evading a police officer?
16         MR. BASHAM:  Objection.  Asked and answered.
17    A.   Yes, I believe so.
18  BY MR. THOMPKINS:
19    Q.   And that's the crime that you arrested him for
20  at that point when you arrested him, for obstructing,
21  evading and resisting?
22    A.   Yes.
23    Q.   How did he evade?
24    A.   By -- during the course of my investigation I
25  instructed him to stand there by my police car.  Being

---

**Page 71**

1  that there was weapons involved and by his statement
2  that the only weapons there, were in his house.  So for
3  officer safety sake, I instructed him to stand by my
4  police car where I was able to observe him and keep an
5  eye there, that he didn't have access to any weapons.
6         And by him leaving that point and attempting
7  to re-enter the home where he just told us that the only
8  weapons were inside his home, he was therefore
9  committing the resisting, obstructing and evading a
10  police officer.
11    Q.   What facts did you have about the weapon that
12  was in the home at the time that you've told him to
13  stop?
14    A.   Only the presence that he had told me of there
15  being weapons in the home.
16    Q.   What facts did you have that would indicate
17  where the weapon was located at the time that you
18  prevented him from entering his home?
19         MR. BASHAM:  Objection, asked and answered.
20    A.   I didn't have any facts as to where it was
21  located.
22  BY MR. THOMPKINS:
23    Q.   What facts did you have that would indicate
24  what type of weapon that it was that was in the home at
25  the time that you prevented him from entering his home?

---

**Page 72**

1    A.   The fact that he referred to it as a -- the
2  gun or guns.
3    Q.   Okay.  At no point did he refer to it as the
4  gun that Mr. Gurule told you about, did he?
5    A.   No, not to my knowledge.
6    Q.   And at no point did Mr. Gurule refer to the
7  gun that Mr. Gallegos, Antonio Gallegos told you about,
8  as being the gun that was pointed at him, did he?
9    A.   I'm sorry?
10    Q.   Mr. Gallegos -- excuse me, Mr. Gurule, did he
11  ever tell you that the gun that Antonio Gallegos
12  referred to was the gun that was pointed at him?
13    A.   No, I don't believe so.
14    Q.   Okay.  Do you recall being interviewed by
15  Chief Martinez, Chief Joe Martinez when a complaint was
16  filed about this incident?
17    A.   Yes.
18    Q.   And do you recall -- did you ever get a copy
19  of and/or see his supplement to your report of that
20  incident, of that investigation?
21    A.   Yes, I believe so.
22    Q.   And do you recall what he said about where the
23  weapon was located when he documented it in his
24  supplemental report?
25    A.   I can't recall specifically.

---

**Page 73**

1    Q.   I'm going to place before you what's been
2  marked as Exhibit 5 to Mr. Vigil's deposition, and I
3  direct your attention to, if we -- it's easier to go up
4  from the bottom, one, two, three, third paragraph from
5  the bottom.
6         I'm sorry, second paragraph from the bottom,
7  beginning with, I contacted the officers involved and
8  had them give me their side of the story.  See report by
9  Jeremy Apodaca for details.
10         And he says, "officer," and I quote, "Officer
11  Robert Vigil stated that a weapon was believed to be
12  somewhere on the premises of the vehicle.  So they could
13  not allow anyone out of their sight."
14         Do you have any reason to believe that the
15  chief did not record what Robert Vigil told him
16  accurately in his supplemental report?
17    A.   I believe that's accurate.
18    Q.   Okay.
19         MR. BASHAM:  You know, since your expert is
20  taking a break, maybe we can take a five-minute break.
21  We have been going for almost two hours.
22         MR. THOMPKINS:  Sure.  Let's take a -- how
23  much time do you need?
24         MR. BASHAM:  Five.
25         MR. THOMPKINS:  Five minutes?

