**EXHIBIT 6**

```
                                                              1

 1            IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW MEXICO
 2

 3
     ANTONIO GALLEGOS, KRISTIAN PETTINE,
 4   ANDRE GALLEGOS, and K.L.P.L., a
     minor child,
 5
                    Plaintiffs,
 6
     vs.                              No. 1:12-CV-224-LH/KBM
 7

 8   CITY OF ESPAÑOLA, a municipal corporation,
     JOE MARTINEZ, individually and in his official capacity;
 9   JEREMY APODACA, individually and in his official
     capacity; ROBERT VIGIL, individually and in his official
10   capacity; CITY OF ESPAÑOLA OFFICERS and SUPERVISORS JOHN
     DOES 1 through, individually and in their official
11   capacities,

12
                    Defendants.
13
                  DEPOSITION OF JOE A. MARTINEZ
14                  Wednesday, June 19, 2013
                           9:04 a.m.
15                 Cumbre Court Reporting, Inc.
                      2019 Galisteo Street
16                 Santa Fe, New Mexico 87505

17

18        PURSUANT TO THE NEW MEXICO RULES OF CIVIL
     PROCEDURE, this Deposition was:
19
     TAKEN BY:    NATHANIEL V. THOMPKINS
20                ATTORNEY FOR THE PLAINTIFFS

21
     REPORTED BY:  ALLISON ASH-HOYMAN
22                 NEW MEXICO CCR #18
                   CUMBRE COURT REPORTING, INC.
23                 2019 Galisteo, Suite A-1
                   Santa Fe, New Mexico 87505
24

25
```

Page 74

1  Q. Do you want to take a break?
2  A. Yes.
3     MR. THOMPKINS: We have been going at it.
4     (Break taken.)
5  BY MR. THOMPKINS:
6  Q. We left off talking about reviewing, either
7  daily or on a monthly basis, the data on number of
8  Uniform Incident Reports and areas and stuff like that.
9  And I think your testimony was you didn't have that data
10 available on a daily basis.
11    Did you request that your lieutenant review or
12 get that data and review it on a daily basis?
13 A. No.
14 Q. Okay. Were you aware that there were
15 background checks done on applicants that came to the --
16 that applied to the Española Police Department before
17 they got hired?
18 A. Yes.
19 Q. When you became chief, did you have an
20 occasion to review the officers' files in terms of --
21 the background files?
22 A. Okay. If I may explain.
23    At the time that I was there, because of
24 budget constraints, I was not allowed to hire. Okay?
25 There was no hiring done. So --

Page 75

1  Q. I'm talking about officers that were already
2  employed when you got there.
3  A. Okay. And the question was?
4  Q. Did you review any background files of the
5  officers that were employed, already employed with the
6  Española Police Department --
7  A. No.
8  Q. -- at the time?
9  A. No.
10 Q. Do you know who the officer was that
11 performed, when you were chief, was tasked with the
12 responsibility for performing background checks?
13 A. There was -- Stacy Saiz was one of them, and I
14 believe he was the only one at the time I was there, but
15 I do know that prior to that he had somebody that did it
16 with him, and that was Jeff B. Martinez.
17 Q. When you -- you indicated earlier that you had
18 met with Stacy on training, and this is the same Stacy
19 that --
20 A. Yes.
21 Q. -- is in charge of training?
22    When you met with Stacy, did you meet with him
23 on issues of background checks?
24 A. I don't recall that I did.
25 Q. Did you get any feedback from him on any of

Page 76

1  the officers with respect to their background?
2  A. No.
3  Q. Who was Stacy's supervisor?
4  A. He would fall under the lieutenant.
5  Q. And that being Christian Lopez?
6  A. Christian Lopez, yes.
7  Q. Who had the authority to fire officers if they
8  weren't performing up to --
9  A. It would be the chiefs.
10    If I may go a little further on that, it had
11 to be with the approval of the city manager.
12 Q. You would make a recommendation and the city
13 manager would have to --
14 A. Yes.
15 Q. -- confirm it?
16 A. Yes.
17 Q. Who had the authority to -- when you were
18 chief, to set policy for the department?
19 A. I don't -- I don't recall other than -- I
20 don't recall.
21 Q. Okay. During the period you were chief, did
22 you ever set any policy for the department?
23 A. No.
24    MR. THOMPKINS: Can I see the exhibits that we
25 had Monday?