---

# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**ANTONIO GALLEGOS, KRISTIAN PETTINE,**
ANDRE GALLEGOS, and K. L. P.L, a minor child,

       Plaintiffs,

v.                                  Case No. 12-CV-00224 LH/KBM

CITY OF ESPANOLA, a municipal corporation,
JOE MARTINEZ, individually and in his official capacity;
JEREMY APODACA, individually and in his official capacity;
ROBERT VIGIL, individually and in his official capacity;
CITY OF ESPANOLA OFFICERS and SUPERVISORS
JOHN DOES 1 THROUGH 10, individually and in their official
capacities, CAMILLE SCARCELLA, individually and in her
official capacity; and STATE OF NEW MEXICO, CYFD,
EMPLOYEES and SUPERVISORS JOHN DOES 1 through 10,
Individually,

       Defendants

**PLAINTIFF, ANTONIO GALLEGOS' ANSWERS TO
CITY DEFENDANTS' FIRST SET OF INTERROGATORIES**

       **COME NOW** the Plaintiff, Antonio Gallegos by and through his counsel, New Mexico

Firm, LLC, (Nathaniel V. Thompkins) and submits his Answers to Defendants' First Set of

Interrogatories and states as follows:

       **INTERROGATORY NO. 1.** Please state your full name, any other name you have used

during your lifetime, your date and place of birth, and your social security number.

       **ANSWER:**

**Objection.** With regard to Plaintiff's social security number this information is protected by the federal
constitutional right to privacy. Avoiding the disclosure of personal matters is a privacy interest which the
United States Supreme Court recognizes. *Whalen v. Roe*, 429 U.S. 589, 598 (1977). Although it is
unspecified in the federal constitution, the right to privacy is "within the penumbra of specific guarantees
of the Bill of Rights," including the Tenth Amendment to the Constitution of the United States. *Griswold
v. Connecticut*, 381 U.S.479 (1965). In *Hartnett v. Papa John's Pizza, Inc.*, 2012 WL 3860739 (D. N.M.

1

**INTERROGATORY NO. 12.**  Please state the full nature of your relationship and your personal responsibility to K.L.P.L, minor child on July 31, 2010.

**ANSWER:**

**KLPL is my step-daughter, since she is my daughter and I care for her along with her mother Kristian Gallegos, my wife.**

**INTERROGATORY NO. 13.**  Has Plaintiff received medical treatment, counseling or treatment for the trauma and suffering he alleges was caused by the incidents at issue in the Complaint?  If so, please state the name, address and phone number of each such counselor and/or treatment provider and list the dates of such counseling and/or treatment.

**ANSWER: No medical attention was sought or provided.**

14

**INTERROGATORY NO. 14.** Please describe any and all compensatory damages you claim as a result of the incident on July 31, 2010.

**ANSWER:**

- I suffered physical pain and suffering from being Tasered by the defendants. I suffered emotional distress for being arrested without probable cause. I am seeking compensation for the pain and suffering I endured during my arrest. I am seeking damages for my false arrest and detention.  Damages for my embarrassment and humiliation. I am also seeking attorney fees, costs, pre-judgment and post judgment interest.  Finally, I'm seeking damages for violations of my constitutional rights. These damages cannot be itemized except for a designation of the categories. None have been billed or itemized by a hospital, doctors, medicines, medical appliances, or by a loss of earning capacity.

- Robert Cortez went to American Spirit Homes on July 31, 2010, after the police left, and found our property totally abandoned and unsecured. My wife's car had the keys in the ignition, all the windows rolled down, the heater on full blast with the radio turned on full volume. The business office's front door was left open and unlocked. The lobby area was turned over with papers all over the room and my bill fold thrown and left unsecured on the floor.

- Officer Vigil had taken my driver's licenses and kept it on his person for about a week.  I met with the Chief of Police and the City Manager where upon it was returned to me.

15

## <u>VERIFICATION</u>

STATE OF NEW MEXICO       )
                                    )ss.
COUNTY OF SANTA FE        )

     I, Antonio Gallegos, being first duly sworn, upon oath depose and state that I have read

Plaintiff's Answers to First Interrogatories and know the contents thereof, and that the same are true

based upon information and belief, and I believe them to be true.

                                  _____
                                  Antonio Gallegos

     SUBSCRIBED AND SWORN TO before me this 26 day of February 2013, by Antonio

Gallegos.

OFFICIAL SEAL
BINA SHAHANI
Notary Public
State of New Mexico
My Comm. Expires _____

                                  _____
                                  Notary Public

My Commission Expires:

4/15/15