Page 77

1     THE REPORTER: (Handing documents to counsel.)
2     MR. THOMPKINS: Do you still have your --
3     MR. BASHAM: Yes, I do.
4     MR. THOMPKINS: Okay.
5  Q. Let me ask you, in this case we have two
6  officers, Officer Jeremy Apodaca and Officer Robert
7  Vigil. Did you, while you were chief, have occasion to
8  review any of their employment files?
9  A. No.
10 Q. How about their background files?
11 A. No.
12 Q. I'm going to place before you what's been
13 marked as Exhibit 5 to Robert Vigil's deposition and ask
14 you if you can take a look at that and tell me -- and
15 identify what it is.
16 A. It's a supplemental report by me.
17 Q. Okay. And it's in reference to this incident?
18 A. Yes.
19 Q. Okay. And it doesn't say on there, but what
20 report are you supplementing?
21 A. The report of battery on a police officer,
22 resisting, evading or obstructing an officer and --
23 Q. Do you know what report that is?
24 A. It refers to one Antonio Gallegos and Kristian
25 Pettine.

Page 78

1  Q. Do you know who made that report?
2  A. This one?
3  Q. No, no. The one that you are supplementing.
4  A. No, it was -- I believe Jeremy Apodaca was the
5  initial officer.
6  Q. What is the date of your report?
7  A. I don't believe I have a date on here. I
8  don't know.
9  Q. Did you sign the report?
10 A. It doesn't look like I did. I don't see a
11 signature.
12 Q. Does that look like it's the complete
13 supplement that you created besides the photographs that
14 you said are attached?
15 A. Yes.
16 Q. Did you -- in creating this supplementary
17 report, did you read the initial report?
18 A. Yes.
19    If I may retract. I don't remember if at the
20 time I had read the initial report. I remember meeting
21 with the officers and their immediate supervisor on it.
22 I don't know if they had already completed their report
23 or not.
24 Q. Okay. So you don't know if the report was
25 available for you to review?

Page 79

1  A. Yes, I don't know. I don't remember.
2  Q. Okay. And in this supplemental report do you
3  reference that report in any way or --
4  A. Yes, I did. I said to refer to the report for
5  details, I believe.
6  Q. Can you walk me through and show me where you
7  are referring to that report?
8  A. Okay. "I contacted the officers involved and
9  had them give me their side of the story. (See report
10 by Jeremy Apodaca for details.)"
11 Q. Okay.
12    MR. BASHAM: Where are you?
13    MR. THOMPKINS: Second paragraph on the bottom
14 on the first page.
15    MR. BASHAM: Okay, thank you.
16 BY MR. THOMPKINS:
17 Q. So does that indicate to you, or refresh your
18 recollection of whether or not you reviewed that report
19 prior to --
20 A. No, it doesn't.
21 Q. Okay. And the paragraph that you just read,
22 do you see where it says "Officer Robert Vigil stated
23 that a weapon was believed to be somewhere on the
24 premises of the vehicle, so they could not allow anyone
25 out of their sight"?

Page 80

1  A. Yes.
2  Q. And where did you get that information?
3  A. It had to have been from Robert Vigil himself.
4  Q. So he would have told you that --
5  A. Yes.
6  Q. -- there was a suspected weapon in a vehicle
7  and that they were concerned and didn't want anybody to
8  leave their presence?
9  A. Yes, it had to have come from him.
10 Q. Okay. Did you listen to the -- third
11 paragraph from the top, you said 911 tapes, did you
12 listen to the 911 tapes before you wrote this report?
13 A. I don't think so.
14 Q. Okay. One of the questions I had asked you
15 about internal affairs investigations and you indicated
16 that it would go up the chain of command in terms of
17 starting it, an internal affairs investigation, the
18 supervisor would start it, and then if it needed to go
19 further it would go further? Do you recall that?
20 A. Yes.
21 Q. Can you tell me why or how you -- well, who is
22 Officer Apodaca's supervisor at the time of this
23 incident?
24 A. The immediate supervisor was Jeff Martinez, he
25 was on duty that day. Jeff R. Martinez. There are two

Page 81

1  Jeff Martinezes.
2  Q. There are two Jeff Martinezes, but one was a
3  sergeant?
4  A. Yes.
5  Q. And the sergeant was the supervisor?
6  A. Yes.
7  Q. And who was Officer Vigil's supervisor?
8  A. It would have been Jeff.
9  Q. Same supervisor?
10 A. Yes.
11 Q. Okay. Why isn't Jeff Martinez the one that
12 initially got the request to look into the complaint of
13 misconduct?
14 A. Why didn't he? I'm sorry. Repeat the
15 question, please.
16 Q. Yes. You are the chief, and you said that if
17 there was a complaint of misconduct that they would do
18 an IA, it would go up the chain of command.
19 A. Yes.
20 Q. Okay. How did this go over to Jeff Martinez
21 and get to you?
22 A. Okay. Want me to explain?
23    I was called in by the city manager. Okay?
24 And he asked me to meet with the Gallegos family.
25 That's why even this supplemental was done, or even why

**Page 82**

1  I looked into it.
2    Q.  Okay.
3    A.  He asked me to meet with the Gallegos family.
4  I met with Antonio and Ms. Pettine. And the father was
5  there, and another gentleman, I don't remember the name.
6    Q.  So was that because the city manager asked you
7  and you met with them would prevent you from assigning
8  it to the supervisor to do an investigation?
9    A.  It wouldn't prevent me from assigning anybody
10 to do an investigation, no.
11   Q.  Okay. Why didn't you give it to Jeff Martinez
12 and say look into this and tell me what you find?
13   A.  I met with Jeff Martinez, and he told me that
14 he was -- he believed that the arrest was justified. At
15 the time I didn't see any need for any further
16 investigation.
17   Q.  Okay. Did you determine if Jeff Martinez,
18 when he says he determined that the arrest was
19 justified, was he talking from his personal observation
20 of the arrest?
21   A.  No. He was talking from what the officers
22 explained to him.
23   Q.  Okay. Did Jeff Martinez review the incident
24 report that was created as a result of this incident?
25   A.  I don't know which of the sergeants would have

**Page 83**

1  read the report and approved it.
2    Q.  Okay. What was Sergeant Martinez's duty that
3  day? What shift did he work, do you recall?
4    A.  No, I don't.
5    Q.  Was he avail- -- he was their supervisor,
6  would he be -- would he be working the same shift as
7  them?
8    A.  Yes, he would.
9    Q.  Okay. And if he were their supervisor and
10 they made a call for a supervisor, he would have been
11 available -- well, back up.
12       Do you know if he was working that day?
13   A.  Yes.
14   Q.  He was working that day.
15   A.  Yes.
16   Q.  And if they made a call for a supervisor, he
17 would have been the supervisor that would have received
18 the call or received the response and had gone to the
19 scene.
20   A.  Yes.
21   Q.  Okay. So Officer Vigil testified that
22 Sergeant Martinez was on the graveyard shift that day.
23 That would be inconsistent with your understanding?
24   A.  Not necessarily. I don't know actually what
25 shift he was working. But I know that he responded to

**Page 84**

1  the scene.
2    Q.  Okay. And so if the incident report takes
3  place at between 12:46 and 1:45 --
4    A.  It would have been swing shift.
5    Q.  Swing shift?
6    A.  If he was working, yes.
7    Q.  How many shifts did they -- does the -- did
8  the Española Police Department have on July 31st of
9  2010? Do you know?
10   A.  I don't recall. I'm thinking there was
11 coverage all 24 hours, so I'm thinking three shifts, but
12 I'm not sure.
13   Q.  If Officer Vigil said that there were two
14 12-hour shifts, and there was day shift A and day shift
15 B, would that help refresh your recollection?
16   A.  Yes. Yes, I do believe that there was a
17 period where the officers were working 12-hour shifts.
18   Q.  Okay. So if Sergeant Martinez were called to
19 the scene on July 31st at -- between 12:46 and 1:45,
20 would he be on the day shift, the first six-hour shift,
21 as opposed to the evening shift from 6:00 to -- 6:00
22 p.m. to 6:00 in the morning?
23   A.  I don't remember how they were arranged, the
24 12-hour shifts, when they started, when they finished.
25   Q.  You don't recall the time frame that the

**Page 85**

1  shifts --
2    A.  No, I don't recall time frame.
3    Q.  Okay. But whatever shift the officers were
4  working, Sergeant Martinez, as their supervisor, should
5  have been working that shift?
6    A.  All I can tell you is that he responded to the
7  scene, so he must have been working. I don't know that
8  there was another sergeant on duty.
9    Q.  Okay. So whatever shift that was between 1:46
10 [sic] and 1:45, Sergeant Martinez would have been, as
11 you understand it, assigned to that shift?
12   A.  Yes.
13   Q.  What was the -- what was the purpose of this
14 report, your supplemental report?
15   A.  What was the purpose?
16   Q.  Yes.
17   A.  To document what I had learned.
18   Q.  What you had done?
19       MR. BASHAM: What he had learned.
20   A.  What I had learned.
21 BY MR. THOMPKINS:
22   Q.  I'm sorry, what you had heard?
23       MR. BASHAM: Learned.
24 BY MR. THOMPKINS:
25   Q.  I'm sorry. What you had learned?

Page 86

1    A. Yes.
2    Q. Where does this report go in terms of the
3  department?
4    A. It goes on record. It's attached to the
5  original report.
6    Q. It becomes a part of the original report?
7    A. It becomes a part of the original report, yes.
8    Q. Okay. I'm going to place before you what's
9  been marked as Exhibit 1 to Mr. Vigil's deposition.
10       And can you take a look at that and tell me if
11  you recognize what that is.
12    A. Yes. This is the original report. It's by
13  Jeremy Apodaca.
14    Q. When did you first see that report?
15    A. I don't remember when I saw it. I do remember
16  seeing it.
17    Q. Was it before you wrote your supplemental?
18       MR. BASHAM: Objection, asked and answered.
19    A. I don't know.
20  BY MR. THOMPKINS:
21    Q. Does that look like it's a complete report?
22    A. I believe so.
23    Q. Can you -- do you see your supplemental
24  attached to that report?
25    A. (Indicating.)

Page 87

1    Q. Okay.
2    A. Yes, I do.
3    Q. Okay. And let me ask you this: From the
4  first page of the Uniform Incident Report it says -- how
5  many pages are there noted as being a part of that
6  report?
7    A. Three.
8    Q. Okay. And just leafing through that, there is
9  more than three pages to that report, isn't there?
10    A. Yes.
11    Q. And so this is incorrect in terms of saying
12  that this Uniform Incident Report has three pages; is
13  that correct?
14    A. Yes.
15    Q. When an officer makes a Uniform Incident
16  Report, and if he has got all these pages, should he
17  document that all these pages are part of his report?
18    A. Yes.
19    Q. So would it be your understanding that when
20  this report was originally made that he had only had
21  three pages to the report?
22    A. That's what he indicates, but it should have
23  been more.
24    Q. Okay. And is -- part of the standard
25  operating procedures would be to reference the number of

Page 88

1  pages that are part of an incident report in this
2  fashion?
3    A. Yes.
4    Q. And when we go to the incident narrative,
5  would it be proper to start the incident narrative as a
6  separate page rather than adding it as a numbered page
7  to the original incident report?
8    A. I don't believe so.
9    Q. You don't believe so?
10    A. I don't think it's -- I think he should have.
11    Q. He should have kept the numbering?
12    A. The numbering, yes.
13    Q. Okay. Would it indicate to you that maybe he
14  created this separate and then numbered the pages
15  separately as a separate document?
16    A. I don't know what he did.
17    Q. Okay. You said you don't know the specific
18  time when you first saw it, but was it this incident
19  report, in relation to the time that you did the
20  supplemental report, was it close to the time of the
21  supplemental report or is there no connection to it?
22    A. I don't recall.
23    Q. Does your supplemental report, other than
24  being attached to this, does it go into the personnel
25  files of the officers?

Page 89

1    A. I don't know.
2    Q. You don't -- what was the procedure at the
3  time that you were chief if a report -- if an
4  investigation such as the one that you have done was
5  conducted?
6    A. When this report goes to the secretary, after
7  it's been approved it goes into a file. This report
8  would have been put in the same file.
9    Q. But your incident report is not -- your
10  supplement report is not connected with the
11  investigation of the original incident, it's in response
12  to a citizen complaint?
13    A. Yes.
14    Q. And investigations of citizen complaints, do
15  they go into an officer's personnel file, whatever
16  officer is being complained about?
17    A. In this case, no. It would be a supplemental
18  to the original report.
19    Q. How about, what's the procedure that you
20  understood at the time that you were chief, that would
21  happen to citizen complaints of officers?
22    A. I don't recall.
23    Q. Do you know if your sergeants or -- you had
24  three at the time in your command, monitored the police
25  radio for activity while they were on shift?

Page 114

1  Q. And did you not look at the investigation to
2  determine whether or not the officers had all the
3  elements necessary to arrest them for the crimes that
4  they allegedly committed?
5  A. I believe the elements were there for
6  resisting arrest. I believe another charge could have
7  been added, failure to obey an officer. But he was
8  given the command not to go, he insisted on going,
9  that's failure to obey an officer.
10      And from there it escalated.
11  Q. And in order for you to look at this and
12  determine what the elements of those crimes were, you
13  would have to know what the law is for those crimes;
14  isn't that correct?
15  A. Yes.
16  Q. So you would have to know what the law is as a
17  police officer of when an individual is arrested?
18  A. Yes.
19  Q. And that would be a part of your analysis of
20  whether or not these individuals were unjustly arrested,
21  is your knowledge of the law and applying that to the
22  facts in the incident report.
23  A. Yes.
24  Q. Okay. And it also would be your determination
25  in looking at this incident report of whether the other

Page 115

1  individuals that were arrested for detox, of what the
2  elements for detox were before they got arrested?
3      MR. BASHAM: Objection, relevance.
4  BY MR. THOMPKINS:
5  Q. Is that correct?
6  A. I don't know.
7  Q. Okay. You don't know if you would need the --
8  to know and understand what the elements for the
9  six-hour detox hold is before an individual can be
10  arrested under that law?
11      MR. BASHAM: Objection, relevance.
12      They didn't complain.
13      MR. THOMPKINS: Mark, that's leading. So if
14  you are going to sit there and try to lead the witness,
15  then I'm going to call the judge and tell him that you
16  are not objecting, you actually didn't even object, you
17  are leading the witness.
18      MR. BASHAM: I did object. I said relevance.
19      THE WITNESS: Would you ask it again, please?
20  BY MR. THOMPKINS:
21  Q. When the individuals -- when you are doing
22  your investigation of the complaint of being unjustly
23  arrested, is it not your responsibility to know the law
24  and the elements of the law under a six-hour detox hold,
25  in order for you to determine whether they were arrested

Page 116

1  properly or not?
2      MR. BASHAM: Objection, relevance.
3      Answer.
4  A. I didn't look into any of the facts of the
5  other individuals. Antonio Gallegos and Ms. Pettine
6  were the ones that complained to me, and as I said
7  before, the biggest complaint was that they weren't
8  intoxicated.
9  BY MR. THOMPKINS:
10  Q. If you were in doubt during the course of your
11  investigation with respect to what you did in the
12  supplementary report, didn't you have the availability
13  to discuss the law with counsel for the City of
14  Española?
15  A. Did I have the availability?
16  Q. (Nodding head.)
17  A. The counsel for the City of Española was in
18  Albuquerque. I mean, he wasn't available to us on a
19  daily basis.
20  Q. You couldn't call him?
21  A. Could have called him, yes.
22  Q. Did you call him?
23  A. No.
24  Q. He was available by phone if you --
25  A. Yes.

Page 117

1  Q. -- so chose?
2      MR. BASHAM: Objection, argumentative.
3      MR. THOMPKINS: Let's take a break and give me
4  a moment. I may not have any other questions for you
5  but I want to check my notes just to make sure.
6      (Break taken.)
7  BY MR. THOMPKINS:
8  Q. I just have a couple of more questions.
9      As the chief you are ultimately responsible
10  for the training of the police officers that work under
11  you?
12  A. Ultimately, yes.
13  Q. We took Officer Vigil's deposition on Monday,
14  and I asked him some questions about the taser
15  directives and policies.
16      And are you familiar with those directives and
17  policies?
18  A. No.
19  Q. First let me -- let me place before you what's
20  been marked as Exhibit 3 to Mr. Vigil's deposition, and
21  I ask you to turn your attention to -- let me get there
22  first.
23      Page -- it's No. 2 at the bottom of the page.
24  A. What page is that? I'm sorry.
25  Q. It has a No. 2 at the bottom of the page.

# EXHIBIT 7

ESPANOLA POLICE DEPARTMENT

SUPPLEMENTAL REPORT

BY CHIEF JOE A. MARTINEZ

Case: Battery on a Police Officer
      Resisting, Evading or Obstructing an Officer

Date of Occurrence: July 31, 2010

On August 5, 2010 I was informed by City Manager James V. Lujan to meet with him and the Gallegos family on August 6, 2010.

Antonio Gallegos and Kristian Pettine felt that they were unjustly arrested on July 31, 2010 when Espanola Police Department Officers were called to their residence/place of business for reportedly someone pulling a gun on someone.

According to 911 tapes (call available on disc) the reporting party Alfonzo Gurule was at the Chevron Gas Station across the street wanting the Police because an individual at the Trailer Sales Place had pulled a gun on him.

Antonio Gallegos and Kristian Pettine said that they were not drunk at the time. The officers were told that the individual they were looking for was not there but they insisted on looking and that Antonio told him that he was going inside. They told him to stay outside but he started walking in the house feeling that he shouldn't have to. At that time he was going in Officer Robert Vigil went after him and physically detained him and then took him down to the ground and that Officer Apodaca used his taser on him once when he was struggling with Officer Vigil and then again when he was down on the ground. CYFD was called for and her daughter was taken into custody and then given to the father. They do not believe that a reason for this existed. Antonio Gallegos's father was also present as were another friend and Antonio's seventeen year old son. Antonio's father did say he had already talked to Magistrate Alex Naranjo who is a friend of his.

I contacted the Officers involved and had them give me their side of the story. (See report by Jeremy Apodaca for details.) Officer Robert Vigil stated that a weapon was believed to be somewhere on the premises of the vehicle so they could not allow anyone out of their sight. Antonio Gallegos refused to obey their orders to remain outside while the investigation was going on.

I contacted Public Service Officer Brian Martinez who had also responded to the scene with Officer Jeremy Apodaca and Officer Robert Vigil; PSA Officer Brian Martinez had taken pictures of the broken bottle in front of the house. liquor bottle in the vehicle as well as some empties. He also had pictures of what looked to be old injuries on the baby's hands. PSA Brian Martinez has also took photos of the baby seat in the vehicle,

when asked why he said that the seat was loose and not secured in a safe manner or the way it was intended to be.(see photos attached)

Sergeant Jeff Martinez also responded to the scene. He got there after everyone was in custody. He spoke to the Officers and agreed with their decision based on what the Officers told him. Everyone at the scene was intoxicated and the child being taken by CYFD was in the best interest of the child.
Sergeant Jeff Martinez transported Ms. Pettine to the detention center and said that she was definitely intoxicated. Her vehicle had been searched with her consent, it was littered with empty beer cans as well as a liquor bottle on the seat. Sergeant Martinez said that Antonio Gallegos at the detention center was demanding and belligerent towards Officers.

On this same date I went to the detention center and spoke with some of the Detention Officers that were on duty at the time of incarceration.

Detention Officer David Oveado said that Antonio Gallegos and the Girl (Pettine) were both intoxicated, as well as the other individuals brought in for detoxification.

Detention Officer Shawn Madrid said that he also saw the individuals arrested on that day. He spoke to the female because she was yelling from her cell to the other cells. She was intoxicated.

I also obtained booking photos for the two individuals. (see attached)

**EXHIBIT 8**



# JEWELL & THOMPKINS, P.C.

November 8, 2010

*Certified Mail Return Receipt Requested:*
Mayor of Espanola, Alice Lucero
405 Paseo de Oñate,
Española, NM 87532

RE: Tort Claim Notice pursuant to NMSA 1978, §41-4-16 et seq.

Dear Mayor Lucero:

This letter is a follow-up my clients' contacting Chief of Police, Joe Martinez, and placing him on Notice their claims. In the first week of August 2010 my clients went to Chief Martinez and filed a complaint against Officers Jeremy Apodaca and Robert Vigil in connection with their arrests. Chief Martinez apologized to my clients (Antonio & Kristine) then went to CYFD to see if he could get Kristine's two year old daughter (Kolby) returned. Chief Martinez further promised he would investigate the incident and get back to them. To date, Chief Martinez has done nothing.

Please be advised that our clients Antonio Gallegos, Kristine Pettine, Andre Gallegos and Kolby L. Pettine are contemplating legal action against the City of Espanola and including by not limited to: Espanola Police Officers - Jeremy Apodaca, Robert Vigil, and Chief Joe Martinez.

On July 31, 2010, Officer Robert Vigil and Officer Jeremy Apodaca without just cause or reason, arrested my clients Antonio Gallegos and Kristine Pettine. In addition the officers arrested and hand-cuffed the minor child, Andre Gallegos. Finally, the officers took custody of the minor daughter, Kolby L. Pettine and placed her with CYFD.

Upon reviewing the police incident report and having defended my clients on various criminal charges stemming from this event, it is clear that each of their constitutional rights have been violated.

Santa Fe
460 St. Michael's Drive, Suite 402
Santa Fe, NM 87505
Phone : 505-670-7876   Fax : 866-657-8780

Albuquerque
P.O. Box 9262 • 2021 Girard SE, Bldg. 2, Suite 201
Albuquerque, New Mexico 87199-9262
Office : 505-247-7426   Fax : 505-243-6472

Tommy Jewell Email : TJewell20@aol.com;   Nate Thompkins Email : nvt@thompkinsfirm.com   Legal Assistant Email : janis.jewell@gmail.com

Kindly direct your questions and/or correspondence to my attention.

Very truly yours,

*[signature]*

Nathaniel V. Thompkins

cc: clients